## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE CITY OF CHICAGO,**<br><br>*Plaintiff,*<br><br>*v.*<br><br>**JEFFERSON BEAUREGARD SESSIONS III,**<br>**Attorney General of the United States**<br><br>*Defendant.* | **Civil Action No. 1:18-cv-6859** |

### COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff the City of Chicago hereby alleges as follows:

### INTRODUCTION

1.      Chicago brings this action to enjoin the Attorney General of the United States from yet again imposing sweeping immigration policy conditions on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, a formula grant that has for years provided crucial support for law enforcement in Chicago and other cities.  The challenged conditions are unauthorized by Congress and *ultra vires*, and violate federalism principles.  They are an unlawful attempt to punish Chicago for prioritizing public safety for all Chicagoans instead of yielding to federal dictates.  In fact, this Court struck down many of the conditions already, issuing a permanent injunction just months ago preventing the conditions from being applied to last year's Byrne JAG grants.  But now, despite the Court's clear ruling that the conditions are unlawful, and its clear warning that re-issuing them could result in an award of attorney's fees against the federal government, the Attorney General has imposed them again on

the coming year's grants.  His renewed attempt to conscript Chicago's police to serve federal policy rather than City policy contravenes the Constitution and federal statutes alike.

2.      Since the 1980s, Chicago has adhered to a "Welcoming City" policy that prioritizes local crimefighting and community engagement, rather than federal civil immigration enforcement.  That policy promotes cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Chicago.  For many years, Chicago's Welcoming City policy has been no obstacle to its receipt of law enforcement funds under the Byrne JAG formula grant program.

3.      Despite that long history, last year, the Attorney General tried to use the Byrne JAG program to gut Chicago's Welcoming City policy and others like it.  In July 2017, the Department of Justice released the FY2017 solicitation for Byrne JAG funding.  The solicitation informed grant applicants that they would be expected to comply with three immigration-related grant conditions.  Those conditions would have required Chicago (1) to detain its own residents and others at federal immigration officials' request, in order to give the federal government a 48-hour notice window prior to an arrestee's release (the "notice condition"); (2) to give federal immigration officials unlimited access to local police stations and law enforcement facilities in order to interrogate any suspected non-citizen held there, effectively federalizing all of the City's detention facilities (the "access condition"); and (3) to certify compliance with 8 U.S.C. § 1373, a federal statute that bars local governments from restricting their employees from sharing citizenship and immigration status information with federal immigration authorities (the "Section 1373 compliance condition").

4.      Chicago sued, and this Court (Leinenweber, J.) held the three conditions unconstitutional and *ultra vires* and set them aside.  The Court first issued a preliminary

injunction against the notice and access conditions that was affirmed by the Seventh Circuit. Then, in July 2018, the Court permanently enjoined all three conditions for FY2017. In its decision on the permanent injunction, the Court held that the notice and access conditions were unlawful because, consistent with the Seventh Circuit's ruling, no statute authorized the Attorney General to impose discretionary policy conditions on the Byrne JAG formula grant program, and thus his attempt to do so anyway—to usurp Congress's legislative authority by rewriting basic aspects the Byrne JAG program—violated the constitutional Separation of Powers. The Court also held that the Section 1373 compliance condition was unlawful because Section 1373 itself is facially unconstitutional under the Tenth Amendment anti-commandeering doctrine. The Court also made clear that it would not tolerate any attempt by the Attorney General to circumvent its ruling by re-imposing the conditions in FY2018. If the Attorney General re-imposed the conditions, the Court noted, Chicago's "lawyers would get paid."

5. In the face of those rulings, the Attorney General has once again attempted to press Chicago's law enforcement officers into the service of the federal immigration authorities by imposing sweeping policy conditions on Byrne JAG formula grant funds—this time, as a condition on FY2018 funds. Those conditions are unlawful both facially and as applied to Chicago.

6. In the FY2018 Byrne JAG solicitation, the Department of Justice specifically noted that it would issue awards by September 30, 2018. In early October 2018, the Department began releasing FY2018 Byrne JAG award letters. To date, the Department has issued 752 FY2018 local awards, totaling almost $59 million; by contrast, the Department has issued 806 local awards, worth almost $71 million, for FY2017. Despite the release of a substantial portion of FY2018 funding, the Department has not yet issued Chicago's award.

7.     Four of the conditions imposed on the FY2018 Byrne JAG grant are *materially identical* to the FY2017 Byrne JAG conditions this Court has already set aside as unlawful. Specifically, the Department has again required Byrne JAG recipients and their subgrantees to: (1) comply with 8 U.S.C. § 1373, which this Court already held facially unconstitutional; (2) comply with 8 U.S.C. § 1644, which prohibits the same conduct as Section 1373 and is thus unconstitutional under the same reasoning; (3) provide 48 hours' advance notice to federal immigration authorities, "where feasible" and when requested, before releasing an alien from custody, just like the notice condition that was already set aside as unlawful by this Court; and (4) provide federal authorities with "access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States," just like the access condition already set aside by this Court.  Beyond attempting to resuscitate the conditions that this Court already held unlawful, the Attorney General has also added a new unlawful condition requiring Chicago and other cities to certify that they will not publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield from detection fugitives from justice or undocumented immigrants, even where such disclosure would not violate the law.

8.     Neither the Byrne JAG statute nor any other statute empowers the Attorney General to condition formula grant funds in this manner.  Indeed, most of the conditions the Attorney General seeks to impose were already held unlawful by this Court, and Chicago is entitled to attorney's fees and costs because the Attorney General's unreasonable decision to impose unlawful conditions has forced Chicago to prosecute this action to once again obtain an injunction against them.

9. The law has not changed since this Court ruled: The Federal Executive may not arrogate power that the Constitution reserves to Congress on the one hand, or to state and local governments on the other. Yet the Attorney General does just that by again imposing on the Byrne JAG formula grant program policy conditions that were never approved by Congress and that would federalize local jails, mandate warrantless detentions for civil infractions, sow fear in local immigrant communities, undermine local law, and make the people of Chicago less safe.

10. The Attorney General's new conditions are just as harmful as those struck down by this Court, and in precisely the same ways. The Attorney General once again seeks to countermand local policies that foster crucial trust between police and immigrant communities, on pain of denying Chicago crucial funds that provide lifesaving equipment to Chicago police officers and critical services to Chicago residents. Once again, his sole justification is his disagreement with Chicago's policy choices. He does so in the face of this Court's explicit ruling last year that his conditions are unlawful and that the harms to Chicago are irreparable and cannot be remedied by later payment of the funds at issue.

11. This Court should order injunctive and corresponding declaratory relief and should order the Attorney General to pay fees and costs to Chicago as well. In order to prevent an endless cycle of litigation, in which the Attorney General unlawfully withholds Chicago's grant funds each year until Chicago sues and the Court intervenes, that relief should cover FY2018 and all future grant years.

## PARTIES

12.     Plaintiff Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.  Chicago is the third largest city in the Nation, and is home to almost 3 million residents, including numerous immigrants.

13.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States.  He is sued in his official capacity.  He is the federal official in charge of the Department of Justice, which took and threatens to take the actions at issue in this lawsuit.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.  The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706, the All Writs Act, 28 U.S.C. § 1651, the mandamus statute, 28 U.S.C. § 1361, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the United States Constitution.

15.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1) because substantial events giving rise to this action occurred therein and because Chicago resides therein and no real property is involved in this action.

## FACTUAL ALLEGATIONS

## I.     CHICAGO PRIORITIZES LOCAL CRIMEFIGHTING UNDER ITS WELCOMING CITY POLICY

16.     Chicago is a metropolis of almost 3 million that has attracted migrants and immigrants of every race, nationality, and creed for nearly two centuries.  Chicago's diverse population requires a public safety strategy that respects all the City's residents.  One aspect of that strategy—the Welcoming City Ordinance—has developed over the past few decades.

17.     The first formal iteration of the policy was announced by then-Mayor Harold Washington in a 1985 Executive Order that provided that City officials would not "request information about or otherwise investigate or assist in the investigation of the citizenship or residency status of any person" unless required by other law to do so.  Mayor Richard M. Daley reiterated this policy upon taking office in April 1989.

18.     In 2006, the Chicago City Council unanimously incorporated the policy into the City's Municipal Code by enacting the Welcoming City Ordinance.  Among other things, the Council cited its concern that local enforcement of federal immigration infractions would "cause a chilling effect on crime prevention and solving if both witnesses and victims are called upon to weigh a need to cooperate with local authorities against a fear of deportation, thereby undermining long-standing efforts to engender trust and cooperation between law enforcement officials and immigrant communities."  Like the executive orders that preceded it, the 2006 Ordinance prohibited City "agent[s]" and "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."  It also barred disclosure of "information regarding the citizenship or residency status of any person unless required to do so by legal process . . . ."

19.     In 2012, Mayor Rahm Emmanuel and the Chicago City Council expanded the Welcoming City Ordinance to address increasing federal requests to detain individuals suspected of immigration-related offenses (also known as "immigration holds") issued by U.S. Immigration and Customs Enforcement ("ICE").  The expanded Welcoming City Ordinance provides that Chicago will comply with an immigration hold only when it has an independent

reason to believe that the subject poses a threat to public safety, such as if they have an outstanding criminal warrant, or have been identified as a gang member.

20.     The 2012 Welcoming City Ordinance reflects the City Council's findings that (1) "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems," (2) "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all [of the City's] residents," and (3) "[t]he cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City."  Chicago Municipal Code § 2-173-005.

21.     The current Welcoming City Ordinance, codified as Chapter 2-173 of the Chicago Municipal Code, and the Chicago Police Department's implementing policy, Special Order S06-14-03, contain several key prohibitions relevant to this lawsuit.

   a.     Subject to certain exceptions for certain criminal suspects and gang members,[1] Section 2-173-042 prohibits City "agent[s]" or "agenc[ies]" from "arrest[ing], detain[ing] or continu[ing] to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation," or doing so "based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law."

---

[1]     Specifically, and as noted above, the Section 2-173-042 restrictions do not apply if the subject of the ICE investigation "(1) has an outstanding criminal warrant; (2) has been convicted of a felony in any court of competent jurisdiction; (3) is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony charge is pending; or (4) has been identified as a known gang member."

b.    Subject to the same exceptions, as well as an exception for "legitimate law enforcement purpose[s] . . . unrelated to the enforcement of a civil immigration law," Section 2-173-042 also prohibits City "agent[s]" or "agenc[ies]" from, "while on duty, expend[ing] their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," or from "permit[ting] ICE agents access to a person being detained by, or in the custody of, the agency or agent" or "permit[ting] ICE agents use of agency facilities for investigative interviews or other investigative purpose."

c.    The prohibitions of Section 2-173-042 are implemented by Chicago Police Department ("CPD") Special Order S06-14-03, which contains the same prohibitions, subject to the same exceptions, as Section 2-173-042.

d.    Section 2-173-020 prohibits City "agent[s]" or "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."

e.    Section 2-173-030 prohibits City "agent[s]" or "agenc[ies]" from "disclos[ing] information regarding the citizenship or immigration status of any person" unless "otherwise provided under applicable federal law," the City is "required to do so by legal process," or "such disclosure has been authorized in writing by the individual to whom such information pertains."

22.    Chicago's official interpretation of the Welcoming City Ordinance—which was expressly communicated to all City Departments in October 2017—is that the Welcoming City

Ordinance is not intended to prohibit or restrict any Chicago entity or official from sending to or receiving from federal immigration authorities information concerning an individual's immigration status. Nor is it intended to enable the City to harbor undocumented individuals. It is instead intended to prevent Chicago and its police officers from themselves enforcing federal immigration law.

23. Chicago's Welcoming City policy plays a vital role in strengthening the relationship between Chicago's government, its police force, and its immigrant communities. This relationship is built city block by city block, and it is essential that Chicago's police officers have the flexibility they need to engage the immigrant communities in their crime-fighting initiatives without projecting a constant threat of deportation. Social science research has consistently shown that policies like the City's Welcoming City policy are sound means of building trust with immigrant communities and reducing crime. One recent review of relevant literature concluded that "existing evidence supports the expansion of limited cooperation policies" like Chicago's Welcoming City Ordinance.[2] Another recent study found that "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."[3] That conclusion is consistent with the lived experience of untold police officers; as a broad coalition of police chiefs explained, "build[ing] trusting and supportive relations with immigrant communities . . . is essential to reducing crime and helping victims."[4] By contrast, the idea that policies like Chicago's encourage crime is a

---

[2] Daniel E. Martinez, et al., *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, Sociology Compass (Oct. 7, 2017), https://tinyurl.com/ybt2fyzv.

[3] *E.g.*, Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), http://tinyurl.com/y75lsykd (emphasis added).

[4] Press Release, Major Cities Chiefs Ass'n, U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order (Jan. 25, 2017), http://tinyurl.com/y8zqhypw.

"[m]yth": "[S]tudies have found no support for the idea that immigrants are responsible for more crime" or that "sanctuary policies lead to increased crime."[5]

24.     Meanwhile, the perception that Chicago's policies provide amnesty or "sanctuary" to violent criminals is also false.  As the Seventh Circuit recognized, Chicago's policy is designed to avoid local participation in federal immigration enforcement but "does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government.  The federal government can and does freely operate in 'sanctuary' localities." *City of Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018).  Moreover, Chicago makes exceptions to this general non-participation policy for individuals most likely to present a threat to the community, such as those with an outstanding criminal warrant and those who are known gang members. MCC § 2-173-042 (enumerating exceptions); CPD Special Order S06-014-03 (same).

## II.     THE BYRNE JAG PROGRAM, A NON-DISCRETIONARY FORMULA GRANT PROGRAM, PROVIDES LAW ENFORCEMENT FUNDING FOR CHICAGO

25.     Congress created the current Byrne JAG program in 2005 by merging two funding programs for state and local criminal justice initiatives.  H.R. Rep. No. 109-233, at 88-89 (2005).  Those predecessor programs afforded state and local governments significant discretion over their use of program funds.  In combining the programs, Congress sought to give grantees even "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing.  *Id.*

26.     The Byrne JAG program's design promotes local discretion by circumscribing the Attorney General's authority to impose federal policy priorities on grantees.  The program requires that the Attorney General "shall allocate" funds, 34 U.S.C. § 10156(d)(2)(A), "in

---

[5]     Benjamin Gonzalez et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 9-10, 18-24, Urb. Aff. Rev. (2017), http://tinyurl.com/y8hb9fnc.

accordance with" a formula based on population and crime statistics, *id.* § 10152(a)(1). *See id.* § 10156(d)(2)(A).

27.     Consistent with the nature of formula grants, the Byrne JAG statute limits the Attorney General's discretion over the program.  He does not decide the amount of each grant. Rather, the Attorney General must follow the statutory formula to determine allotments for each state and local government.  34 U.S.C. § 10156.  As part of this process, the Attorney General is authorized to "reserve not more than 5 percent" of the funds allocated to the program for specific purposes after a finding that such reservation is "necessary" to address "extraordinary increases in crime" or to "mitigate significant programmatic harm" caused by the formula.  *Id.* § 10157(b). The statute authorizes no other deviations from the prescribed formula.

28.     The Attorney General's authority to define or modify the components of the Byrne JAG application is similarly circumscribed.  He may specify the "form" of the application. 34 U.S.C. § 10153(a).  He may specify what "data, records, and information (programmatic and financial)" applicants can be "reasonably" required to provide to ensure programmatic and financial integrity.  *Id.* § 10153(a)(4).  He can "coordinat[e] with the National Institute of Justice" to develop a mandatory "program assessment component" to measure the success of funded programs.  *Id.* § 10152(c).  And he can require applicants to "comply with all provisions of this part and all other applicable Federal laws."  *Id.* § 10153(a)(5)(D).  There is no provision authorizing him to alter the application's components, or to add new policy requirements.

29.     Byrne JAG applications have only one substantive component:  A plan indicating how the applicant will use its funds within one or more of eight broadly defined programmatic areas, 34 U.S.C. § 10153(a)(6), ranging from "[l]aw enforcement" to "[d]rug treatment" to "crime victim" support, *id.* § 10152(a)(1)(A)-(H).  An applicant is entitled to receive its Byrne

JAG allotment so long as it uses funds to advance "any one" of those objectives. *Id.*
§§ 10152(a)(1)-(2), 10153(a)(6)(B).

30.     Indeed, federal law prohibits the Department of Justice from using the Byrne JAG
program to "exercise any direction, supervision, or control over any police force or any other
criminal justice agency of any State or any political subdivision thereof." 28 U.S.C. § 10228.

31.     Chicago has received Byrne JAG funds every fiscal year between 2005, the year
the program began, and 2017. In FY2016, Chicago received $2.33 million through the Byrne
JAG program. Chicago received its FY2017 award letter, awarding it $2.2 million, on August
20, 2018 (but, as explained herein, only after litigating for more than a year to enjoin the
unlawful immigration-related conditions that the Attorney General imposed on the FY2017
funds).

32.     Chicago has used Byrne JAG funds to support projects ranging from critical law
enforcement equipment and overtime to community policing outreach and engagement. Since
FY2005, for instance, Chicago has spent approximately $33 million in Byrne JAG funds to buy
nearly 1,000 police vehicles. Several of those projects have extended across multiple grant
years, including the Force for Good program, which began in 2011 and helps not-for-profit
organizations meet community needs in neighborhoods experiencing high rates of violent crime,
by providing services such as emergency shelter and clothing; youth mentoring and safe,
structured activities; and job training and placement. Most recently, Chicago has used Byrne
JAG funds to pay for ShotSpotter technology, which facilitates rapid police responses to
shooting incidents. Without Byrne JAG funds, Chicago would have to restrict or shut down
some or all of these programs, or else divert funds from other policing objectives to sustain them.

33.     Chicago plans to use its FY2018 Byrne JAG funds to increase its Bureau of Detectives' capacity to clear violent cases and bring shooters to justice.  Those capacity-building efforts include a planned investment in technology that will permit forensic analysis of mobile devices; an initiative to digitize hard-copy records and make them searchable; prioritized case and evidence review of homicides, nonfatal shootings, and cold cases to generate new investigative leads; and advanced interview and investigation training for detectives.  An additional portion of the Byrne JAG funding will support the Force for Good program.

34.     Eleven other local governments, including Cook County, the City of Evanston, and the Village of Skokie, depend on Chicago's Byrne JAG application for the funds they receive through the program each year.  Those subgrantees receive their own Byrne JAG funds through Chicago's application.

## III.    THE TRUMP ADMINISTRATION TARGETS CHICAGO'S BYRNE JAG FUNDING

### A.    The Trump Administration Targets So-Called Sanctuary Cities By Executive Order

35.     Despite the soundness of Chicago's policies—and despite the City's sovereign right to decide its own law enforcement priorities and strategies—the Trump Administration has singled out Chicago and other so-called "sanctuary" jurisdictions.  In his first week in office, President Trump issued Executive Order 13768, which threatened to deny federal grants and take enforcement actions against such jurisdictions.  President Trump ordered DHS to publish weekly lists of any municipalities that refused to comply with immigration hold requests, together with lists of any undocumented immigrants arrested—but not necessarily convicted—for any non-immigration offenses.

-14-

36. This executive order was later enjoined in large part—a ruling later affirmed by the Ninth Circuit—for violating the constitutional Separation of Powers. *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1234-1235 (9th Cir. 2018).

**B. The Trump Administration Targets The Byrne JAG Program**

37. The Trump Administration next began targeting the Byrne JAG program. For the FY2017 Byrne JAG application, the Attorney General imposed three conditions on a grantee's ability to receive their allotted Byrne JAG funds.

a. *The "notice" condition:* The FY2017 awards contained a condition requiring that, "when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request . . . that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . —provide the required notice to DHS."

b. *The "access" condition*: The FY 2017 awards also contained a condition requiring that "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States."

c. *The "Section 1373 compliance" condition*: In addition to the notice and access conditions, the FY2017 awards contained a requirement that the recipient certify its compliance with Section 1373.

38.     In August 2017, Chicago sought a preliminary injunction to prevent the Attorney General from imposing those conditions on FY2017 Byrne JAG funds, on grounds that the conditions were unconstitutional, *ultra vires*, and arbitrary and capricious.

39.     The Attorney General defended the notice and access conditions by arguing that they were authorized by 34 U.S.C. § 10102(a)(6), which endows an Assistant Attorney General with the power to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants." He defended the Section 1373 compliance condition under 34 U.S.C. § 10153(a)(5)(D), which permits the Attorney General to require a "certification" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." He defended all three conditions by suggesting they were meant to ensure that state and local law enforcement would not impair the law-enforcement activities of the federal government, including those federal activities contemplated by 8 U.S.C. §§ 1226(c), 1231(a)(1)(B), and 1231(a)(4).

40.     This Court preliminarily enjoined the notice and access conditions, in large part because the Attorney General "fail[ed] to direct the Court to any textual authority within the Byrne JAG statute itself" to impose the notice and access conditions. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 941 (N.D. Ill. 2017). The Court did not preliminarily enjoin the compliance condition. The Attorney General took an interlocutory appeal from the preliminary injunction order, and the Seventh Circuit affirmed, unanimously holding that the notice and access conditions were *ultra vires* and unlawful and that the Attorney General's reading of Section 10102(a)(6) as authorizing those conditions was "contrary to the plain meaning of the statutory language." *City of Chicago v. Sessions*, 888 F.3d 272, 284 (7th Cir. 2018).

-16-

41.    This Court ultimately granted summary judgment in Chicago's favor on all three conditions, concluding in July 2018 that each of the notice, access, and Section 1373 compliance conditions was *ultra vires* and unconstitutional.  *See* Mem. Op. and Order, *City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), ECF No. 198, at 58 (attached as Ex. A).  On the notice and access conditions, the Court adopted "the same reasons stated in [its] preliminary injunction ruling and the Seventh Circuit's opinion."  *Id.* at 36-37.  On the Section 1373 compliance condition, the Court concluded that, particularly in light of the Supreme Court's intervening decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), Section 1373 violated Tenth Amendment anti-commandeering principles by tying Chicago's hands in managing city personnel and city policy.  *Id.* at 32-34.  Having held Section 1373 unconstitutional, the Court concluded that the Attorney General lacked authority to require compliance with Section 1373 as an "applicable federal law" under the Byrne JAG statute.  *Id.* at 40.

42.    This Court's final judgment declared each of the notice, access, and Section 1373 compliance conditions *ultra vires* and a violation of the constitutional principle of separation of powers and set the conditions aside under the Administrative Procedure Act as unlawful.  *See* Final Judgment and Order, *City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), ECF No. 211, at 2 (attached as Ex. B).  It also permanently enjoined the Attorney General from "denying or delaying issuance of any FY 2017 Byrne JAG award insofar as that denial or delay" was based on the notice, access, or compliance condition, and prohibited the Attorney General from "using the Conditions in any FY 2017 Byrne JAG award document, delaying the processing or approval of a recipient's requests to draw upon the FY 2017 Byrne JAG funds based on the Conditions, and enforcing the Conditions against FY 2017 Byrne JAG recipients, regardless of whether those Conditions appeared in FY 2017 Byrne JAG award documents."  *Id.* at 3.

-17-

43.     During the remedy phase, Chicago expressed concern that the FY2018 Byrne

JAG grant would contain the same provisions, and asked the Court to issue an injunction

covering future grant awards.  The Court declined to do so, but warned that attorney's fees would

likely be appropriate if the Attorney General once again forced Chicago to sue to prevent

imposition of the same unlawful conditions.

> **C.     The Justice Department Expresses Concern That Chicago Does Not Comply
>          With Section 1373 But Refuses To Make A Final Determination**

44.     Because this Court determined that Section 1373 was unconstitutional and thus

that the Section 1373 compliance condition was not authorized in the first place, it did not take

up the question whether Chicago actually complies with Section 1373.  But Chicago has always

maintained that it does comply.

45.     The Justice Department began requiring Byrne JAG grantees to certify

compliance with Section 1373 in FY2016, and Chicago did so at that time.  In a May 2016 report

by the Department of Justice's Office of Inspector General, the Department suggested that the

Welcoming City Ordinance, which prohibits city employees from sharing immigration status

information with federal agents unless "otherwise provided under applicable federal law,"

Chicago Municipal Code § 2-173-030, contains "a potential ambiguity" as to its "proper

construction" such that the "saving clause" contained in the Ordinance might be unclear.

46.     Since that report, Chicago has exchanged multiple letters with the Department of

Justice concerning Chicago's compliance with Section 1373.  On April 21, 2017, the Department

sent letters to Chicago and eight other jurisdictions, informing Chicago that it was "required to

submit documentation … that validates that your jurisdiction is in compliance with 8 U.S.C.

§ 1373."  Chicago responded in July 2017, explaining that the Ordinance's "saving clause" in

fact "makes clear than an individual's citizenship or immigration status information will *not* be

kept confidential if federal law provides otherwise."  In October 2017, the Department of Justice

sent another letter, stating among other things that it had "determined that [Chicago] appears to

have laws, policies, or practices that violate 8 U.S.C. § 1373."  The letter was based on the

premise that Section 1373 applies not only to the sharing of "information regarding immigration

status," but also information "regarding a person's custody status or release date."   Chicago sent

another response, disagreeing with the Department's interpretation of the relevant statutory text,

but reporting that, "[i]n the interest of resolving this issue," it had sent written notice to City

department heads "instructing them to share with their officers and employees Chicago's

interpretation of the [Welcoming City Ordinance] and explanation of its compliance with Section

1373."  *See* Letter from Edward Siskel, Corporation Counsel, City of Chicago, to Alan R.

Hanson, Acting Assistant Attorney General, Office of Justice Programs, U.S. Dep't of Justice

(October 27, 2017) (attached as Ex. C).

      47.    The Department of Justice nevertheless sent Chicago another letter in January

2018, announcing that "the Department remains concerned that your jurisdiction's laws, policies,

or practices may violate section 1373, or, at a minimum, that they may be interpreted or applied

in a manner consistent with section 1373."  The letter requested that Chicago produce "[a]ll

documents reflecting any orders, directives, instructions, or guidance to your law enforcement

employees …, that were distributed, produced, and/or in effect during the relevant timeframe,

regarding whether and how these employees may, or may not, communicate" with federal

agents.  Chicago timely responded to the Department's request on February 23, 2018 by

voluntarily providing the Department with copies of responsive documents.  In the spirit of

transparency, Chicago accompanied that response with an expedited FOIA request for

documents related to the Department's interpretation of Section 1373.

48.     To date, Chicago has neither received a final determination of compliance with Section 1373 nor any documents in response to its FOIA request.

**D.      The Trump Administration Advances A Radical New Interpretation Of 8 U.S.C. § 1324**

49.     While the litigation over the FY2017 conditions on the Byrne JAG Program was pending, the Trump Administration sought to weaponize another provision of the U.S. Code against jurisdictions seeking to prioritize local law enforcement over enforcement of civil immigration law.

50.     During a January 4, 2018, interview on Fox News, then-Acting Director of U.S. Immigrations and Customs Enforcement Thomas Homan said that he had asked the Department of Justice to "[l]ook into criminal charges for elected officials with sanctuary policies, as they are harboring illegal aliens, according to 8 U.S.C. § 1324."  Kirstjen Nielsen, the Secretary of Homeland Security, confirmed during testimony before the Senate Judiciary Committee on January 16, 2018, that "the Department of Justice is reviewing what avenues may be available" to charge elected officials in so-called sanctuary jurisdictions.

51.     In the nearly seventy years since 8 U.S.C. § 1324 was enacted, the federal government has never attempted to prosecute an elected official acting in their official capacity for violation of that statute.  For much of this time, cities such as Chicago declined to participate in federal immigration enforcement without any indication that doing so violated any criminal statute.  This attempt by the Trump Administration to criminalize the policy choices of local governments represents a significant threat to the ability of cities such as Chicago to enact policies intended to foster public safety.

E.   **The FY2018 Byrne JAG Award Documents Contain The Same Unlawful Conditions (Plus Two New Ones)**

52.   Notwithstanding over a year of litigation before this Court and this Court's clear rulings invalidating its approach, the Department of Justice's FY2018 Byrne JAG Local Solicitation and required certifications (attached as Exs. D-G) reflect the Attorney General's decision to re-impose the FY2017 notice, access, and 1373 conditions, as well as several new conditions similarly designed to impress state and local officers into the service of federal immigration-enforcement priorities.

53.   The conditions announced in the FY2018 Local Solicitation appear in FY2018 Byrne JAG award letters issued to date to jurisdictions other than Chicago.

54.   Four of the immigration-related conditions announced in the FY2018 solicitation and carried over to each jurisdiction's award letter are materially identical to the FY2017 Byrne JAG conditions this Court has already held unlawful and set aside.  On that basis alone, the Attorney General is precluded from defending the conditions.  Therefore, the conditions should be enjoined and Chicago should be awarded fees and costs.

55.   *The "Section 1373 compliance condition":*  The FY2018 award letters issued by the Attorney General require that the "program or activity" funded under the Byrne JAG award comply with 8 U.S.C. § 1373(a) and (b) and that the Chief Legal Officer of the recipient execute a certification (attached as Ex. E) declaring the "program or activity" in compliance with those provisions.  This condition is materially identical to the FY2017 Section 1373 compliance condition.

56.   *The "Section 1644 compliance condition":*  The FY2018 award letters issued by the Attorney General require that the "program or activity" funded under the Byrne JAG award comply with 8 U.S.C. § 1644 and that the Chief Legal Officer of the recipient execute a

certification declaring the "program or activity" in compliance with that provision (attached as Ex. E). This condition is materially identical to the FY2017 Section 1644 compliance condition, because 8 U.S.C. § 1644 proscribes the exact same conduct as 8 U.S.C. § 1373.

57.     *The "FY2018 notice condition":*  The FY2018 award letters issued by the Attorney General require that Byrne JAG recipients "provide—as early as practicable…—advance notice to [federal immigration officials] of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from [a federal immigration authority] a formal written request pursuant to the INA that seeks such advance notice."  The conduct required by this condition is identical to the conduct the Attorney General attempted to require with the FY2017 notice condition.

58.     *The "FY2018 access condition":*  The FY2018 award letters issued by the Attorney General require that Byrne JAG recipients permit "access to any State or local government (or government-contracted) correctional facility by such agents for the purpose [of] 'interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States.'"  The conduct required by this condition is identical to the conduct the Attorney General attempted to require with the FY2017 access condition.

59.     In addition to these revived conditions, the FY2018 Byrne JAG solicitation announced a new unlawful condition, and an additional mandatory certification, each of which is intended to deny funds from cities like Chicago that seek nothing more than to exercise their right to opt out of participation in federal immigration enforcement.  The Attorney General has likewise carried these conditions over to FY2018 award documents.

60.     *The "harboring" condition*: The FY2018 Byrne JAG award letters issued by the Attorney General prohibit grantees from attempting to conceal, harbor, or shield from detection

any undocumented immigrant by publicly disclosing federal law enforcement information, even where doing so would not violate any statute. The Attorney General purported to justify this condition as being "[c]onsistent with the purposes and objectives of federal law enforcement statutes and federal criminal law."

61.     *The "additional certification" condition:*  In addition to certifying compliance with Section 1373 and 1644, the FY2018 Byrne JAG Local Solicitation requires the Chief Legal Officer of a FY2018 Byrne JAG applicant to execute a "Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231 (a), 1324(a), 1357(a), & 1366(1) & (3)" (attached as Ex. F).  The award documents require the Chief Executive Officer to execute "Certifications and Assurances by the Chief Executive of the Applicant Government" (attached as Ex. G) that adopts this certification by the Chief Legal Officer.  The Chief Legal Officer certification represents that "neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the 'program or activity' to be funded … that would (1) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); or (2) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) or (c), 8 U.S.C. § 1231(a), or 8 U.S.C. § 1366(1) or (3)."  Ex. F. These conditions have no legal basis.

62.     On information and belief, the same conditions are contained in all FY2018 Byrne JAG award documents.  In the prior litigation, the Attorney General submitted a sworn declaration from the Acting Assistant Attorney General for the Office of Justice Programs explaining that the FY2017 conditions were "identical" for "each award document being generated within OJP . . . including any such award document that would be generated for the City of Chicago, Illinois."

## IV. THE UNLAWFUL NEW CONDITIONS WILL INJURE CHICAGO

63.     The Trump Administration's unlawful actions pose a threat of imminent harm to Chicago.  By imposing the unlawful conditions on the Byrne JAG program, the Attorney General seeks to pressure Chicago into abandoning its longstanding public safety priorities, on pain of losing critical formula grant funds that would otherwise support officer safety, community empowerment, and innovative countermeasures in the fight against gun violence.  Last year, Chicago had to wait more than a year before receiving its FY2017 Byrne JAG funds.  Now, Chicago faces another interminable delay.

64.     To date, the Department has refused to finally determine whether Chicago complies with Section 1373 (and therefore also Section 1644).  Instead, it has expressed a vague concern that Chicago has some heretofore unidentified policy that contradicts its official interpretation of the Welcoming City Ordinance and put forth an unprincipled and overbroad definition of "immigration status information" that encompasses a detainee's custody status and release date.  Despite refusing to provide clear guidance on what Sections 1373 and 1644 require, the Department continues to insist that Byrne JAG applicants' chief legal and executive officers execute certifications—under express penalty of "criminal prosecution," or "civil penalties and administrative remedies for false claims"—that their jurisdictions comply with Sections 1373 and 1644.  This uncertainty has clouded the City's ability to apply for funds.

65.     The uncertainty regarding the Department's interpretation of Section 1373 and 1644 also has given rise to a fear of prosecution or other adverse legal action.  In the first week following his inauguration, President Trump ordered the Attorney General to take "appropriate enforcement action against any entity that violates [Section] 1373," Executive Order No. 13,768 § 9(a), which the Attorney General has interpreted to mean filing civil preemption actions against jurisdictions he believes violate Section 1373.  *See* Opp. Mot. Prelim. Inj., *Richmond v.*

*Trump*, No. 3:17-cv-01535 (N.D. Cal.), ECF No. 16, at 8-9, 22.  Carrying out that threat, the

Department of Justice sued the State of California based in part on Section 1373 to try to force

California to abandon its immigration-related policies.  *See United States v. State of California*,

No. 2:18-cv-00490 (E.D. Cal.).  Chicago reasonably believes that the Attorney General may

pursue similar enforcement litigation against Chicago, particularly given that the Attorney

General has singled out Chicago for special opprobrium:  In a public speech given shortly after

Chicago filed its FY2017 lawsuit against the same conditions, he declared that "requir[ing]"

Chicago to "reorder[] [its] law enforcement practice is exactly the point!" of his policies.

66.     The additional certification requirement poses the same problems.  While Chicago

is confident that it does not "impede" the federal government's exercise of authority under 8

U.S.C. §§ 1226(a) or (c), 1231(a)(4), 1357(a) or 1366(1) or (3), it has well-founded concerns,

based on the Trump Administration's history of targeting Chicago, that the Administration may

put forth a new, broad interpretation of those provisions, designed to ensnare Chicago or its

officials in a dispute over the validity of those certifications.

67.     More fundamentally, complying with the FY2018 conditions would undermine

public safety in Chicago.  The Welcoming City Ordinance assists effective policing by building

trust between law enforcement officers and the immigrant community.  Conversely, policing

suffers when members of that community, whatever their immigration status, do not feel free to

report crimes, assist in investigations, or testify as witnesses.  The Attorney General's insistence

that Chicago abandon its existing policies, that Chicago give immigration enforcement agents

on-demand access to its detention facilities to investigate potential civil immigration violations,

and that Chicago detain individuals solely so that they can be investigated for possible civil

immigration violations would undermine crucial public trust, cut local law enforcement efforts off at the knees, and make everyone in Chicago less safe.

68.     Chicago now faces the prospect of a severe federal incursion on its sovereignty. Chicago could abandon its attempts to preserve the policymaking autonomy afforded it under our federal system, in hopes that the Attorney General award Chicago the funds promised it by Congress.  Given the Attorney General's dogged refusal to award Chicago funds to which it has a plain statutory entitlement, even such a dramatic reversal may not bring Chicago the law enforcement funds it needs.  Or Chicago could continue its decades-long focus on policies that further the best interests of its residents and officers but lose out on funds it has long used to fund critical law-enforcement needs.  The use of the federal government's coercive power in this manner causes a deep and irreparable injury to Chicago's sovereignty, and to our federal system.

69.     Moreover, whichever decision Chicago ultimately makes, its residents and police force will be immediately and irreparably harmed.  If Chicago submits to the Attorney General's demands, it will forfeit decades' worth of trust and goodwill that its police force has built in the communities it serves.  And as those decades of experience show, that kind of trust, once lost, is lost forever.  Alternatively, if Chicago asserts its right to determine its own policy and refuses to certify compliance with the Department's new and unlawful conditions, it (and the eleven other jurisdictions that depend on Chicago's application for their Byrne JAG funds) will forever forfeit the FY2018 Byrne JAG grant monies—monies that are critical to Chicago's community policing operation and that purchase essential and life-saving equipment for Chicago and its neighboring jurisdictions.  Even if Chicago and its neighbors could later obtain those funds, the damage would have already been done in the months or years their police forces and residents will have spent without crucial equipment and services.

## V.    THE ATTORNEY GENERAL IS NOW PRECLUDED FROM DEFENDING MOST OF THE FY2018 BYRNE JAG CONDITIONS

70.     The Attorney General is precluded from relitigating claims and issues that he lost in the FY2017 litigation brought by Chicago—namely, the legality of the Section 1373 compliance, Section 1644 compliance, notice, and access conditions on the Byrne JAG program—with regard to the FY2018 Byrne JAG awards or any future Byrne JAG awards.  All of the legal requirements for preclusion are met here.

71.     The FY2018 versions of those conditions are materially identical to the FY2017 versions this Court has already enjoined as unlawful.  The FY2018 Section 1373 and Section 1644 compliance conditions are no different than the FY2017 Section 1373 condition, because Section 1644 proscribes the same conduct as Section 1373.  And the FY2018 notice and access conditions, though framed slightly differently, require the same conduct as the FY2017 notice and access conditions—providing 48 hours' advance notice to federal immigration authorities of the scheduled release date and time of identified individuals and allowing federal officials on-demand access to individuals in Chicago's custody for purposes of immigration-related interrogation.

72.     The validity of the FY2017 Section 1373, notice, and access conditions was not just actually litigated in a prior lawsuit—it was the central issue in the FY2017 litigation.

73.     This Court's final judgment critically depended upon its determination that the FY2017 Section 1373, notice, and access conditions were unlawful.  That order set aside each of the three FY2017 conditions based on this Court's conclusion the Attorney General could not lawfully impose any of those conditions.

74.     Finally, the Attorney General was fully represented in the FY2017 litigation by capable lawyers from the Department of Justice.

## COUNT ONE:  VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (ULTRA VIRES)

75.     Chicago incorporates by reference the allegations of the preceding paragraphs.

76.     The Department of Justice may exercise only authority conferred by statute.  *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013); *see also* 5 U.S.C. § 706(2)(C).

### A.     The FY2018 Notice And Access Conditions Are *Ultra Vires*

77.     Notwithstanding this Court's order setting aside the materially identical FY2017 notice and access conditions, the Attorney General continues to press FY2018 conditions requiring identical conduct.

78.     The Court's prior determination that the notice and access conditions are unlawful, in a lawsuit involving the same parties and the same underlying federal grant program, is conclusive here.  The Attorney General is therefore precluded from relitigating the lawfulness of the notice and access conditions.

79.     Even as an initial matter, the Attorney General lacks statutory authority to condition Byrne JAG funds on the FY2018 notice and access conditions.  Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute, as this Court and the Seventh Circuit have held.   The FY2018 notice and access conditions cannot stand.

80.     As a direct and proximate result of those unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down the programs they support.

81.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the Attorney General is without authority to impose the FY2018 notice and access conditions on Byrne JAG funds (or materially identical conditions in future grant years),

an order that those conditions be set aside, and an injunction preventing those conditions from going into effect.

82.     Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 notice or access conditions).

83.     Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  The Attorney General's attempt to impose the FY2018 notice and access conditions on Chicago is not substantially justified given this Court's order setting aside materially identical conditions the Attorney General attempted to impose on FY2017 Byrne JAG funds.

84.     Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  The Attorney General's attempt to impose the FY2018 notice and access conditions on Chicago notwithstanding this Court's order setting aside materially identical conditions from FY2017 demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

   **B.     The Section 1373 And Section 1644 Compliance Conditions Are *Ultra Vires***

85.     The Attorney General also persists in his attempts to impose the Section 1373 and Section 1644 conditions, even in the face of this Court's decision that Section 1373 is facially unconstitutional and therefore cannot be imposed as an "applicable law" on Byrne JAG applicants.

86.     The Court's prior determination that the Section 1373 compliance condition is unlawful, in a lawsuit involving the same parties and the same underlying federal grant program, is conclusive here as to both the Section 1373 compliance condition and the substantively

identical Section 1644 compliance condition. The Attorney General is therefore precluded from relitigating the lawfulness of the notice and access conditions.

87. The Attorney General lacks statutory authority to condition Byrne JAG funds on compliance with Section 1373 or Section 1644. The Byrne JAG statute's requirement that grantees comply with "all other applicable Federal laws" does not confer authority to condition Byrne JAG funding on Section 1373 or Section 1644 compliance, because neither provision is an "applicable" law here. The phrase "all other applicable Federal laws" in the Byrne JAG statute refers to the host of laws that regulate the conduct of federal grant recipients *as grant recipients*. It does not refer to every section of the U.S. Code that could possibly apply to a state or local government. Neither Section 1373 nor Section 1644 regulate grantees as grantees nor do its terms mention federal grants or funds.

88. Moreover, and as this Court already held with respect to a substantively identical condition in the FY2017 Byrne JAG grant, Section 1373 and Section 1644 are facially unconstitutional because they seek to commandeer state and local officials into the service of federal immigration-enforcement authorities. Because those laws are facially unconstitutional, they are not "applicable laws" available for incorporation into the Byrne JAG program.

89. The Section 1373 and Section 1644 compliance conditions on the FY2018 Byrne JAG grant cannot stand.

90. As a direct and proximate result of these unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down the programs they support.

91. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that Attorney General is without authority to impose the FY 2018 Section 1373 and

Section 1644 conditions on Byrne JAG funds (or materially identical conditions in future grant years), an order that those conditions be set aside, and an injunction preventing those conditions from going into effect.

92.     Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 or Section 1644 conditions).

93.     Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  The Attorney General's attempt to impose the FY2018 Section 1373 compliance and Section 1644 compliance conditions on Chicago is not substantially justified given this Court's order setting aside materially identical conditions the Attorney General attempted to impose on FY2017 Byrne JAG funds.

94.     Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  The Attorney General's attempt to impose the FY2018 Section 1373 compliance and Section 1644 compliance conditions on Chicago notwithstanding this Court's order setting aside materially identical conditions from FY2017 demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

## C.     The Harboring Condition Is *Ultra Vires*

95.     The Attorney General also lacks statutory authority to condition FY2018 Byrne JAG funding on a commitment not to conceal, harbor, or shield from detection undocumented immigrants by disclosing federal law enforcement information.

96. The Byrne JAG statute allows the Attorney General to require a certification of compliance only with applicable laws. The harboring condition specifically states that it applies even where disclosure of information would not violate federal anti-harboring laws.

97. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that Attorney General is without authority to impose the harboring condition on FY2018 Byrne JAG funds (or materially identical conditions in future grant years), an order that that condition be set aside, and an injunction preventing that condition from going into effect.

98. Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the harboring condition).

### D. The Additional Certification Requirement Is *Ultra Vires*

99. The Attorney General also lacks statutory authority to condition Byrne JAG funds on a certification that the applicant has no law that "impedes" the federal government's exercise of authority under 8 U.S.C. §§ 1226(a) & (c), 1231 (a), 1357(a), or 1366(1) & (3).

100. The phrase "all applicable Federal laws" in the Byrne JAG statute refers to laws that regulate the conduct of federal grant recipients. Sections 1226(a) and (c), 1231(a), 1357(a), and 1366(1) and (3), by their terms, apply to the federal government, not individual cities and states. Those laws are therefore not "applicable" to individual grant recipients making the certifications required for participation in the Byrne JAG program.

101. As a direct and proximate result of these unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down the programs they support.

102. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the Attorney General is without authority to impose the additional certification

requirement on Byrne JAG funds (in FY2018 or any future grant year), an order that the condition be set aside, and an injunction preventing the condition from going into effect.

103.     Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 additional certification condition).

## COUNT TWO:  VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (SEPARATION OF POWERS)

104.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

105.     When an agency acts "contrary to constitutional right, power, privilege, or immunity," a reviewing court must "hold unlawful and set aside" the challenged action.  5 U.S.C. § 706.

106.     The Constitution vests the spending power in Congress, not the President. The Executive "does not have unilateral authority to refuse to spend . . . funds" that have already been appropriated by Congress "for a particular project or program."  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

107.     Congress in the Byrne JAG statute required the Executive to distribute Byrne JAG funds based on a simple funding formula.  Imposing a new condition on the program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.  The FY2018 notice and access conditions, the Section 1373 and Section 1644 compliance conditions, the harboring condition, and the additional certification condition were not imposed by Congress, but rather by the Attorney General.  Those conditions therefore amount to improper usurpation of Congress's spending power by the Executive Branch.

-33-

108. The Court's prior determination that the Attorney General lacks the statutory authority to impose the notice and access conditions or the Section 1373 compliance condition, in a lawsuit involving the same parties and the same underlying federal grant program, is conclusive here. The Attorney General is therefore precluded from relitigating the issue of his authority to impose the notice and access conditions or the Section 1373 compliance condition and the substantively identical Section 1644 compliance condition.

109. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the FY2018 notice and access conditions, the Section 1373 and Section 1644 compliance conditions, the harboring condition, and the additional certification condition (as well as any materially identical conditions the Attorney General may impose in future grant years) violate the constitutional separation of powers and arrogate to the Executive power that is reserved to the Legislature, as well as an injunction preventing those conditions from going into effect.

110. Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 compliance, Section 1644 compliance, notice, access, harboring, or additional certification conditions).

111. Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The Attorney General's attempt to impose the FY2018 Section 1373 compliance, Section 1644 compliance, notice, and access conditions on Chicago is not substantially justified given this Court's order setting aside

-34-

materially identical conditions the Attorney General attempted to impose on FY2017 Byrne JAG funds.

112.    Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  The Attorney General's attempt to impose the FY2018 Section 1373 compliance, Section 1644 compliance, notice, and access conditions on Chicago notwithstanding this Court's order setting aside materially identical conditions from FY2017 demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

## COUNT THREE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (SPENDING CLAUSE)

113.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

114.    In any event, Congress could not have authorized the conditions here because they do not satisfy the additional requirements of the Spending Clause.  Accordingly, those requirements must be enjoined.

### A.    The Conditions Are Unconstitutionally Ambiguous

115.    Federal restrictions on grants provided to state and local governments must also be articulated "unambiguously" so that the recipient can "voluntarily and knowingly accept[]" Congress's terms.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16-17 (1981).

116.    All of the FY2018 immigration-related conditions are ambiguous as to what is expected of grant recipients in Chicago's position, particularly given Chicago's Welcoming City Ordinance and other relevant policies and practices.  The FY2018 notice and access conditions do not provide Chicago sufficient notice of what will be expected of it because they are entirely dependent on the future exercise of discretion by federal agents outside of the Department of Justice.  The Section 1373 and Section 1644 compliance conditions are also ambiguous, and the

Department's guidance documents and other actions have only added to the confusion. Furthermore, many interpretations of Section 1373 and Section 1644 would raise serious constitutional concerns. The harboring condition is likewise ambiguous. The Trump Administration has offered no guidance on how a municipality's disclosure of information could constitute "conceal[ing], harbor[ing], or shield[ing] from detection" any individual. Finally, the additional certification condition is also ambiguous. It imposes on the certifying jurisdiction an obligation not to "impede" the federal government's exercise of its authority under 8 U.S.C. §§ 1226(a) & (c), 1231 (a), 1357(a), or 1366(1) & (3), but nowhere explains what the Department understands "impede" to mean.

### B. The Conditions Are Not Germane To The Byrne JAG Program

117.    Conditions on spending grants must be "relevant to [the] federal interest" in the particular grant program. *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958); *accord South Dakota v. Dole*, 483 U.S. 203, 207-208 & n.3 (1987). This nexus requirement ensures that the federal government does not use spending conditions to regulate state and local governments beyond the contours of the spending program itself.

118.    The FY2018 notice and access conditions are not relevant to the federal interest in the Byrne JAG funds Chicago receives. Among other things, information concerning when detainees will be released from lockup and policies respecting access for federal immigration agents bear no relevance to improving the ability of Chicago's Bureau of Detective to solve violent crimes, the Force for Good Program, or other uses to which Chicago puts Byrne JAG funds. Nor are they relevant to the Byrne JAG program's larger purposes.

119.    The Section 1373 and Section 1644 compliance conditions are also not relevant to the federal interest in the Byrne JAG funds Chicago receives, or to the program's larger purposes. Information sharing with federal officials regarding an individual's immigration status

bears no connection to the replacement vehicles for worn-out police patrol cars, support for the Force for Good program, or the acquisition of new law enforcement equipment.

120.    The additional certification condition is also not relevant to the federal interest in the Byrne JAG funds Chicago receives.

121.    As a direct and proximate result of these unconstitutional conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down or materially alter the programs they support.

122.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the FY 2018 notice and access conditions, the Section 1373 and Section 1644 compliance conditions, the Section 1324 condition, and the additional certification condition (as well as any materially identical conditions the Attorney General may impose in future grant years) violate the Spending Clause, as well as an injunction preventing those conditions from going into effect.

123.    Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 compliance, Section 1644 compliance, notice, access, or additional certification conditions).

**COUNT FOUR: COMMANDEERING**

124.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

125.    As this Court has already declared, in a lawsuit involving the same parties and the same underlying federal grant program, 8 U.S.C. § 1373 is facially unconstitutional.  That determination is conclusive here.  The Attorney General is therefore precluded from relitigating Section 1373's constitutionality.

126.    8 U.S.C. § 1644 is substantively identical to Section 1373.  The Attorney General is therefore precluded from litigating Section 1644's constitutionality as well.

127.    And beyond the conclusive import of the prior litigation with regard to Section 1373 and Section 1644, they are plainly unconstitutional under the anticommandeering doctrine. The Tenth Amendment prohibits the federal government from "requir[ing]" state and local governments "to govern according to Congress's instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).  Congress has transgressed the limits of the Tenth Amendment when it "regulat[es] activities undertaken by government entities only," Ex. A at 21, rather than "evenhandedly regulat[ing] an activity in which both States and private actors engage," *NCAA*, 138 S. Ct. at 1478.

128.    Sections 1373 and 1644 do just that, by prohibiting state and local governments from engaging in a core aspect of governing: controlling the actions of their own employees and retaining control over local law enforcement policy. Sections 1373 and 1644 are therefore facially unconstitutional and cannot be validly enforced against Chicago or imposed on Byrne JAG recipients as "applicable Federal laws."  34 U.S.C. § 10153(a)(5)(D).

129.    As a direct and proximate result of these unconstitutional conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down or materially alter the programs they support.

130.    Pursuant to 28 U.S.C. § 2201, Chicago is entitled to a declaration that 8 U.S.C. §§ 1373 and 1644 violate the Tenth Amendment.

131.    Pursuant to 28 U.S.C. § 2201, Chicago is further entitled to a declaration that 8 U.S.C. §§ 1373 and 1644 cannot validly be imposed as conditions on the Byrne JAG program as

well as an injunction preventing the FY2018 Section 1373 and Section 1644 conditions (or any materially identical conditions the Attorney General may seek to impose in future grant years) from going into effect.

132.    Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 compliance or Section 1644 compliance conditions).

133.    Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  Any contention that the Section 1373 and Section 1644 are constitutional is not substantially justified given this Court's order holding Section 1373 facially unconstitutional.

134.    Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.  Any contention that that Section 1373 and Section 1644 are constitutional demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

## COUNT FIVE: DECLARATORY JUDGMENT THAT CHICAGO'S WELCOMING CITY ORDINANCE AND IMPLEMENTING POLICIES COMPLY WITH SECTION 1373 AND SECTION 1644

135.    Chicago incorporates by reference the allegations of the preceding paragraphs.

136.    Where City officials or agents come to possess immigration status information, Chicago has no policy restricting the sharing of such information contrary to Section 1373 or Section 1644.

137.    Section 20 of the Welcoming City Ordinance permits Chicago's agents and agencies to request or receive information about citizenship or immigration status (from ICE or elsewhere) whenever required by "federal regulation"—which, as Chicago's Chief Legal Officer

has explained, "do[es] not restrict the sharing of immigration status information with federal immigration officers."

138.    Section 30 of the Welcoming City Ordinance limits the disclosure of an individual's citizenship or immigration status information "[e]xcept as otherwise provided by applicable federal law."  In the context of the Welcoming City Ordinance—and, again, as Chicago's Chief Legal Office has explained—"applicable federal law" includes Sections 1373 and 1644 to whatever extent Sections 1373 and 1644, and any individual federal request made pursuant to those provisions, is a lawful and constitutional exercise of federal authority.

139.    Section 42 of the Welcoming City Ordinance (and the Chicago Police Department's implementing policy, CPD Special Order S06-14-03) does not violate Section 1373 or Section 1644 because the information Chicago's agents or agencies may not share is information "regarding a person's custody status or release date."  That information is not "information regarding . . . citizenship or immigration status" covered by Sections 1373 and 1644.  *See Steinle v. City and County of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

140.    Chicago has repeatedly certified its compliance with Section 1373 and explained its reasons for doing so.  Those certifications necessarily extend to Section 1644, because Section 1373 and Section 1644 proscribe the same conduct.

141.    To date, the Department has not stated whether it accepts Chicago's prior certifications.  While Chicago is confident it complies with both Section 1373 and Section 1644 for the reasons stated above, the Department's conduct has sown confusion and created the impression that the federal government believes otherwise, notwithstanding Chicago's legal analysis.  Chicago is reluctant to certify compliance with Section 1373 and Section 1644 in its

FY 2018 Byrne JAG application, which is due imminently, until the Department affirms that the City's prior certifications are acceptable.

142.    Chicago has a credible fear of prosecution or other enforcement action.  The Attorney General has made clear that he considers so-called "sanctuary" cities like Chicago a "clear and ongoing threat to public safety" and that "OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity."  He has also taken the President's directive to "enforce" Section 1373 as an instruction to file preemption lawsuits against jurisdictions with policies he believes violate Section 1373.  *See supra* ¶ 65. That the Department has sued the State of California over its approach to federal immigration enforcement is a strong indication that the Department has taken the President's instruction to heart and is willing to pursue legal action against "sanctuary" jurisdictions.

143.    Pursuant to 28 U.S.C. § 2201, Chicago is entitled to a declaration that its Welcoming City Ordinance and implementing policies comply with Sections 1373 and 1644.

**COUNT SIX: DECLARATORY JUDGMENT THAT CHICAGO'S WELCOMING CITY ORDINANCE AND IMPLEMENTING POLICIES COMPLY WITH 8 U.S.C. § 1324**

144.    Chicago incorporates by reference the allegations of the preceding paragraphs.

145.    The Welcoming City Ordinance prohibits Chicago's agents and agencies from arresting, detaining, or continuing to detain an individual based solely on their immigration status unless required to do so by applicable law.  These provisions expressly require compliance with federal laws and regulations, including 8 U.S.C. § 1324.

146.    The Ordinance also restricts the extent to which local officials may be compelled to participate in federal immigration enforcement.  Nothing in 8 U.S.C. § 1324 creates an affirmative requirement for local governments to enforce immigration law or to assist federal authorities in enforcing immigration law.

147.     While Chicago is confident it complies with Section 1324, the Attorney General's conduct has sown confusion and created the impression that the federal government believes otherwise, notwithstanding Chicago's own legal analysis.

148.     High-ranking Trump Administration officials have threated to prosecute local officials and governments for violation of Section 1324, without providing any meaningful guidance on how to determine compliance.

149.     Pursuant to 28 U.S.C. § 2201, Chicago is entitled to a declaration that it complies with Section 1324.

## COUNT SEVEN: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (FAILURE TO USE NOTICE AND COMMENT PROCEDURES; ARBITRARY AND CAPRICIOUS)

150.     Chicago incorporates by reference the allegations of the preceding paragraphs.

151.     In addition to lacking statutory and constitutional authority to impose the immigration-related conditions on the Byrne JAG grant, the conditions are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

152.     The FY 2018 immigration-related conditions are arbitrary and capricious because the Department failed to rely on reasoned decisionmaking and, to the extent it cited reasons at all, those reasons are contradicted by the evidence before the agency.  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Here, among other things, the Department proposes to evaluate grant applicants on the basis of their immigration policies rather than on their compliance with expressly enumerated statutory application requirements.  *See* 34 U.S.C. § 10153(a)(1)-(5).  It also "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, including but not limited to the policing challenges created by alienating and inducing fear in

immigrant communities.  It also "offered an explanation for its decision that runs counter to the evidence before the agency," which likewise is arbitrary and capricious, *id.*, including the evidence submitted by nine jurisdictions in their Section 1373 certification letters indicating that Welcoming City-style policies promote rather than detract from effective policing.  Indeed, when the Attorney General referred to one study in the press that showed that such policies lead to higher crime, *the study's own authors said he was misrepresenting their work*.

153.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 1651 and 2201, Chicago is entitled to a declaration that the immigration-related conditions for the FY2018 Byrne JAG funds are in violation of the APA as well as an injunction preventing those conditions from going into effect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a)    Declare unlawful and set aside the immigration-related conditions included in the FY2018 Byrne JAG solicitation and awards on a program-wide basis;

b)    Declare that 8 U.S.C. §§ 1373 and 1644 violate anti-commandeering principles and are therefore facially unconstitutional under the Tenth Amendment;

c)    Declare that Chicago's Welcoming City Ordinance and implementing policies comply with 8 U.S.C. § 1373, 8 U.S.C. § 1644, and 8 U.S.C. § 1324;

d)    Enjoin the Attorney General from enforcing his proposed immigration-related conditions on FY 2018 Byrne JAG funding on a program-wide basis;

e)    Enjoin the Attorney General from imposing substantively similar conditions in future grant years;

f)    Enjoin the Attorney General from denying or delaying issuance of any Byrne JAG award and from denying or delaying release of any Byrne JAG funds (in FY2018 or future grant years) insofar as the denial or delay is based on the challenged conditions;

g)      Order the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award immediately;

h)      Award attorney's fees and costs to Chicago to the fullest extent permissible by law;

i)      Retain jurisdiction to monitor the Attorney General's compliance with this Court's judgment; and

j)      Grant such other relief as this Court may deem proper.

October 12, 2018.                                  Respectfully Submitted,

                                                  By  /s/ Edward N. Siskel
                                                  EDWARD N. SISKEL
                                                  Corporation Counsel of the City of Chicago


JAMIE S. GORELICK (*pro hac vice* pending)        JUSTIN A. HOUPPERT
DAVID W. OGDEN (*pro hac vice* pending)           Assistant Corporation Counsel
ARI HOLTZBLATT (*pro hac vice* pending)           SCOTT D. SPEARS
ARI SAVITZKY (*pro hac vice* pending)             Assistant Corporation Counsel
MOLLY M. JENNINGS (*pro hac vice* pending)        121 N. LaSalle Street, Suite 600
JUSTIN BAXENBERG (*pro hac vice* forthcoming)     Chicago, IL 60602
ARI EVANS (*pro hac vice* forthcoming)            (312) 744-0220
WILMER CUTLER PICKERING HALE
    AND DORR LLP                                  ANDREW W. WORSECK
1875 Pennsylvania Avenue NW                       Chief Assistant Corporation Counsel
Washington, DC 20006                              30 N. LaSalle Street, Suite 1230
(202) 663-6000                                    Chicago, IL 60602
                                                  (312) 744-0220
DEBO P. ADEGBILE (*pro hac vice* pending)         andrew.worseck@cityofchicago.org
WILMER CUTLER PICKERING HALE
    AND DORR LLP                                  RONALD S. SAFER
7 World Trade Center                              MATTHEW C. CROWL
250 Greenwich Street                              NICK KAHLON
New York, NY 10007                                TAL CHAIKEN
(212) 230-8800                                    LAURA KLEINMAN
                                                  RILEY SAFER HOLMES & CANCILA LLP
                                                  Three First National Plaza

70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*