## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

---

**THE CITY OF CHICAGO,**

                           *Plaintiff,*

      *v.*

**ATTORNEY GENERAL OF THE UNITED STATES,**

                          *Defendant.*

**Civil Action No. 1:18-cv-6859**

---

### AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff the City of Chicago hereby alleges as follows:

### INTRODUCTION

1.     Chicago brings this action to enjoin the Attorney General of the United States from yet again imposing sweeping immigration policy conditions on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, a formula grant that has for years provided crucial support for law enforcement in Chicago and other cities.

2.     The challenged conditions are unauthorized by Congress and *ultra vires*, and violate federalism principles. They are an unlawful attempt to punish Chicago for prioritizing public safety for all Chicagoans instead of yielding to federal dictates. In fact, this Court struck down many of the conditions already, issuing a permanent injunction just months ago preventing the conditions from being applied to last year's Byrne JAG grants. But despite the Court's clear ruling that the conditions are unlawful, and its clear warning that re-issuing them could result in an award of attorney's fees against the federal government, the Attorney General purports to

impose them again on grants for FY2018. This renewed attempt to conscript local police to serve federal policy contravenes the Constitution and federal statutes alike. Just like the FY2017 conditions, the FY2018 conditions are unlawful on their face and should be set aside.

3. The conditions are also unlawful as applied to Chicago, because they were imposed on Chicago's award by an official who is unlawfully occupying the Office of the Attorney General. Since former Attorney General Jefferson Beauregard Sessions III's resignation on November 7, 2018, Matthew Whitaker, Mr. Sessions' chief of staff, has purported to assume the duties of the office of the Attorney General at the direction of the President. Mr. Whitaker's appointment as acting Attorney General violates federal law and the Appointments Clause. Chicago received an award letter for its FY2018 Byrne JAG grant on November 20, 2018—thirteen days after Mr. Whitaker began acting as Attorney General. The award notification—issued under the authority of the Attorney General—purported to impose the challenged conditions on Chicago's receipt of Byrne JAG grant funds. In addition to the problem that the challenged conditions are not authorized by Congress and therefore *ultra vires* regardless of who heads the Department of Justice, Mr. Whitaker may not permissibly impose them on Chicago because he may not lawfully exercise the powers of the Office of the Attorney General.

## BACKGROUND

4. Since the 1980s, Chicago has adhered to a "Welcoming City" policy that prioritizes local crimefighting and community engagement, rather than federal civil immigration enforcement. That policy promotes cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Chicago. For many years, Chicago's Welcoming City policy has been no obstacle to its receipt of law enforcement funds under the Byrne JAG formula grant program.

5.      Despite that long history, last year, Attorney General Sessions tried to use the Byrne JAG program to gut Chicago's Welcoming City policy and others like it. In July 2017, the Department of Justice released the FY2017 solicitation for Byrne JAG funding. The solicitation informed grant applicants that they would be expected to comply with three immigration-related grant conditions. Those conditions would have required Chicago (1) to detain its own residents and others at federal immigration officials' request, in order to give the federal government a 48-hour notice window prior to an arrestee's release (the "notice condition"); (2) to give federal immigration officials unlimited access to local police stations and law enforcement facilities in order to interrogate any suspected non-citizen held there, effectively federalizing all of the City's detention facilities (the "access condition"); and (3) to certify compliance with 8 U.S.C. § 1373, a federal statute that bars local governments from restricting their employees from sharing citizenship and immigration status information with federal immigration authorities (the "Section 1373 compliance condition").

6.      Chicago sued, and this Court (Leinenweber, J.) held the three conditions unconstitutional and *ultra vires* and set them aside. The Court first issued a preliminary injunction against the notice and access conditions that was affirmed by the Seventh Circuit. Then, in July 2018, the Court permanently enjoined all three conditions for FY2017. In its decision on the permanent injunction, the Court held that the notice and access conditions were unlawful because, consistent with the Seventh Circuit's ruling, no statute authorized the Attorney General to impose discretionary policy conditions on the Byrne JAG formula grant program, and thus his attempt to do so anyway—to usurp Congress's legislative authority by rewriting basic aspects of the Byrne JAG program—violated the constitutional Separation of Powers. The Court also held that the Section 1373 compliance condition was unlawful because Section 1373 itself is

facially unconstitutional under the Tenth Amendment anti-commandeering doctrine. In addition, the Court ordered the Attorney General to issue Chicago's FY2017 award and to release Chicago's FY2017 award funds no later than when the Attorney General issued awards and released funds for any other grantee. The Court also made clear that it would not tolerate any attempt by the Attorney General to circumvent its ruling by re-imposing the conditions in FY2018. If the Attorney General re-imposed the conditions, the Court noted, Chicago's "lawyers would get paid."

7.      In the face of those rulings, Attorney General Sessions once again attempted to press local law enforcement officers into the service of the federal immigration authorities by imposing sweeping policy conditions on Byrne JAG formula grant funds—this time, as a condition on FY2018 funds. Those conditions are unlawful both facially and as applied to Chicago.

8.      In the FY2018 Byrne JAG solicitation, the Department of Justice specifically noted that it would issue awards by September 30, 2018. In early October 2018, the Department began releasing FY2018 Byrne JAG award letters. By the time Chicago filed its initial complaint on October 12, 2018, the Department had issued 752 FY2018 local awards, totaling almost $59 million—70% of the local funding available for FY2018, covering over 65% of the eligible jurisdictions. But notwithstanding this Court's order not to delay Chicago's FY2017 award, the Department did not issue Chicago's FY2018 award at the same time as the awards for the other 752 jurisdictions.

9.      Instead, Chicago was forced to file suit to prompt action on its FY2018 Byrne JAG application. Only after Chicago filed this lawsuit did the Department finally issue

Chicago's FY2018 award on November 20, 2018, two months after the Department began issuing awards to hundreds of other jurisdictions.

10.     Four of the conditions announced in the FY2018 solicitation and included in Chicago's FY2018 Byrne JAG award are *materially identical* to the FY2017 Byrne JAG conditions this Court has already set aside as unlawful. Specifically, the Department once again required Chicago and its subgrantees, as well as all other Byrne JAG recipients, to: (1) comply with 8 U.S.C. § 1373, which this Court already held facially unconstitutional; (2) comply with 8 U.S.C. § 1644, which prohibits the same conduct as Section 1373 and is thus unconstitutional for the same reason; (3) provide 48 hours' advance notice to federal immigration authorities, "where feasible" and when requested, before releasing an alien from custody, just like the notice condition that was already set aside as unlawful by this Court; and (4) provide federal authorities with "access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States," just like the access condition already set aside by this Court.

11.     On or about November 2, 2018—weeks *after* Chicago filed this lawsuit—the Department posted a separate "Special Notice" on its website stating that the Department will not "use or enforce" these conditions against Chicago while this litigation is pending. The Notice, however, does not formally withdraw the conditions and expressly purports to reserve the Department's right to impose the conditions at a later date.

12.     Beyond attempting to resuscitate the conditions that this Court already held unlawful, the Attorney General also added a new unlawful condition requiring Chicago and other cities not to publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield from detection fugitives from justice or undocumented immigrants, even where

such disclosure would not violate the law. This vague and sweeping new condition would chill City officials from publicly criticizing controversial federal immigration enforcement strategies, such as the targeting of noncitizens at courthouses or other sensitive locations.

13. Neither the Byrne JAG statute nor any other statute allows the Attorney General to impose conditions on Byrne JAG formula grant funds. Indeed, most of the conditions imposed on the FY2018 Byrne JAG program were already held unlawful by this Court in the litigation over the FY2017 Byrne JAG program, and Chicago is accordingly entitled to attorney's fees and costs because the unreasonable decision to impose unlawful conditions has forced Chicago to prosecute this action to once again obtain an injunction against them.

14. The law has not changed since this Court last ruled: The Federal Executive may not arrogate power that the Constitution reserves to Congress on the one hand, or to state and local governments on the other. Yet the imposition on the Byrne JAG formula grant program of policy conditions that were never approved by Congress does just that. The conditions would also federalize local jails, mandate warrantless detentions for civil infractions, sow fear in local immigrant communities, undermine local law, and make the people of Chicago less safe.

15. The new conditions are just as harmful as those struck down by this Court, and in precisely the same ways. They threaten local policies that foster crucial trust between police and immigrant communities, on pain of denying Chicago crucial funds that provide lifesaving equipment to Chicago police officers and critical services to Chicago residents, in the face of this Court's explicit ruling last year that these conditions are unlawful and that the harms to Chicago are irreparable and cannot be remedied by later payment of the funds at issue.

16. The conditions additionally are unlawful as applied to Chicago because during the period between the filing of the initial complaint and the issuance of Chicago's Byrne JAG

award, Attorney General Sessions resigned, and the President unlawfully directed Mr. Whitaker to assume the duties of the Attorney General. Mr. Whitaker lacks the statutory and constitutional authority to impose these conditions—or any other conditions—on Chicago's Byrne JAG grant.

17.     This Court should order declaratory and corresponding injunctive relief confirming that the challenged conditions are unlawful and ultra vires and setting those conditions aside pursuant to the Administrative Procedure Act ("APA"). In order to prevent an endless cycle of litigation, in which the Attorney General unlawfully withholds Chicago's grant funds each year until Chicago sues and the Court intervenes, that relief should cover FY2018 and all future grant years. The Attorney General should be ordered to pay Chicago the City's attorney's fees and costs incurred in relitigating conditions previously enjoined by this Court.

18.     This Court should also order declaratory and corresponding injunctive relief confirming that Mr. Whitaker cannot lawfully exercise the duties of the office of the Attorney General and that such duties instead must be exercised by Deputy Attorney General Rod J. Rosenstein unless and until another proper appointment is made.

## PARTIES

19.     Plaintiff Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois. Chicago is the third largest city in the Nation, and is home to almost 3 million residents, including numerous immigrants.

20.     The Attorney General of the United States is the federal official in charge of the Department of Justice, which took and threatens to take the actions at issue in this lawsuit. The Attorney General of the United States is also the federal official that the Byrne JAG statute directs to administer the Byrne JAG program. At all relevant times prior to November 7, 2018, the Attorney General was Jefferson Beauregard Sessions III. Since November 7, 2018, Matthew Whitaker purports to exercise the duties of the office of the Attorney General of the United

States and claims to be the federal official in charge of the Department of Justice, pursuant to an order of the President to that effect. At the time of that order, Mr. Whitaker was not serving in a Senate-confirmed role.[1]

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346. The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706, the All Writs Act, 28 U.S.C. § 1651, the mandamus statute, 28 U.S.C. § 1361, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the United States Constitution.

22.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1) because substantial events giving rise to this action occurred therein and because Chicago resides therein and no real property is involved in this action.

## FACTUAL ALLEGATIONS

### I.     CHICAGO PRIORITIZES LOCAL CRIMEFIGHTING UNDER ITS WELCOMING CITY POLICY

23.     Chicago is a metropolis of almost 3 million that has attracted migrants and immigrants of every race, nationality, and creed for nearly two centuries. Chicago's diverse population requires a public safety strategy that respects all the City's residents. One aspect of that strategy—the Welcoming City Ordinance—has developed over the past few decades.

---

[1]     In light of Attorney General Sessions's departure from office, his successor is automatically substituted in the caption of this official capacity action under the Federal Rules. *See* Fed. R. Civ. P. 25 (d). However, the identity of Mr. Sessions's successor—and more specifically, the purported installation of Matthew Whitaker as Acting Attorney General—is contested, for the reasons noted herein. For ease of reference, Chicago has restyled this action as *Chicago v. Attorney General of the United States*. *See* Fed. R. Civ. P. 17(d) ("A public officer who sues or is sued in an official capacity may be designated by official title rather than by name.").

24.     The first formal iteration of the policy was announced by then-Mayor Harold Washington in a 1985 Executive Order that provided that City officials would not "request information about or otherwise investigate or assist in the investigation of the citizenship or residency status of any person" unless required by other law to do so.  Mayor Richard M. Daley reiterated this policy upon taking office in April 1989.

25.     In 2006, the Chicago City Council unanimously incorporated the policy into the City's Municipal Code by enacting the Welcoming City Ordinance.  Among other things, the Council cited its concern that local enforcement of federal immigration infractions would "cause a chilling effect on crime prevention and solving if both witnesses and victims are called upon to weigh a need to cooperate with local authorities against a fear of deportation, thereby undermining long-standing efforts to engender trust and cooperation between law enforcement officials and immigrant communities."  Like the executive orders that preceded it, the 2006 Ordinance prohibited City "agent[s]" and "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."  It also barred disclosure of "information regarding the citizenship or residency status of any person unless required to do so by legal process . . . ."

26.     In 2012, Mayor Rahm Emmanuel and the Chicago City Council expanded the Welcoming City Ordinance to address increasing federal requests to detain individuals suspected of immigration-related offenses (also known as "immigration holds") issued by U.S. Immigration and Customs Enforcement ("ICE"). The expanded Welcoming City Ordinance provides that Chicago will comply with an immigration hold only when it has an independent

reason to believe that the subject poses a threat to public safety, such as if they have an outstanding criminal warrant, or have been identified as a gang member.

27.     The 2012 Welcoming City Ordinance reflects the City Council's findings that (1) "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems," (2) "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all [of the City's] residents," and (3) "[t]he cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City." Chicago Municipal Code § 2-173-005.

28.     The current Welcoming City Ordinance, codified as Chapter 2-173 of the Chicago Municipal Code, and the Chicago Police Department's implementing policy, Special Order S06-14-03, contain several key prohibitions relevant to this lawsuit.

    a.     Subject to certain exceptions for certain criminal suspects and gang members,[2] Section 2-173-042 prohibits City "agent[s]" or "agenc[ies]" from "arrest[ing], detain[ing] or continu[ing] to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation," or doing so "based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law."

---

[2]     Specifically, and as noted above, the Section 2-173-042 restrictions do not apply if the subject of the ICE investigation "(1) has an outstanding criminal warrant; (2) has been convicted of a felony in any court of competent jurisdiction; (3) is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony charge is pending; or (4) has been identified as a known gang member."

b.     Subject to the same exceptions, as well as an exception for "legitimate law enforcement purpose[s] . . . unrelated to the enforcement of a civil immigration law," Section 2-173-042 also prohibits City "agent[s]" or "agenc[ies]" from, "while on duty, expend[ing] their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," or from "permit[ting] ICE agents access to a person being detained by, or in the custody of, the agency or agent" or "permit[ting] ICE agents use of agency facilities for investigative interviews or other investigative purpose."

c.     The prohibitions of Section 2-173-042 are implemented by Chicago Police Department ("CPD") Special Order S06-14-03, which contains the same prohibitions, subject to the same exceptions, as Section 2-173-042.

d.     Section 2-173-020 prohibits City "agent[s]" or "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."

e.     Section 2-173-030 prohibits City "agent[s]" or "agenc[ies]" from "disclos[ing] information regarding the citizenship or immigration status of any person" unless "otherwise provided under applicable federal law," the City is "required to do so by legal process," or "such disclosure has been authorized in writing by the individual to whom such information pertains."

29.     Chicago's official interpretation of the Welcoming City Ordinance—which was expressly communicated to all City Departments in October 2017—is that the Welcoming City

Ordinance is not intended to prohibit or restrict any Chicago entity or official from sending to or receiving from federal immigration authorities information concerning an individual's immigration status. Nor is it intended to enable the City to harbor undocumented individuals. It is instead intended to prevent Chicago and its police officers from themselves enforcing federal immigration law.

30. Chicago's Welcoming City policy plays a vital role in strengthening the relationship between Chicago's government, its police force, and its immigrant communities. This relationship is built city block by city block, and it is essential that Chicago's police officers have the flexibility they need to engage the immigrant communities in their crime-fighting initiatives without projecting a constant threat of deportation. Social science research has consistently shown that policies like the City's Welcoming City policy are sound means of building trust with immigrant communities and reducing crime. One recent review of relevant literature concluded that "existing evidence supports the expansion of limited cooperation policies" like Chicago's Welcoming City Ordinance.[3] Another recent study found that "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."[4] That conclusion is consistent with the lived experience of untold police officers; as a broad coalition of police chiefs explained, "build[ing] trusting and supportive relations with immigrant communities . . . is essential to reducing crime and helping victims."[5] By contrast, the idea that policies like Chicago's encourage crime is a

---

[3]     Daniel E. Martinez, et al., *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, Sociology Compass (Oct. 7, 2017), https://tinyurl.com/ybt2fyzv.

[4]     *E.g.*, Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), http://tinyurl.com/y75lsykd (emphasis added).

[5]     Press Release, Major Cities Chiefs Ass'n, U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order (Jan. 25, 2017), http://tinyurl.com/y8zqhypw.

"[m]yth": "[S]tudies have found no support for the idea that immigrants are responsible for more crime" or that "sanctuary policies lead to increased crime."[6]

31.     Meanwhile, the perception that Chicago's policies provide amnesty or "sanctuary" to violent criminals is also false. As the Seventh Circuit recognized, Chicago's policy is designed to avoid local participation in federal immigration enforcement but "does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government. The federal government can and does freely operate in 'sanctuary' localities." *City of Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018). Moreover, Chicago makes exceptions to this general non-participation policy for individuals most likely to present a threat to the community, such as those with an outstanding criminal warrant and those who are known gang members. MCC § 2-173-042 (enumerating exceptions); CPD Special Order S06-014-03 (same).

## II.     THE BYRNE JAG PROGRAM, A NON-DISCRETIONARY FORMULA GRANT PROGRAM, PROVIDES LAW ENFORCEMENT FUNDING FOR CHICAGO

32.     Congress created the current Byrne JAG program in 2005 by merging two funding programs for state and local criminal justice initiatives. H.R. Rep. No. 109-233, at 88-89 (2005). Those predecessor programs afforded state and local governments significant discretion over their use of program funds. In combining the programs, Congress sought to give grantees even "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. *Id.*

33.     The Byrne JAG program's design promotes local discretion by circumscribing the Attorney General's authority to impose federal policy priorities on grantees. The program

---

[6]     Benjamin Gonzalez et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 9-10, 18-24, Urb. Aff. Rev. (2017), http://tinyurl.com/y8hb9fnc.

requires that the Attorney General "shall allocate" funds, 34 U.S.C. § 10156(d)(2)(A), "in accordance with" a formula based on population and crime statistics, *id.* § 10152(a)(1). *See id.* § 10156(d)(2)(A).

34.     Consistent with the nature of formula grants, the Byrne JAG statute limits the Attorney General's discretion over the program. He does not decide the amount of each grant. Rather, the Attorney General must follow the statutory formula to determine allotments for each state and local government. 34 U.S.C. § 10156. As part of this process, the Attorney General is authorized to "reserve not more than 5 percent" of the funds allocated to the program for specific purposes after a finding that such reservation is "necessary" to address "extraordinary increases in crime" or to "mitigate significant programmatic harm" caused by the formula. *Id.* § 10157(b). The statute authorizes no other deviations from the prescribed formula.

35.     The Attorney General's authority to define or modify the components of the Byrne JAG application is similarly circumscribed. He may specify the "form" of the application. 34 U.S.C. § 10153(a). He may specify what "data, records, and information (programmatic and financial)" applicants can be "reasonably" required to provide to ensure programmatic and financial integrity. *Id.* § 10153(a)(4). He can "coordinat[e] with the National Institute of Justice to develop a mandatory "program assessment component" to measure the success of funded programs. *Id.* § 10152(c). And he can require applicants to "comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5)(D). There is no provision authorizing him to alter the application's components, or to add new policy requirements.

36.     Byrne JAG applications have only one substantive component: A plan indicating how the applicant will use its funds within one or more of eight broadly defined programmatic areas, 34 U.S.C. § 10153(a)(6), ranging from "[l]aw enforcement" to "[d]rug treatment" to

-14-

"crime victim" support, *id*. § 10152(a)(1)(A)-(H). An applicant is entitled to receive its Byrne JAG allotment so long as it uses funds to advance "any one" of those objectives. *Id.* §§ 10152(a)(1)-(2), 10153(a)(6)(B).

37. Indeed, federal law prohibits the Department of Justice from using the Byrne JAG program to "exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 28 U.S.C. § 10228.

38. Chicago has received Byrne JAG funds every fiscal year between 2005, the year the program began, and 2017. In FY2016, Chicago received $2.33 million through the Byrne JAG program. Chicago received its FY2017 award letter, awarding it $2.2 million, on August 20, 2018 (but, as explained herein, only after litigating for more than a year to enjoin the immigration-related conditions that Attorney General Sessions unlawfully sought to impose on the FY2017 funds).

39. Chicago has used Byrne JAG funds to support projects ranging from critical law enforcement equipment and overtime to community policing outreach and engagement. Since FY2005, for instance, Chicago has spent approximately $33 million in Byrne JAG funds to buy nearly 1,000 police vehicles. Several of those projects have extended across multiple grant years, including the Force for Good program, which began in 2011 and helps not-for-profit organizations meet community needs in neighborhoods experiencing high rates of violent crime, by providing services such as emergency shelter and clothing; youth mentoring and safe, structured activities; and job training and placement. Most recently, Chicago has used Byrne JAG funds to pay for ShotSpotter technology, which facilitates rapid police responses to shooting incidents. Without Byrne JAG funds, Chicago would have to restrict or shut down some or all of these programs, or else divert funds from other policing objectives to sustain them.

40.    Chicago plans to use its FY2018 Byrne JAG funds to increase its Bureau of Detectives' capacity to clear violent cases and bring shooters to justice. Those capacity-building efforts include a planned investment in technology that will permit forensic analysis of mobile devices; an initiative to digitize hard-copy records and make them searchable; prioritized case and evidence review of homicides, nonfatal shootings, and cold cases to generate new investigative leads; and advanced interview and investigation training for detectives. An additional portion of the Byrne JAG funding will support the Force for Good program.

41.    Eleven other local governments, including Cook County, the City of Evanston, and the Village of Skokie, depend on Chicago's Byrne JAG application for the funds they receive through the program each year. Those subgrantees receive their own Byrne JAG funds through Chicago's application.

## III.    THE ATTORNEY GENERAL TARGETS CHICAGO'S BYRNE JAG FUNDING

### A.    The Trump Administration And Attorney General Sessions Target So-Called Sanctuary Cities

42.    Despite the soundness of Chicago's policies—and despite the City's sovereign right to decide its own law enforcement priorities and strategies—the Trump Administration has singled out Chicago and other so-called "sanctuary" jurisdictions. In his first week in office, President Trump issued Executive Order 13768, which threatened to deny federal grants and take enforcement actions against such jurisdictions. President Trump ordered DHS to publish weekly lists of any municipalities that refused to comply with immigration hold requests, together with lists of any undocumented immigrants arrested—but not necessarily convicted—for any non-immigration offenses.

43.     This executive order was later enjoined in large part—a ruling later affirmed by the Ninth Circuit—for violating the constitutional Separation of Powers. *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1234-1235 (9th Cir. 2018).

44.     From the early days of the Trump Administration, former Attorney General Sessions personally led the charge against so-called "sanctuary" cities and focused special attention and ire on Chicago. Less than two months into his tenure, Attorney General Sessions, without any factual basis, labeled so-called sanctuary jurisdictions a "clear and ongoing threat to public safety."[7] He continued with this rhetoric in subsequent months, asserting that "[s]anctuary cities put the lives and well-being of their residents at risk" and "give sanctuary to criminals, not to law-abiding Americans."[8] And over the objection of career attorneys, he personally pushed the Department of Justice to develop policies that would target so-called sanctuary cities.[9]

45.     Attorney General Sessions singled out Chicago for special opprobrium. The very same day that Chicago filed suit to challenge the unlawful FY2017 conditions, Attorney General Sessions declared that "[t]o a degree perhaps unsurpassed by any other jurisdiction, the political leadership of Chicago has chosen deliberately and intentionally to adopt a policy that obstructs

---

[7]     Press Release, U.S. Dep't of Justice, Statement by Attorney General Jeff Sessions on the U.S. Immigration and Customs Enforcement Declined Detainer Outcome Report (Mar. 20, 2017), http://tinyurl.com/ybrrnf8g.

[8]     Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

[9]     *See* Katie Benner, *Justice Dept. Rank-and-File Tell of Discontent Over Sessions's Approach*, NY Times (October 19, 2018), https://tinyurl.com/yd6trvzv (describing one instance in which former Attorney General Sessions "directly questioned a career lawyer" at the Department of Justice who expressed concern about the legal grounds for pursuing a particular anti-sanctuary city policy).

this country's lawful immigration system."[10]  He vowed to deny Chicago grant dollars unless it complied with the conditions.[11]  And he returned to this same theme again and again in speeches across the country.  In remarks in Miami in August 2017, he described Chicago's "'sanctuary' policies" as a "sad example" of a supposed breakdown in the "respect for the rule of law."[12]  And he asserted that "requir[ing]" Chicago to "reorder[] [its] law enforcement practice is exactly the point!" of his policies.[13]

46.  Attorney General Sessions' public criticism of so-called "sanctuary" cities continued even in the face of numerous setbacks in federal court.  Even after this Court and others had enjoined his unlawful attempts to target those jurisdictions, his preoccupation with jurisdictions like Chicago remained unbroken.  In June 2018, he declared that "[s]anctuary policies are terribly wrong" and vowed to "keep fighting" notwithstanding lawsuits from "sanctuary cities like … Chicago" that challenged the imposition of conditions on the Byrne JAG program.[14]  A few weeks later, in a speech in California, Attorney General Sessions even suggested (with no evidence whatsoever) that sanctuary policies may lead to the "release [of]

---

[10]  Press Release, U.S. Dep't of Justice, Statement by Attorney General Sessions on the City of Chicago's Lawsuit Against the U.S. Department of Justice (Aug. 7, 2017), https://tinyurl.com/yan8j9ca.

[11]  *Id.*

[12]  Press Release, U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on Sanctuary Policies (Aug. 16, 2017), https://tinyurl.com/y7tyj3so.

[13]  *Id.*

[14]  Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks at Lackawanna College on Immigration and Law Enforcement Actions (June 15, 2018), https://tinyurl.com/yac8f5nz.

pedophiles, rapists, murderers, drug dealers, and arsonists back into the communities where they had no right to be in the first place."[15]

**B.    Attorney General Sessions Targets The Byrne JAG Program**

47.    Soon after taking office, Attorney General Sessions began to turn his rhetoric into action by targeting the Byrne JAG program. On July 25, 2017, he claimed that "[s]o-called 'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens" and announced that he therefore would impose three conditions on a grantee's ability to receive its allotted Byrne JAG funds in order to "encourage these 'sanctuary' jurisdictions to change their policies."[16]

a.    *The "notice" condition:* The FY2017 awards contained a condition requiring that, "when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request . . . that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . —provide the required notice to DHS."

b.    *The "access" condition*: The FY2017 awards also contained a condition requiring that "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with

---

[15]    Press Release, U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks to the Criminal Justice Legal Foundation (June 26, 2018), https://tinyurl.com/ydhx7ezm.

[16]    Attorney General Sessions, Statement Announcing Byrne JAG Conditions (July 25, 2017), https://tinyurl.com/y9ttqhsl.

individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States."

c.  *The "Section 1373 compliance" condition*: In addition to the notice and access conditions, the FY2017 awards contained a requirement that the recipient certify its compliance with Section 1373.

48.  In August 2017, Chicago sought a preliminary injunction to prevent Attorney General Sessions from imposing those conditions on FY2017 Byrne JAG funds, on grounds that the conditions were unconstitutional, *ultra vires*, and arbitrary and capricious.

49.  Attorney General Sessions defended the notice and access conditions by arguing that they were authorized by 34 U.S.C. § 10102(a)(6), which endows an Assistant Attorney General with the power to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants." He defended the Section 1373 compliance condition by invoking 34 U.S.C. § 10153(a)(5)(D), which permits the Attorney General to require a "certification" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." He also suggested that all three conditions were meant to ensure that state and local law enforcement would not impair the law-enforcement activities of the federal government, including those federal activities contemplated by 8 U.S.C. §§ 1226(c), 1231(a)(1)(B), and 1231(a)(4).

50.  This Court preliminarily enjoined the notice and access conditions, in large part because Attorney General Sessions "fail[ed] to direct the Court to any textual authority within the Byrne JAG statute itself" allowing him to impose the notice and access conditions. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 941 (N.D. Ill. 2017). The Court did not preliminarily

enjoin the Section 1373 compliance condition. Attorney General Sessions took an interlocutory appeal from the preliminary injunction order, and the Seventh Circuit affirmed, unanimously holding that the notice and access conditions were *ultra vires* and unlawful and that Attorney General Sessions' reading of Section 10102(a)(6) as authorizing those conditions was "contrary to the plain meaning of the statutory language." *City of Chicago v. Sessions*, 888 F.3d 272, 284 (7th Cir. 2018).

51.     This Court ultimately granted summary judgment in Chicago's favor on all three conditions, concluding in July 2018 that each of the notice, access, and Section 1373 compliance conditions was *ultra vires* and unconstitutional. *See* Mem. Op. and Order, *City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), ECF No. 198, at 58 (attached as Ex. A). On the notice and access conditions, the Court adopted "the same reasons stated in [its] preliminary injunction ruling and the Seventh Circuit's opinion." *Id.* at 36-37. On the Section 1373 compliance condition, the Court concluded that, particularly in light of the Supreme Court's intervening decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), Section 1373 violated Tenth Amendment anti-commandeering principles by tying Chicago's hands in managing city personnel and city policy. *Id.* at 32-34. Having held Section 1373 unconstitutional, the Court concluded that the Attorney General lacked authority to require compliance with Section 1373 as an "applicable federal law" under the Byrne JAG statute. *Id.* at 40.

52.     This Court's final judgment declared each of the notice, access, and Section 1373 compliance conditions *ultra vires* and a violation of the constitutional principle of separation of powers and set the conditions aside under the Administrative Procedure Act as unlawful. *See* Final Judgment and Order, *City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), ECF No. 211, at 2 (attached as Ex. B). It also permanently enjoined the Attorney General from "denying

or delaying issuance of any FY 2017 Byrne JAG award insofar as that denial or delay" was based on the notice, access, or compliance condition, and prohibited the Attorney General from "using the Conditions in any FY 2017 Byrne JAG award document, delaying the processing or approval of a recipient's requests to draw upon the FY 2017 Byrne JAG funds based on the Conditions, and enforcing the Conditions against FY 2017 Byrne JAG recipients, regardless of whether those Conditions appeared in FY 2017 Byrne JAG award documents." *Id.* at 3.

53. During the remedy phase, Chicago expressed concern that the FY 2018 Byrne JAG grant would contain the same provisions and asked the Court to issue an injunction covering future grant awards. The Court declined to do so but warned that attorney's fees would likely be appropriate if the Attorney General once again forced Chicago to sue to prevent imposition of the same unlawful conditions.

**C. The Justice Department Expresses Concern That Chicago Does Not Comply With Section 1373 But Refuses To Make A Final Determination**

54. Because this Court determined that Section 1373 was unconstitutional and thus that the Section 1373 compliance condition was not authorized in the first place, it did not take up the question whether Chicago actually complies with Section 1373. But Chicago has always maintained that it does comply.

55. The Justice Department began requiring Byrne JAG grantees to certify compliance with Section 1373 in FY2016, and Chicago did so at that time. In a May 2016 report by the Department of Justice's Office of Inspector General, the Department suggested that the Welcoming City Ordinance, which prohibits City employees from sharing immigration status information with federal agents unless "otherwise provided under applicable federal law," Chicago Municipal Code § 2-173-030, contains "a potential ambiguity" as to its "proper construction" such that the "saving clause" contained in the Ordinance might be unclear.

56.     Since that report, Chicago has exchanged multiple letters with the Department of Justice concerning Chicago's compliance with Section 1373. On April 21, 2017, the Department sent letters to Chicago and eight other jurisdictions, informing Chicago that it was "required to submit documentation … that validates that your jurisdiction is in compliance with 8 U.S.C. § 1373." Chicago responded in July 2017, explaining that the Ordinance's "saving clause" in fact "makes clear than an individual's citizenship or immigration status information will *not* be kept confidential if federal law provides otherwise." In October 2017, the Department of Justice sent another letter, stating among other things that it had "determined that [Chicago] appears to have laws, policies, or practices that violate 8 U.S.C. § 1373." The letter was based on the premise that Section 1373 applies not only to the sharing of "information regarding immigration status," but also information "regarding a person's custody status or release date." Chicago sent another response, disagreeing with the Department's interpretation of the relevant statutory text, but reporting that, "[i]n the interest of resolving this issue," it had sent written notice to City department heads "instructing them to share with their officers and employees Chicago's interpretation of the [Welcoming City Ordinance] and explanation of its compliance with Section 1373." *See* Letter from Edward Siskel, Corporation Counsel, City of Chicago, to Alan R. Hanson, Acting Assistant Attorney General, Office of Justice Programs, U.S. Dep't of Justice (October 27, 2017) (attached as Ex. C).

57.     The Department of Justice nevertheless sent Chicago another letter in January 2018, announcing that "the Department remains concerned that your jurisdiction's laws, policies, or practices may violate section 1373, or, at a minimum, that they may be interpreted or applied in a manner consistent with section 1373." The letter requested that Chicago produce "[a]ll documents reflecting any orders, directives, instructions, or guidance to your law enforcement

employees …, that were distributed, produced, and/or in effect during the relevant timeframe, regarding whether and how these employees may, or may not, communicate" with federal agents. Chicago timely responded to the Department's request on February 23, 2018 by voluntarily providing the Department with copies of responsive documents. In the spirit of transparency, Chicago accompanied that response with an expedited FOIA request for documents related to the Department's interpretation of Section 1373.

58.     To date, Chicago has neither received a final determination of compliance with Section 1373 nor any documents in response to its FOIA request.

### D.     The Trump Administration Adopts Controversial Immigration Enforcement Strategies That Prompt Public Criticism From Local Officials, Including In Chicago

59.     Beyond the Byrne JAG program, the Trump Administration has adopted aggressive immigration enforcement tactics that target noncitizens in so-called "sanctuary" jurisdictions.

60.     One especially controversial strategy deployed by the Trump Administration involves targeting noncitizens *inside* courthouses, including noncitizens on official business at the courthouse, to seek a protective order, testify as a witness, or other reasons.[17] The prior Administration had allowed limited immigration enforcement at courthouses for noncitizens fitting within certain "enforcement priorities," such as threats to national security, public safety,

---

[17]     *E.g.*, Steve Coll, *When a Day in Court Is a Trap for Immigrants*, THE NEW YORKER (Nov. 8, 2017), https://tinyurl.com/ybv355d3; *see also, e.g.*, Brittany Mejia and Jazmine Ulloa, *ICE arrests in courtrooms escalate feud between California and Trump administration over immigration policy*, L.A. TIMES (Aug. 29, 2018), https://tinyurl.com/y6v8bjvh; Maria Cramer, *ICE Courthouse Arrests Worry Attorneys, Prosecutors*, BOSTON GLOBE (June 16, 2017), https://tinyurl.com/y9wsyyqq.

and border security,[18] but the Trump Administration does not observe these limitations on enforcement in courthouses.[19] The Trump Administration does not consider a courthouse to be a "sensitive location."

61.     The Trump Administration has expressly linked this strategy of targeting people in courthouses to its disagreement with Chicago's Welcoming City ordinance and other similar local policies. According to ICE, "courthouse arrests seem to be occurring more frequently" *because* "some law enforcement agencies no longer honor ICE detainers or limit ICE's access to their detention facilities."[20]

62.     The Trump Administration has targeted other sensitive locations as well, arresting noncitizens as they drop their children off for school or as they leave a hospital.[21] Although the Administration's policy purportedly is to "generally . . . avoid[]" taking enforcement actions at schools, medical facilities, places of worship, religious ceremonies, or public demonstrations, ICE expressly permits such enforcement actions under certain circumstances.[22]

---

[18]     U.S. Immigration and Customs Enforcement, *Fact Sheet: Frequently Asked Questions - Existing Guidance on Enforcement Actions at or Focused on Sensitive Locations* (July 15, 2016), https://www.dhs.gov/news/2016/07/15/fact-sheet-frequently-asked-questions-existing-guidance-enforcement-actions-or.

[19]     *See* U.S. Immigration and Customs Enforcement, *FAQ on Sensitive Locations and Courthouse Arrests*, https://www.ice.gov/ero/enforcement/sensitive-loc.

[20]     *Id.*; *see also id.* ("[T]he increasing unwillingness of some jurisdictions to cooperate with ICE in the safe and orderly transfer of targeted aliens inside their prisons and jails has necessitated additional at-large arrests.").

[21]     *E.g.*, Andrea Castillo, *Immigrant arrested by ICE after dropping daughter off at school, sending shockwaves through neighborhood*, L.A. TIMES (March 3, 2017), https://tinyurl.com/y76yn949; Scott Neuman and John Burnett, *10-Year-Old Girl Is Detained By Border Patrol After Emergency Surgery*, NPR (Oct. 26, 2017), https://tinyurl.com/yd2ufsgj; Christie Duffy, *2 dads nabbed by ICE as they drop off kids at NJ school; 3rd takes shelter in church*, PIX11 (Jan. 25, 2018), https://tinyurl.com/ycjz7f4w.

[22]     U.S. Immigration and Customs Enforcement, *FAQ on Sensitive Locations and Courthouse Arrests*, https://www.ice.gov/ero/enforcement/sensitive-loc.

63.     Chicago Mayor Rahm Emanuel has stated unequivocally that it is City policy not to permit ICE to enforce federal immigration law in Chicago schools.[23] It is essential to the values embodied in the Welcoming City Ordinance that Chicago and its officials remain free to speak out publicly and forcefully against attempts by the Trump Administration to arrest noncitizens at sensitive locations, including courthouses, schools, medical facilities, places of worship, religious ceremonies, and public demonstrations. The Board President of Cook County (which is a Byrne JAG sub-grantee of Chicago) has also issued a formal proclamation specifically opposing ICE's courthouse arrests after a resident who has previously received protection from immigration enforcement activity under the Deferred Action for Childhood Arrivals (DACA) program was wrongfully detained in the Cook County courthouse in Skokie after appearing for a minor traffic violation.[24] Chicago and its subgrantees will continue to speak out against wrong-headed immigration enforcement strategies that sow fear and chaos in local courthouses, schools, hospitals, and places of worship.

**E.     The Trump Administration Advances A Radical New Interpretation Of 8 U.S.C. § 1324**

64.     While the litigation over the FY2017 conditions on the Byrne JAG Program was pending, the Trump Administration sought to weaponize another provision of the U.S. Code against jurisdictions seeking to prioritize local law enforcement over enforcement of civil immigration law.

---

[23]     *See* Press Conference (September 6, 2017), https://livestream.com/chicagosmayor/press/videos/162377651 ("ICE will not go to our schools.").

[24]     Carrie Frillman, *Cook Co. President Urges Trump To Stop ICE Arrests In Courthouses*, PATCH (Feb. 7, 2018), https://tinyurl.com/y8rdp8vb.

65.     During a January 4, 2018, interview on Fox News, then-Acting Director of U.S. Immigrations and Customs Enforcement Thomas Homan said that he had asked the Department of Justice to "[l]ook into criminal charges for elected officials with sanctuary policies, as they are harboring illegal aliens, according to 8 U.S.C. § 1324." Kirstjen Nielsen, the Secretary of Homeland Security, confirmed during testimony before the Senate Judiciary Committee on January 16, 2018, that "the Department of Justice is reviewing what avenues may be available" to charge elected officials in so-called sanctuary jurisdictions.

66.     In the nearly seventy years since 8 U.S.C. § 1324 was enacted, the federal government has never attempted to prosecute an elected official acting in their official capacity for violation of that statute. For much of this time, cities such as Chicago declined to participate in federal immigration enforcement without any indication that doing so violated any criminal statute. This attempt by the Trump Administration to criminalize the policy choices of local governments represents a significant threat to the ability of cities such as Chicago to enact policies intended to foster public safety.

### F.     Attorney General Sessions Seeks To Impose The Same Unlawful Conditions (Plus Two New Ones) On FY2018 Byrne JAG Grants

67.     Notwithstanding over a year of litigation before this Court and this Court's clear rulings invalidating its approach, the Department of Justice's FY2018 Byrne JAG Local Solicitation and required certifications (attached as Exs. F-I) reflect Attorney General Sessions' decision to re-impose the FY2017 notice, access, and 1373 conditions, as well as several new conditions similarly designed to impress state and local officers into the service of federal immigration-enforcement priorities. Those conditions are described in further detail below.

68.     Chicago submitted an application for FY2018 Byrne JAG funding, but refused to certify it would comply with the unlawful conditions.

69.     Attorney General Sessions began issuing FY2018 Byrne JAG grants in early October 2018.  The conditions announced in the FY2018 Local Solicitation appeared in FY2018 Byrne JAG award letters issued at this time.

70.     By October 12, 2018, the Department had issued 752 FY2018 local awards, totaling almost $59 million—representing 70% of the local funding available for FY2018 and over 65% of the eligible jurisdictions.  But Chicago still had not received notification of its FY2018 award or of when it might expect to receive its award.  Chicago therefore commenced this action in an attempt to obtain the FY2018 Byrne JAG grant to which it is entitled.

**G.      Attorney General Sessions Resigns And The President Unlawfully Directs Matthew Whitaker To Act As Attorney General**

71.     Meanwhile, on November 7, 2018, Attorney General Sessions resigned at the request of the President.

72.     Federal law directs that upon the Attorney General's resignation the Deputy Attorney General is empowered to "exercise all the duties" of the office of the Attorney General. 5 U.S.C. § 508.  Federal law further provides for other high-ranking, Senate-confirmed Justice Department officials to exercise such duties should the Deputy Attorney General be unavailable to do so.

73.     Notwithstanding the clear requirements of federal law, the President directed Mr. Whitaker, Attorney General Sessions' chief of staff, to act as the Attorney General.  The Attorney General's chief of staff is not in the statutory line of succession.

74.      Nor was Mr. Whitaker appointed to his role as Attorney General Sessions' chief of staff with the advice and consent of the Senate.  The Appointments Clause of the U.S. Constitution requires that the appointment of principal officers of the United States, such as the Attorney General, be with the advice and consent of the Senate.

-28-

75.     There are no fewer than seven Department of Justice officials, including Deputy Attorney General Rosenstein and Solicitor General Noel Francisco, who were nominated by President Trump and appointed pursuant to the Appointments Clause to offices in the statutory line of succession for the office of the Attorney General. Numerous other officials currently serving in the Department of Justice have also been confirmed to their roles by the Senate. The President has not explained why none of these constitutionally appointed officers could fulfil the duties of the Attorney General. Nor has he claimed any exigency that would justify even temporarily installing an unconfirmed Department of Justice employee into a cabinet-level position.

**H.      The Department Imposes Unlawful Conditions On Chicago's FY2018 Byrne JAG Award**

76.     On November 20, 2018—more than a month after Chicago commenced this action, and almost two weeks into Mr. Whitaker's supposed tenure as Acting Attorney General—Chicago received notification of its FY2018 Byrne JAG grant award.

77.     The notification confusingly states that it was issued "[o]n behalf of Attorney General Jefferson Sessions III," who had resigned thirteen days before the notification was sent.

78.     Four of the immigration-related conditions contained in Chicago's FY2018 award are materially identical to the FY2017 Byrne JAG conditions this Court has already held unlawful and set aside. On that basis alone, the Attorney General—whoever that may be—is precluded from defending the conditions.

79.     The Department of Justice—under the direction of Attorney General Sessions—announced on November 3, 2018 that it would not "use or enforce" those repeat conditions, but reserved the right to do so "[i]f the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner such that DOJ decides to use or enforce any or all of [the

repeat conditions]." Special Notice Re: FY 2018 Byrne JAG award conditions 41-43 and 45-47 (attached as Ex. E). This reservation of the right to impose the illegal conditions means that, despite this Court's extremely clear admonition that the Attorney General should not reimpose those very conditions, Chicago did not obtain its FY2018 Byrne JAG award when other jurisdictions did and cannot obtain those funds free and clear. Accordingly, Chicago was forced to sue again on the same conditions and should receive its attorney's fees and costs for having to do so.

80. The repeated conditions are, as mentioned, materially identical to those already enjoined and held unlawful by this Court:

81. *The "Section 1373 compliance condition":* Chicago's FY2018 award requires that the "program or activity" funded under Chicago's Byrne JAG award comply with 8 U.S.C. § 1373(a) and (b) and that the Chief Legal Officer of the recipient execute a certification (attached as Ex. F) declaring the "program or activity" in compliance with those provisions. Ex. D ¶¶ 41-42. This condition is materially identical to the FY2017 Section 1373 compliance condition.

82. *The "Section 1644 compliance condition":* Chicago's FY2018 award requires that the "program or activity" funded under Chicago's Byrne JAG award comply with 8 U.S.C. § 1644 and that the Chief Legal Officer of the recipient execute a certification declaring the "program or activity" in compliance with that provision (attached as Ex. F). Ex. D ¶¶ 41-42. This condition is materially identical to the FY2017 Section 1644 compliance condition, because 8 U.S.C. § 1644 proscribes the exact same conduct as 8 U.S.C. § 1373.

83. *The "FY2018 notice condition":* Chicago's FY2018 award requires Chicago to "provide—as early as practicable … —advance notice to [federal immigration officials] of the

scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from [a federal immigration authority] a formal written request pursuant to the INA that seeks such advance notice." Ex. D ¶ 46. The conduct required by this condition is identical to the conduct Attorney General Sessions attempted to require with the FY2017 notice condition.

84. *The "FY2018 access condition":* Chicago's FY2018 award requires Chicago to permit "access to any State or local government (or government-contracted) correctional facility by such agents for the purpose [of] 'interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States.'" Ex. D ¶ 45. The conduct required by this condition is identical to the conduct Attorney General Sessions attempted to require with the FY2017 access condition.

85. In addition to these revived conditions, Chicago's FY2018 Byrne JAG award contains a new unlawful condition, and an additional mandatory certification, each of which is intended to deny funds to cities like Chicago that seek nothing more than to exercise their right to opt out of participation in federal immigration enforcement.

86. *The "harboring" condition:* Chicago's FY2018 Byrne JAG award prohibits Chicago from "direct[ly] or indirect[ly]" attempting to "conceal, harbor, or shield from detection" any undocumented immigrant by publicly disclosing federal law enforcement information, even where doing so would not violate any statute. Ex. D ¶ 44. The award letter attempts to justify this condition as being "[c]onsistent with the purposes and objectives of federal law enforcement statutes and federal criminal law." As written, this condition would appear to prohibit Chicago and its subgrantees from publicly criticizing ICE enforcement strategies that involve targeting City residents at courthouses, schools, and other sensitive

locations, in violation of the City's stated policies and in contravention of the spirit of the Welcoming City Ordinance and fundamental principles of decency and public order. The condition also would require Chicago to monitor its subgrantees to ensure their compliance with this condition. Ex. D ¶ 44(2).

87.     *The "additional certification" condition:*  In addition to certifying compliance with Section 1373 and 1644, the FY2018 Byrne JAG Local Solicitation requires the Chief Legal Officer of a FY2018 Byrne JAG applicant to execute a "Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231 (a), 1324(a), 1357(a), & 1366(1) & (3)" (attached as Ex. G). The Chief Executive Officer, in turn, is required to execute "Certifications and Assurances by the Chief Executive of the Applicant Government" (attached as Ex. H) that adopts this certification by the Chief Legal Officer. Ex. D ¶ 61. The Chief Legal Officer certification represents that "neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the 'program or activity' to be funded … that would or does—(a) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); or (b) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) or (c), 8 U.S.C. § 1231(a), or 8 U.S.C. § 1366(1) or (3)." Ex. G. As with the repeat conditions, the Attorney General has temporarily withdrawn this condition, but reserved the right to reimpose it "[i]f the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner such that DOJ decides to use or enforce any or all of [the repeat conditions]." Ex. E.

88.     These conditions have no legal basis. Moreover, all the conditions are invalid because Mr. Whitaker lacked the authority to serve as Acting Attorney General when he imposed the conditions on Chicago.

## IV. THE UNLAWFUL NEW CONDITIONS HAVE INJURED AND CONTINUE TO INJURE CHICAGO

89. By imposing the unlawful conditions on the Byrne JAG program, Attorney General Sessions sought to pressure cities into abandoning their longstanding public safety priorities, on pain of losing critical formula grant funds that would otherwise support officer safety, community empowerment, and innovative countermeasures in the fight against gun violence.

90. The Department of Justice under purported acting Attorney General Whitaker has continued this strategy, including by seeking to impose unlawful conditions on Chicago's FY2018 Byrne JAG grant award.

91. The imposition of these unlawful conditions through the Byrne JAG program injures Chicago by hindering the City's sovereign ability to develop and deploy effective policing policy without regard to the constraints imposed by the conditions. In addition, the conditions injure Chicago in myriad specific ways set forth below.

92. The Department's delay in issuing Chicago its FY2018 award deprived Chicago and its sub-grantees of access to critically needed law enforcement funding and forced Chicago to file this lawsuit to obtain its funding. And, by continuing to reserve the right to reimpose the conditions already held unlawful and by insisting that Chicago acquiesce in an equally unlawful "harboring" condition, the Department continues to threaten Chicago and its sub-grantees with the loss of the award that was issued only as a result of this lawsuit. Finally, by forcing Chicago to sue to force the Department even to issue an award letter and *temporarily* withdraw the repeat unlawful conditions, the Department has demonstrated that it will continue to subject Chicago to such delays and deprivations in subsequent years unless this Court orders otherwise.

93.     Although the Department has declared that it will not "use or enforce" the unlawful FY2018 conditions carried over from FY2017, it has reserved the right to impose them at some unspecified point in the future. The voluntary and assertedly temporary decision not to enforce the repeat conditions does not redress Chicago's injury. So long as the Attorney General reserves the right to impose these conditions, Chicago is in danger of the harms described below.

94.     To date, the Department has refused to finally determine whether Chicago complies with Section 1373 (and therefore also Section 1644). Instead, it has expressed a vague concern that Chicago has some heretofore unidentified policy that contradicts its official interpretation of the Welcoming City Ordinance and put forth an unprincipled and overbroad definition of "immigration status information" that encompasses a detainee's custody status and release date. Despite refusing to provide clear guidance on what Sections 1373 and 1644 require, the Department continues to insist that Byrne JAG applicants' chief legal and executive officers execute certifications—under express penalty of "criminal prosecution," or "civil penalties and administrative remedies for false claims"—that their jurisdictions comply with Sections 1373 and 1644. This uncertainty has clouded the City's ability to apply for funds.

95.     The uncertainty regarding the Department's interpretation of Section 1373 and 1644 also has given rise to a fear of prosecution or other adverse legal action. In the first week following his inauguration, President Trump ordered the Attorney General to take "appropriate enforcement action against any entity that violates [Section] 1373," Executive Order No. 13,768 § 9(a), which Attorney General Sessions interpreted to mean filing civil preemption actions against jurisdictions he believes violate Section 1373. *See* Opp. Mot. Prelim. Inj., *Richmond v. Trump*, No. 3:17-cv-01535 (N.D. Cal.), ECF No. 16, at 8-9, 22. Carrying out that threat, the Department of Justice sued the State of California based in part on Section 1373 to try to force

California to abandon its immigration-related policies. *See United States v. State of California*, No. 2:18-cv-00490 (E.D. Cal.). Chicago reasonably believes that the Department may pursue similar enforcement litigation against Chicago.

96. The additional certification requirement poses the same problems. While Chicago is confident that it does not "impede" the federal government's exercise of authority under 8 U.S.C. §§ 1226(a) or (c), 1231(a)(4), 1357(a) or 1366(1) or (3), it has well-founded concerns, based on the Trump Administration's history of targeting Chicago, that the Administration may put forth a new, broad interpretation of those provisions, designed to ensnare Chicago or its officials in a dispute over the validity of those certifications.

97. The new "harboring" condition also threatens to chill the speech of City officials who disagree with the federal government's controversial immigration enforcement strategies, such as targeting noncitizens at courthouses, schools, hospitals, or places of worship in so-called "sanctuary" jurisdictions. The City and its sub-grantees have publicly criticized such practices in the past and will publicly criticize them again in the future. But Chicago has well-founded concerns that the Department will consider such criticism a violation of the Department's vague prohibition on "direct[ly] or indirect[ly]" attempting to "conceal, harbor, or shield from detection" any undocumented noncitizens by publicly disclosing federal law enforcement information. And those concerns are heightened by the suggestions from the former Acting Director of ICE and the current Secretary of Homeland Security that the Administration is considering *criminally prosecuting* elected officials in so-called sanctuary jurisdictions on the theory that Welcoming City-style policies violate the federal anti-harboring statute, 8 U.S.C. § 1324. This unauthorized attempt to silence City officials from commenting on the affairs of

courthouses, schools, hospitals, and public spaces within the City strikes directly at the City's right to self-government.

98.     More fundamentally, complying with the FY2018 conditions would undermine public safety in Chicago. The Welcoming City Ordinance assists effective policing by building trust between law enforcement officers and the immigrant community. Conversely, policing suffers when members of that community, whatever their immigration status, do not feel free to report crimes, assist in investigations, or testify as witnesses. Purported acting Attorney General Mr. Whitaker's insistence that Chicago abandon its existing policies, that Chicago give immigration enforcement agents on-demand access to its detention facilities to investigate potential civil immigration violations, and that Chicago detain individuals solely so that they can be investigated for possible civil immigration violations would undermine crucial public trust, cut local law enforcement efforts off at the knees, and make everyone in Chicago less safe.

99.     Chicago now faces the prospect of a severe federal incursion on its sovereignty. Chicago could abandon its attempts to preserve the policymaking autonomy afforded it under our federal system, in hopes that the Attorney General award Chicago the funds promised it by Congress. Given the dogged refusal to award Chicago funds to which it has a plain statutory entitlement, even such a dramatic reversal may not bring Chicago the law enforcement funds it needs. Or Chicago could continue its decades-long focus on policies that further the best interests of its residents and officers but lose out on funds it has long used to fund critical law-enforcement needs. The use of the federal government's coercive power in this manner causes a deep and irreparable injury to Chicago's sovereignty, and to our federal system.

100.     Moreover, whichever decision Chicago ultimately makes, its residents and police force will be immediately and irreparably harmed. If Chicago accepts the unlawful conditions, it

will forfeit decades' worth of trust and goodwill that its police force has built in the communities it serves. And as those decades of experience show, that kind of trust, once lost, is lost forever. Alternatively, if Chicago asserts its right to determine its own policy and refuses to certify compliance with the Department's new and unlawful conditions, it (and the eleven other jurisdictions that depend on Chicago's application for their Byrne JAG funds) will forever forfeit the FY2018 Byrne JAG grant monies—monies that are critical to Chicago's community policing operation and that purchase essential and life-saving equipment for Chicago and its neighboring jurisdictions. Even if Chicago and its neighbors could later obtain those funds, the damage would have already been done in the months or years their police forces and residents will have spent without crucial equipment and services.

## V. THE ATTORNEY GENERAL IS NOW PRECLUDED FROM DEFENDING MOST OF THE FY2018 BYRNE JAG CONDITIONS

101. The Attorney General is precluded from relitigating claims and issues resolved in the FY2017 litigation brought by Chicago—namely, the legality of the Section 1373 compliance, Section 1644 compliance, notice, and access conditions on the Byrne JAG program—with regard to the FY2018 Byrne JAG awards or any future Byrne JAG awards. All of the legal requirements for preclusion are met here.

102. The FY2018 versions of those conditions are materially identical to the FY2017 versions this Court has already enjoined as unlawful. The FY2018 Section 1373 and Section 1644 compliance conditions are no different than the FY2017 Section 1373 condition, because Section 1644 proscribes the same conduct as Section 1373. And the FY2018 notice and access conditions, though framed slightly differently, require the same conduct as the FY2017 notice and access conditions—providing 48 hours' advance notice to federal immigration authorities of the scheduled release date and time of identified individuals and allowing federal officials on-

demand access to individuals in Chicago's custody for purposes of immigration-related interrogation.

103.     The validity of the FY2017 Section 1373, notice, and access conditions was not just actually litigated in a prior lawsuit—it was the central issue in the FY2017 litigation.

104.     This Court's final judgment critically depended upon its determination that the FY2017 Section 1373, notice, and access conditions were unlawful. That order set aside each of the three FY2017 conditions based on this Court's conclusion the Attorney General could not lawfully impose any of those conditions.

105.     Finally, the Attorney General was fully represented in the FY2017 litigation by capable lawyers from the Department of Justice.

## COUNT ONE:  VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (ULTRA VIRES)

106.     Chicago incorporates by reference the allegations of the preceding paragraphs.

107.     The Department of Justice may exercise only authority conferred by statute. *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013); *see also* 5 U.S.C. § 706(2)(C).

### A.     The FY2018 Notice And Access Conditions Are *Ultra Vires*

108.     Notwithstanding this Court's order setting aside the materially identical FY2017 notice and access conditions, Attorney General Sessions sought to impose FY2018 conditions requiring identical conduct. Purported acting Attorney General Whitaker has continued this policy.

109.     The Court's prior determination that the notice and access conditions are unlawful, in a lawsuit involving the same parties and the same underlying federal grant program, is conclusive here. The Attorney General is therefore precluded from relitigating the lawfulness of the notice and access conditions.

110. Even as an initial matter, the Attorney General lacks statutory authority to condition Byrne JAG funds on the FY2018 notice and access conditions. Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute, as this Court and the Seventh Circuit have held. The FY2018 notice and access conditions cannot stand.

111. As a direct and proximate result of those unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down the programs they support.

112. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the Attorney General is without authority to impose the FY2018 notice and access conditions on Byrne JAG funds (or materially identical conditions in future grant years), an order that those conditions be set aside, and an injunction preventing those conditions from going into effect.

113. Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 notice or access conditions).

114. Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the FY2018 notice and access conditions on Chicago is not substantially justified given this Court's order setting aside materially identical conditions Attorney General Sessions attempted to impose on FY2017 Byrne JAG funds.

115. Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the FY2018

notice and access conditions on Chicago notwithstanding this Court's order setting aside materially identical conditions from FY2017 demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

**B. The Section 1373 And Section 1644 Compliance Conditions Are *Ultra Vires***

116. The Court's prior determination that the Section 1373 compliance condition is unlawful, in a lawsuit involving the same parties and the same underlying federal grant program, is conclusive here as to both the Section 1373 compliance condition and the substantively identical Section 1644 compliance condition. The Attorney General is therefore precluded from relitigating the lawfulness of the notice and access conditions.

117. The Attorney General lacks statutory authority to condition Byrne JAG funds on compliance with Section 1373 or Section 1644. The Byrne JAG statute's requirement that grantees comply with "all other applicable Federal laws" does not confer authority to condition Byrne JAG funding on Section 1373 or Section 1644 compliance, because neither provision is an "applicable" law here. The phrase "all other applicable Federal laws" in the Byrne JAG statute refers to the host of laws that regulate the conduct of federal grant recipients *as grant recipients*. It does not refer to every section of the U.S. Code that could possibly apply to a state or local government. Neither Section 1373 nor Section 1644 regulate grantees as grantees nor do its terms mention federal grants or funds.

118. Moreover, and as this Court already held with respect to a substantively identical condition in the FY2017 Byrne JAG grant, Section 1373 and Section 1644 are facially unconstitutional because they seek to commandeer state and local officials into the service of federal immigration-enforcement authorities. Because those laws are facially unconstitutional, they are not "applicable laws" available for incorporation into the Byrne JAG program.

119. The Section 1373 and Section 1644 compliance conditions on the FY2018 Byrne JAG grant cannot stand.

120. As a direct and proximate result of these unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down the programs they support.

121. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the Attorney General is without authority to impose the FY 2018 Section 1373 and Section 1644 conditions on Byrne JAG funds (or materially identical conditions in future grant years), an order that those conditions be set aside, and an injunction preventing those conditions from going into effect.

122. Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 or Section 1644 conditions).

123. Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the FY2018 Section 1373 compliance and Section 1644 compliance conditions on Chicago is not substantially justified given this Court's order setting aside materially identical conditions Attorney General Sessions attempted to impose on FY2017 Byrne JAG funds.

124. Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the FY2018 Section 1373 compliance and Section 1644 compliance conditions on Chicago notwithstanding this Court's order setting aside materially identical conditions from FY2017 demonstrates bad

faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

### C.      The Harboring Condition Is *Ultra Vires*

125.     The Attorney General also lacks statutory authority to condition FY2018 Byrne JAG funding on a commitment not to conceal, harbor, or shield from detection undocumented immigrants by disclosing federal law enforcement information.

126.     The Byrne JAG statute allows the Attorney General to require a certification of compliance only with applicable laws. The harboring condition specifically states that it applies even where disclosure of information would not violate federal anti-harboring laws.

127.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that Attorney General is without authority to impose the harboring condition on FY2018 Byrne JAG funds (or materially identical conditions in future grant years), an order that that condition be set aside, and an injunction preventing that condition from going into effect.

128.     Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the harboring condition).

129.     Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the harboring condition on Chicago is not substantially justified given that this Court has already held that the Attorney General lacks the authority to impose this sort of policy condition on Byrne JAG funds.

130.     Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the harboring condition on Chicago notwithstanding this Court's holding that the Attorney General lacks the

authority to impose this sort of policy condition on Byrne JAG funds demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

### D. The Additional Certification Requirement Is *Ultra Vires*

131. The Attorney General also lacks statutory authority to condition Byrne JAG funds on a certification that the applicant has no law that "impedes" the federal government's exercise of authority under 8 U.S.C. §§ 1226(a) & (c), 1231 (a), 1357(a), or 1366(1) & (3).

132. The phrase "all applicable Federal laws" in the Byrne JAG statute refers to laws that regulate the conduct of federal grant recipients. Sections 1226(a) and (c), 1231(a), 1357(a), and 1366(1) and (3), by their terms, apply to the federal government, not individual cities and states. Those laws are therefore not "applicable" to individual grant recipients making the certifications required for participation in the Byrne JAG program.

133. As a direct and proximate result of these unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down the programs they support.

134. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the Attorney General is without authority to impose the additional certification requirement on Byrne JAG funds (in FY2018 or any future grant year), an order that the condition be set aside, and an injunction preventing the condition from going into effect.

135. Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 additional certification condition).

136. Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. Any attempt to impose the

additional certification requirement on Chicago is not substantially justified given that this Court has already held that the Attorney General lacks the authority to impose this sort of condition on Byrne JAG funds.

137.     Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.   Any attempt to impose the additional certification requirement on Chicago notwithstanding this Court's holding that the Attorney General lacks the authority to impose this sort of condition on Byrne JAG funds demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

## COUNT TWO:  VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (SEPARATION OF POWERS)

138.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

139.     When an agency acts "contrary to constitutional right, power, privilege, or immunity," a reviewing court must "hold unlawful and set aside" the challenged action. 5 U.S.C. § 706.

140.     The Constitution vests the spending power in Congress, not the President. The Executive "does not have unilateral authority to refuse to spend . . . funds" that have already been appropriated by Congress "for a particular project or program."  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

141.     Congress in the Byrne JAG statute required the Executive to distribute Byrne JAG funds based on a simple funding formula.  Imposing a new condition on the program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.  The FY2018 notice and access conditions, the Section 1373 and Section 1644 compliance conditions, the harboring condition, and the additional certification condition were not imposed by Congress,

but rather by the Attorney General. Those conditions therefore amount to improper usurpation of Congress's spending power by the Executive Branch.

142.     The Court's prior determination that the Attorney General lacks the statutory authority to impose the notice and access conditions or the Section 1373 compliance condition, in a lawsuit involving the same parties and the same underlying federal grant program, is conclusive here. The Attorney General is therefore precluded from relitigating the issue of his authority to impose the notice and access conditions or the Section 1373 compliance condition and the substantively identical Section 1644 compliance condition.

143.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the FY2018 notice and access conditions, the Section 1373 and Section 1644 compliance conditions, the harboring condition, and the additional certification condition (as well as any materially identical conditions the Attorney General may impose in future grant years) violate the constitutional separation of powers and arrogate to the Executive power that is reserved to the Legislature, as well as an injunction preventing those conditions from going into effect.

144.     Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 compliance, Section 1644 compliance, notice, access, harboring, or additional certification conditions).

145.     Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the FY2018 Section 1373 compliance, Section 1644 compliance, notice, and access conditions on

Chicago is not substantially justified given this Court's order setting aside materially identical conditions Attorney General Sessions attempted to impose on FY2017 Byrne JAG funds. The attempt to impose the harboring condition and the additional certification condition on Chicago is not substantially justified given that this Court has already held that the Attorney General lacks the authority to impose these sorts of policy conditions on Byrne JAG funds.

146.    Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. The attempt to impose the FY2018 Section 1373 compliance, Section 1644 compliance, notice, and access conditions on Chicago notwithstanding this Court's order setting aside materially identical conditions from FY2017 demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit. The attempt to impose the harboring condition and the additional certification condition on Chicago notwithstanding this Court's holding that the Attorney General lacks the authority to impose these sorts of policy conditions on Byrne JAG funds demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

## COUNT THREE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (SPENDING CLAUSE)

147.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

148.    In any event, Congress could not have authorized the conditions here because they do not satisfy the additional requirements of the Spending Clause. Accordingly, those requirements must be enjoined.

### A. The Conditions Are Unconstitutionally Ambiguous

149. Federal restrictions on grants provided to state and local governments must also be articulated "unambiguously" so that the recipient can "voluntarily and knowingly accept[]" Congress's terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16-17 (1981).

150. All of the FY2018 immigration-related conditions are ambiguous as to what is expected of grant recipients in Chicago's position, particularly given Chicago's Welcoming City Ordinance and other relevant policies and practices. The FY2018 notice and access conditions do not provide Chicago sufficient notice of what will be expected of it because they are entirely dependent on the future exercise of discretion by federal agents outside of the Department of Justice. The Section 1373 and Section 1644 compliance conditions are also ambiguous, and the Department's guidance documents and other actions have only added to the confusion. Furthermore, many interpretations of Section 1373 and Section 1644 would raise serious constitutional concerns. The harboring condition is likewise ambiguous. The Trump Administration has offered no guidance on how a municipality's disclosure of information could constitute "conceal[ing], harbor[ing], or shield[ing] from detection" any individual. Finally, the additional certification condition is also ambiguous. It imposes on the certifying jurisdiction an obligation not to "impede" the federal government's exercise of its authority under 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1357(a), or 1366(1) & (3), but nowhere explains what the Department understands "impede" to mean.

### B. The Conditions Are Not Germane To The Byrne JAG Program

151. Conditions on spending grants must be "relevant to [the] federal interest" in the particular grant program. *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958); *accord South Dakota v. Dole*, 483 U.S. 203, 207-208 & n.3 (1987). This nexus requirement ensures that

the federal government does not use spending conditions to regulate state and local governments beyond the contours of the spending program itself.

152.    The FY2018 notice and access conditions are not relevant to the federal interest in the Byrne JAG funds Chicago receives. Among other things, information concerning when detainees will be released from lockup and policies respecting access for federal immigration agents bear no relevance to improving the ability of Chicago's Bureau of Detective to solve violent crimes, the Force for Good Program, or other uses to which Chicago puts Byrne JAG funds. Nor are they relevant to the Byrne JAG program's larger purposes.

153.    The Section 1373 and Section 1644 compliance conditions are also not relevant to the federal interest in the Byrne JAG funds Chicago receives, or to the program's larger purposes. Information sharing with federal officials regarding an individual's immigration status bears no connection to the replacement vehicles for worn-out police patrol cars, support for the Force for Good program, or the acquisition of new law enforcement equipment.

154.    The additional certification condition is also not relevant to the federal interest in the Byrne JAG funds Chicago receives.

155.    The harboring condition is also not relevant to the federal interest in the Byrne JAG funds Chicago receives.

156.    As a direct and proximate result of these unconstitutional conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down or materially alter the programs they support.

157.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that the FY 2018 notice and access conditions, the Section 1373 and Section 1644 compliance conditions, the Section 1324 condition, the harboring condition, and the additional

certification condition (as well as any materially identical conditions the Attorney General may impose in future grant years) violate the Spending Clause, as well as an injunction preventing those conditions from going into effect.

158.     Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 compliance, Section 1644 compliance, notice, access, harboring or additional certification conditions).

## COUNT FOUR: COMMANDEERING

159.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

160.     As this Court has already declared, in a lawsuit involving the same parties and the same underlying federal grant program, 8 U.S.C. § 1373 is facially unconstitutional. That determination is conclusive here. The Attorney General is therefore precluded from relitigating Section 1373's constitutionality.

161.     8 U.S.C. § 1644 is substantively identical to Section 1373. The Attorney General is therefore precluded from litigating Section 1644's constitutionality as well.

162.     And beyond the conclusive import of the prior litigation with regard to Section 1373 and Section 1644, they are plainly unconstitutional under the anticommandeering doctrine. The Tenth Amendment prohibits the federal government from "requir[ing]" state and local governments "to govern according to Congress's instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997). Congress has transgressed the limits of the Tenth Amendment when it "regulat[es] activities undertaken by

government entities only," Ex. A at 21, rather than "evenhandedly regulat[ing] an activity in which both States and private actors engage," *NCAA*, 138 S. Ct. at 1478.

163. Sections 1373 and 1644 do just that, by prohibiting state and local governments from engaging in a core aspect of governing: controlling the actions of their own employees and retaining control over local law enforcement policy. Sections 1373 and 1644 are therefore facially unconstitutional and cannot be validly enforced against Chicago or imposed on Byrne JAG recipients as "applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D).

164. As a direct and proximate result of these unconstitutional conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forgo Byrne JAG funds and shut down or materially alter the programs they support.

165. Pursuant to 28 U.S.C. § 2201, Chicago is entitled to a declaration that 8 U.S.C. §§ 1373 and 1644 violate the Tenth Amendment.

166. Pursuant to 28 U.S.C. § 2201, Chicago is further entitled to a declaration that 8 U.S.C. §§ 1373 and 1644 cannot validly be imposed as conditions on the Byrne JAG program as well as an injunction preventing the FY2018 Section 1373 and Section 1644 conditions (or any materially identical conditions the Attorney General may seek to impose in future grant years) from going into effect.

167. Pursuant to 28 U.S.C. §§ 1361 and 1651, Chicago is entitled to a writ of mandamus compelling the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award as contemplated by the Byrne JAG statute (i.e., without the FY2018 Section 1373 compliance or Section 1644 compliance conditions).

168. Pursuant to 28 U.S.C. § 2412(d)(1)(A), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation. Any contention that the

Section 1373 and Section 1644 are constitutional is not substantially justified given this Court's order holding Section 1373 facially unconstitutional.

169.     Pursuant to 28 U.S.C. § 2412(b), Chicago is entitled to an award of its costs, attorney's fees, and expenses associated with this litigation.   Any contention that that Section 1373 and Section 1644 are constitutional demonstrates bad faith and an attempt to undermine or avoid this Court's permanent injunction in Chicago's FY2017 suit.

### COUNT FIVE: DECLARATORY JUDGMENT THAT CHICAGO'S WELCOMING CITY ORDINANCE AND IMPLEMENTING POLICIES COMPLY WITH SECTION 1373 AND SECTION 1644

170.     Chicago incorporates by reference the allegations of the preceding paragraphs.

171.     Where City officials or agents come to possess immigration status information, Chicago has no policy restricting the sharing of such information contrary to Section 1373 or Section 1644.

172.     Section 20 of the Welcoming City Ordinance permits Chicago's agents and agencies to request or receive information about citizenship or immigration status (from ICE or elsewhere) whenever required by "federal regulation"—which, as Chicago's Chief Legal Officer has explained, "do[es] not restrict the sharing of immigration status information with federal immigration officers."

173.     Section 30 of the Welcoming City Ordinance limits the disclosure of an individual's citizenship or immigration status information "[e]xcept as otherwise provided by applicable federal law." In the context of the Welcoming City Ordinance—and, again, as Chicago's Chief Legal Office has explained—"applicable federal law" includes Sections 1373 and 1644 to whatever extent Sections 1373 and 1644, and any individual federal request made pursuant to those provisions, is a lawful and constitutional exercise of federal authority.

174.     Section 42 of the Welcoming City Ordinance (and the Chicago Police Department's implementing policy, CPD Special Order S06-14-03) does not violate Section 1373 or Section 1644 because the information Chicago's agents or agencies may not share is information "regarding a person's custody status or release date." That information is not "information regarding . . . citizenship or immigration status" covered by Sections 1373 and 1644. *See Steinle v. City and County of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

175.     Chicago has repeatedly certified its compliance with Section 1373 and explained its reasons for doing so. Those certifications necessarily extend to Section 1644, because Section 1373 and Section 1644 proscribe the same conduct.

176.     To date, the Department has not stated whether it accepts Chicago's prior certifications. While Chicago is confident it complies with both Section 1373 and Section 1644 for the reasons stated above, the Department's conduct has sown confusion and created the impression that the federal government believes otherwise, notwithstanding Chicago's legal analysis. Chicago is reluctant to certify compliance with Section 1373 and Section 1644 in its FY 2018 Byrne JAG application, which is due imminently, until the Department affirms that the City's prior certifications are acceptable.

177.     Chicago has a credible fear of prosecution or other enforcement action. The Department has taken the President's directive to "enforce" Section 1373 as an instruction to file preemption lawsuits against jurisdictions with policies it believes violate Section 1373. *See supra* ¶ 65. That the Department has sued the State of California over its approach to federal immigration enforcement is a strong indication that the Department has taken the President's instruction to heart and is willing to pursue legal action against "sanctuary" jurisdictions.

178.     Pursuant to 28 U.S.C. § 2201, Chicago is entitled to a declaration that its Welcoming City Ordinance and implementing policies comply with Sections 1373 and 1644.

## COUNT SIX: DECLARATORY JUDGMENT THAT CHICAGO'S WELCOMING CITY ORDINANCE AND IMPLEMENTING POLICIES COMPLY WITH 8 U.S.C. § 1324

179.     Chicago incorporates by reference the allegations of the preceding paragraphs.

180.     The Welcoming City Ordinance prohibits Chicago's agents and agencies from arresting, detaining, or continuing to detain an individual based solely on their immigration status unless required to do so by applicable law. These provisions expressly require compliance with federal laws and regulations, including 8 U.S.C. § 1324.

181.     The Ordinance also restricts the extent to which local officials may be compelled to participate in federal immigration enforcement. Nothing in 8 U.S.C. § 1324 creates an affirmative requirement for local governments to enforce immigration law or to assist federal authorities in enforcing immigration law.

182.     While Chicago is confident it complies with Section 1324, the Department has sown confusion and created the impression that the federal government believes otherwise, notwithstanding Chicago's own legal analysis.

183.     High-ranking Trump Administration officials have threated to prosecute local officials and governments for violation of Section 1324, without providing any meaningful guidance on how to determine compliance.

184.     Pursuant to 28 U.S.C. § 2201, Chicago is entitled to a declaration that it complies with Section 1324.

## COUNT SEVEN: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (ARBITRARY AND CAPRICIOUS)

185.     Chicago incorporates by reference the allegations of the preceding paragraphs.

186. In addition to lacking statutory and constitutional authority to impose the immigration-related conditions on the Byrne JAG grant, the conditions are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

187. The FY 2018 immigration-related conditions are arbitrary and capricious because the Department failed to rely on reasoned decisionmaking and, to the extent it cited reasons at all, those reasons are contradicted by the evidence before the agency. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, among other things, the Department proposes to evaluate grant applicants on the basis of their immigration policies rather than on their compliance with expressly enumerated statutory application requirements. *See* 34 U.S.C. § 10153(a)(1)-(5). It also "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, including but not limited to the policing challenges created by alienating and inducing fear in immigrant communities. It also "offered an explanation for its decision that runs counter to the evidence before the agency," which likewise is arbitrary and capricious, *id.*, including the evidence submitted by nine jurisdictions in their Section 1373 certification letters indicating that Welcoming City-style policies promote rather than detract from effective policing. Indeed, when Attorney General Sessions referred to one study in the press that showed that such policies lead to higher crime, *the study's own authors said he was misrepresenting their work*.

188. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 1651 and 2201, Chicago is entitled to a declaration that the immigration-related conditions for the FY2018 Byrne JAG funds are in violation of the APA as well as an injunction preventing those conditions from going into effect.

## COUNT EIGHT: DECLARATORY JUDGMENT THAT MR. WHITAKER LACKS THE AUTHORITY TO IMPOSE THE CONDITIONS

189.    Chicago incorporates by reference the allegations of the preceding paragraphs.

190.    Upon Attorney General Sessions' resignation, the Department of Justice's succession statute required that Deputy Attorney General Rosenstein should exercise the duties of the office of the Attorney General until such time as a new Attorney General was appointed by and with the advice and consent of the Senate. There is no indication that Deputy Attorney General Rosenstein is not available to exercise the duties of the office of the Attorney General. And if Deputy Attorney General Rosenstein were for any reason unable to act in this capacity, the statutorily mandated line of succession would next run to Solicitor General Francisco.

191.    The Department of Justice's specific succession statute, 28 U.S.C. § 508, controls here, and the more general Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. does not. The President accordingly lacked statutory authority to circumvent the succession statute by directing Mr. Whitaker to act as the Attorney General.

192.    Moreover, if any provision of the Federal Vacancies Reform Act did allow a non-Senate-confirmed Justice Department employee to be installed as Acting Attorney General, that provision would be unconstitutional as applied here. Any authority the President has to appoint an Acting Attorney General from outside the line of succession set forth in the Department of Justice's organic statute is still cabined by the Appointments Clause of the U.S. Constitution. The Appointments Clause requires that anyone acting as an officer of the United States be appointed by and with the advice and consent of the Senate, with a potential exception for exigencies. The office of the Attorney General is indisputably an office subject to the Appointments Clause, and no exigency existed sufficient to overcome the requirements of the Appointments Clause.

193.     The purported appointment of Mr. Whitaker as acting Attorney General is invalid and ineffective.  Therefore, the conditions imposed on Chicago's Byrne JAG grant award under his purported authority are invalid as applied to Chicago for that reason as well.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a)     Declare unlawful and set aside the immigration-related conditions included in the FY2018 Byrne JAG solicitation and awards on a program-wide basis;

b)     Declare that 8 U.S.C. §§ 1373 and 1644 violate anti-commandeering principles and are therefore facially unconstitutional under the Tenth Amendment;

c)     Declare that Chicago's Welcoming City Ordinance and implementing policies comply with 8 U.S.C. § 1373, 8 U.S.C. § 1644, and 8 U.S.C. § 1324;

d)     Declare that Matthew Whitaker's purported appointment as Acting Attorney General is unlawful and that the imposition of the challenged conditions on Chicago's FY2018 Byrne JAG award is unlawful as applied for that reason as well;

e)     Enjoin the Attorney General from enforcing the proposed immigration-related conditions on FY2018 Byrne JAG funding on a program-wide basis;

f)     Enjoin the Attorney General from imposing substantively similar conditions in future grant years;

g)     Enjoin the Attorney General from denying or delaying issuance of any Byrne JAG award and from denying or delaying release of any Byrne JAG funds (in FY2018 or future grant years) insofar as the denial or delay is based on the challenged conditions;

h)     Order the Attorney General to issue and fund Chicago's FY2018 Byrne JAG award immediately;

   i)  Award attorney's fees and costs to Chicago to the fullest extent permissible by

law;

   j)  Retain jurisdiction to monitor the Attorney General's compliance with this

Court's judgment; and

   k)  Grant such other relief as this Court may deem proper.

December 17, 2018.      Respectfully Submitted,

             By /s/ Edward N. Siskel
             EDWARD N. SISKEL
             Corporation Counsel of the City of Chicago

JAMIE S. GORELICK (admitted *pro hac vice*)   ANDREW W. WORSECK
DAVID W. OGDEN (admitted *pro hac vice*)    Chief Assistant Corporation Counsel
ARI HOLTZBLATT (admitted *pro hac vice*)    JUSTIN A. HOUPPERT
ARI SAVITZKY (admitted *pro hac vice*)     Assistant Corporation Counsel
MOLLY M. JENNINGS (admitted *pro hac vice*)  SCOTT D. SPEARS
JUSTIN BAXENBERG (admitted *pro hac vice*)   Assistant Corporation Counsel
ARI EVANS (admitted *pro hac vice*)      30 N. LaSalle Street, Suite 1230
WILMER CUTLER PICKERING HALE    Chicago, IL 60602
  AND DORR LLP          (312) 744-0220
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (admitted *pro hac vice*)  RONALD S. SAFER
WILMER CUTLER PICKERING HALE    MATTHEW C. CROWL
  AND DORR LLP          NICK KAHLON
7 World Trade Center         TAL CHAIKEN
250 Greenwich Street        LAURA KLEINMAN
New York, NY 10007        RILEY SAFER HOLMES & CANCILA LLP
(212) 230-8800          Three First National Plaza
             70 West Madison Street, Suite 2900
             Chicago, IL 60602
             (312) 471-8700

             *Attorneys for the City of Chicago*