# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **THE CITY OF CHICAGO,** | **Civil Action No. 1:18-cv-06859** |
| *Plaintiff,* | |
| *v.* | **Hon. Harry D. Leinenweber** |
| **ATTORNEY GENERAL OF THE UNITED STATES,** | |
| *Defendant.* | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION OF PARTIAL DISMISSAL

Dated: March 1, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
Assistant Branch Director

W. SCOTT SIMPSON
Senior Trial Counsel

Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:    (202) 514-3495
Facsimile:    (217) 492-4888
E-mail:    scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................................. 3

    I.      The Immigration and Nationality Act ........................................................ 3

    II.     DOJ Office of Justice Programs and the Byrne JAG Program .................. 5

ARGUMENT ....................................................................................................................... 9

    I.      The Public-Disclosure Condition Is Permissible ..................................... 10

           A.     The Public-Disclosure Condition Is Authorized by Statute
                   and Does Not Violate the Separation of Powers ........................... 10

           B.     The Public-Disclosure Condition Is Consistent with
                   the Spending Clause ....................................................................... 14

                 1.     The Condition Is Related to the Purposes
                        of the Byrne JAG Program ................................................ 14

                 2.     The Condition Is Unambiguous ........................................ 16

           C.     Plaintiff's Claims under the Administrative Procedure
                   Act Must Be Dismissed .................................................................. 18

                 1.     The APA Claims Do Not Challenge Final Agency
                        Action Reviewable under the APA .................................... 18

                 2.     The Public-Disclosure Condition Is Reasonable under
                        The Administrative Procedure Act .................................... 19

    II.     Plaintiff's Remaining Claims Not Covered by the Court's
          Prior Ruling Are Non-Justiciable .......................................................... 21

           A.     Plaintiff Lacks Standing to Challenge the FY 2018
                   Certification Requirement .............................................................. 22

           B.     Plaintiff's Request for a Declaration Regarding Its
                     Compliance with 8 U.S.C. § 1324 Is Unripe ................................. 23

III.    Plaintiff's Challenge to the Appointment of the Former
        Acting Attorney General Is Irrelevant to the Validity of
        the Challenged Grant Conditions..................................................................24

IV.     Any Injunction Should be Limited to the Plaintiff.....................................27

CONCLUSION .........................................................................................................28

# TABLE OF AUTHORITIES

## CONSTITUTION

U.S. Const. art. III, § 2 cl. 1 .......................................................................................... 21

## CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ............................................................. 23

*Abbs v. Sullivan*, 963 F.2d 918 (7th Cir. 1992) ............................................................. 19

*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440 (7th Cir. 2009) .................... 9

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................................ 4, 21

*Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475 (7th Cir. 2013) .................... 21

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990) .................................. 9

*Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) ............ 15

*Bd. of Educ. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L.*,
   89 F.3d 464 (7th Cir. 1996) ...................................................................................... 21

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................ 18

*Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) ................................................... 17

*Bigelow v. Virginia*, 421 U.S. 809 (1975) .................................................................... 22

*Calderon-Ramirez v. McCament*, 877 F.3d 272 (7th Cir. 2017) ................................... 9

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ......................................................... 27

*Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) ..................................................... 17

*Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068 (7th Cir. 2016) ............ 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................. 19, 21

*City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ....................... 27

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) ................................ 2

*City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) .............. 27

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ................................................................. 10

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999) ................................................................................. 14

*DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275 (D.C. Cir. 1989)...................................... 11

*Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382 (3d Cir. 2006)............................................. 15

*Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985)................................ 23

*Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL 13134271
    (C.D. Cal. Aug. 23, 2011), 533 F. App'x 703 (9th Cir. 2013) ................................ 12

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)................................... 19, 20

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)................................................. 22

*Gill v. Whitford,* 138 S. Ct. 1916 (2018)..................................................................... 27

*Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, ___ F. Supp. 3d ___,
    No. 18-cv-2988, 2019 WL 922594 (D.D.C. Feb. 25, 2019).................................... 27

*Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198 (D. Haw. 1998) ................... 21

*Hinrichs v. Whitburn*, 975 F.2d 1329 (7th Cir. 1992) ................................................ 24

*Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*,
    335 F.3d 607 (7th Cir. 2003) .................................................................... 18

*Humana Hosp. Corp. v. Blankenbaker*, 734 F.2d 328 (7th Cir. 1984)........................ 23

*Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002) ................................................ 15

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) ..................................... 14, 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)........................................ 14

*New York v. United States*, 505 U.S. 144 (1992) ........................................................ 14

*Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039 (7th Cir. 2019)................... 10

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................................. 15

*Pozzie v. HUD*, 48 F.3d 1026 (7th Cir. 1995).............................................................. 19

*Sierra Club v. EPA*, 774 F.3d 383 (7th Cir. 2014)........................................................ 19

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........................................................ 14, 16

*Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624 (9th Cir. 1989)........................................ 23

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)......................................... 22

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001)................................... 9

*Texas v. United States*, 523 U.S. 296 (1998) .............................................. 23

*Thurman v. Lawrence*, No. 1:15-CV-01085-RLY, 2015 WL 6142819
  (S.D. Ind. Oct. 18, 2015) ........................................................ 9

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) ................................... 27

*Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cty., Ind.*,
  977 F.2d 287 (7th Cir. 1992) ........................................................ 23

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)........................................................ 27

*United States v. Nixon*, 418 U.S. 683 (1974) ........................................................ 26

*Van Wyhe v. Reisch*, 581 F.3d 639 (8th Cir. 2009)........................................ 17

*Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001) ....................... 27

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ........................................................ 22

**STATUTES**

5 U.S.C. § 552(b)(7) ........................................................ 11, 20

5 U.S.C. §§ 3345 *et seq.*........................................................ 24

8 U.S.C. §§ 1101 *et seq.*........................................................ 3

8 U.S.C. § 1101(b)(3) ........................................................ 4

8 U.S.C. § 1226(c) ........................................................ 15

8 U.S.C. § 1228(a) ........................................................ 15

8 U.S.C. § 1226(d) ........................................................ 21

8 U.S.C. § 1231(a)(6) .................................................................................................. 15

8 U.S.C. § 1252c ......................................................................................................... 5

8 U.S.C. § 1227(a)(2) .............................................................................................. 4, 15

8 U.S.C. § 1306(a) ....................................................................................................... 4

8 U.S.C. § 1306(b) ....................................................................................................... 4

8 U.S.C. § 1324(a)(1)(A)(iii) ....................................................................................... 4

8 U.S.C. § 1324(a)(1)(A)(v) ........................................................................................ 4

8 U.S.C. § 1324(c) ....................................................................................................... 5

8 U.S.C. § 1357(g) ................................................................................................... 5, 21

8 U.S.C. § 1366(1) ....................................................................................................... 4

8 U.S.C. § 1366(2) ....................................................................................................... 4

8 U.S.C. § 1373 .......................................................................................................... 21

8 U.S.C. § 1378 .......................................................................................................... 15

28 U.S.C. § 510 .......................................................................................................... 25

34 U.S.C. § 10102(a)(2) ................................................................................... 3, 5, 11, 21

34 U.S.C. § 10102(a)(4) ................................................................................... 3, 5, 11, 21

34 U.S.C. § 10102(a)(6) ................................................................................ 5, 11, 12, 25

34 U.S.C. § 10141(b) .................................................................................................. 13

34 U.S.C. § 10152(a)(1) .......................................................................................... 6, 15

34 U.S.C. § 10153(A)(5)(C) ....................................................................................... 12

34 U.S.C. § 10228(a) .................................................................................................. 13

34 U.S.C. §§ 10101-10726 .......................................................................................... 25

34 U.S.C. § 10153(a) ................................................................................................... 6

34 U.S.C. § 10156 ....................................................................................................... 6

34 U.S.C. §§ 10151-10158 ................................................................................ 25

34 U.S.C. § 10251(a)(1) .................................................................................... 6

34 U.S.C. § 10202(c)(1) .................................................................................... 7

42 U.S.C. § 3712(a)(6) (2005) ......................................................................... 12

Pub. L. No. 90-351, 82 Stat. 197 (1968) ........................................................... 2

Pub. L. No. 106-113, 113 Stat. 1535 (1999) .................................................... 25

Pub. L. No. 109-162, 119 Stat. 2960 (2006) .................................................... 12

Pub. L. No. 115-141, 132 Stat. 348 (2018) ...................................................... 25

5 Ill. Comp. Stat. Ann. § 140/7(d) (West 2018) ......................................... 11, 20

720 Ill. Comp. Stat. Ann. § 5/17-52.5(b) (West 2018) .................................... 17

720 Ill. Comp. Stat. Ann. § 5/31-5(a) (West 2018) ......................................... 17

820 Ill. Comp. Stat. Ann. § 305/8.1a(b)(1) (West 2018) ................................. 17

## REGULATION

28 C.F.R. § 0.137(b) ....................................................................................... 24

## OTHER AUTHORITIES

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ............................ 6

Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017)..................... 6, 8

H.R. Rep. No. 109-233 (2005)......................................................................... 12

## INTRODUCTION

Law enforcement in this country is a cooperative endeavor. Unlawful acts often implicate the jurisdiction of more than one agency, and local, state, tribal, and federal officials must work together in a variety of ways to fight crime and ensure public safety. In order to work together effectively and safely, the free flow of law enforcement information is essential. Each law enforcement agency possesses different information and different tools for collecting intelligence. When agencies operate in isolation, no agency has the complete picture, and the implications for public safety can be dire. Further, when agencies conduct law enforcement operations, they must "de-conflict" to protect officer safety and ensure that other agencies do not inadvertently jeopardize their operations. *See, e.g.*, Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence Resource Center, https://www.ncirc.gov/ Deconfliction/ (last visited Mar. 1, 2019); Best Practices in Event Deconfliction, Commission on Accreditation for Law Enforcement Agencies, https://www.calea.org/ sites/ default/ files/ EventDeconfliction_PoliceFoundation.pdf (last visited Mar. 1, 2019). Obviously, information-sharing diminishes if agencies fear that recalcitrant jurisdictions will publicly release information shared through these channels for purposes of subverting the law.

In this case, Chicago challenges certain requirements in the Fiscal Year ("FY") 2018 Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"), including a requirement that protects sensitive federal law enforcement information. In an eight-count Amended Complaint, the City challenges these requirements under the Separation of Powers, the Spending Clause, and the Administrative Procedure Act. Chicago also challenges the constitu-tionality of two federal statutes under the Tenth Amendment, Sections 1373 and 1644 of Title 8, while seeking a declaratory judgment that the City complies with those statutes. Finally, plaintiff seeks a declaration that it complies with another statute, Section 1324 of Title 8, and it challenges the President's appointment of the former Acting Attorney General.

This Court has previously considered certain conditions on the Byrne JAG formula grant program from the previous fiscal year, as well as the constitutionality of Section 1373. *See City of*

*Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018). Defendant respectfully disagrees with the Court's rulings in that case, and hereby reiterates, incorporates, and preserves for further review the arguments his predecessor made therein.[1] Nevertheless, in light of those prior rulings, defendant will not discuss at length in this motion certain FY 2018 grant conditions that are very similar to FY 2017 conditions that this Court has already enjoined – specifically, the FY 2018 access, notice, and Section 1373/1644 compliance conditions. Defendant also will not repeat at length their arguments regarding the constitutionality of Section 1373, which apply equally to Section 1644.[2]

Plaintiff now challenges a new Byrne JAG condition not previously considered by this Court. Beginning in FY 2018, the Office of Justice Programs ("OJP" or "Office") is requiring that Byrne JAG recipients not publicly disclose federal law enforcement information for the purpose of frustrating law enforcement operations. That the Department of Justice ("Department" or "DOJ") would include such a requirement as a condition on federal law enforcement funds should be unsurprising. When Congress created OJP, which is the Department's primary grant-making component, it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government." Pub. L. No. 90-351, 82 Stat. 197 (1968).

Consistent with that congressional finding, the purpose of this Byrne JAG condition is obvious: If law enforcement partners at various levels of government are going to work together to address public safety, they must be free to share information without fear that the information will be misappropriated and misused. That Chicago is now seeking to vindicate a contrary position is remarkable. OJP's authority to include this condition is clear: The Office is authorized to "maintain liaison with . . . State [and local] governments in matters relating to criminal justice."

---

[1] *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167.

[2] In light of its ruling in the prior case that Section 1373 violates the Tenth Amendment, this Court dismissed as moot Chicago's request for a declaration that the City complies with that statute. 321 F. Supp. 3d at 876. The same ruling would apply to plaintiff's request for such a declaration in the present case. Dkt. No. 34 ¶¶ 170-78.

34 U.S.C. § 10102(a)(2), (4). The need for this condition is even clearer given that an elected local official in another State recently made public an impending federal law enforcement operation, intentionally frustrating the enforcement of federal law and putting officers' lives at risk. Moreover, this condition applies to federal law enforcement information regarding both illegal aliens and "fugitive[s] from justice" under the federal criminal laws, further illustrating the condition's relationship to the purposes of the Byrne JAG Program.

Plaintiff's remaining claims not covered by this Court's prior ruling are non-justiciable (and, as to the final claim, also without merit). First, plaintiff lacks standing to challenge the requirement that an applicant for an FY 2018 Byrne JAG grant submit certifications stating that the jurisdiction has no laws or policies that impede the exercise of federal authority under certain statutes. OJP has announced that it is not enforcing this requirement in relation to Chicago in light of prior judicial rulings, so the requirement has had no effect on the City. Second, the request for a declaration that Chicago complies with Section 1324 of Title 8 – the federal prohibition against harboring illegal aliens – is unripe because plaintiff fails to allege any effort to charge the City or its leaders with violating that statute. Finally, plaintiff's challenge to the appointment of former Acting Attorney General Matthew G. Whitaker is irrelevant to the challenged Byrne JAG conditions, which were imposed by the Assistant Attorney General for OJP rather than the Acting Attorney General, such that the plaintiff also lacks standing to challenge that appointment.

For these reasons, plaintiff's claims (other than those covered by the Court's ruling in the prior case) should be dismissed with prejudice.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I. The Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function. Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States. These responsibilities are assigned to law enforcement

agencies, as the INA authorizes the Department of Homeland Security ("DHS"), the Department of Justice, and other Executive agencies to administer and enforce the immigration laws. The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives. *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens. For example, the INA provides that aliens who have committed certain classes of crimes – whether federal, state, or local – shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g*., 8 U.S.C. § 1227(a)(2). A specific statute provides that every twelve months, the Attorney General must report to the House and Senate judiciary committees on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies" – "stating the number incarcerated for each type of offense." *Id*. § 1366(1), (2).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration. For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address. *Id*. §§ 1306(a), (b). More seriously, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."[3] *Id*. § 1324(a)(1)(A)(iii). It also imposes penalties for "engag[ing] in any conspiracy to commit any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts." *Id*. § 1324(a)(1)(A)(v).

---

[3] "Person" for purposes of that crime means "an individual or an organization." 8 U.S.C. § 1101(b)(3).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement. For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id*. § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id*. § 1252c; *see id*. § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens). Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities. Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Section 1644 of Title 8 contains substantially the same proscription. Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity." By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA. *Id*. § 1252c(b).

## II.    DOJ Office of Justice Programs and the Byrne JAG Program

As described in prior filings before this Court, the Assistant Attorney General ("AAG") for OJP possesses "[s]pecific, general and delegated powers," including the power to "maintain liaison with . . . State [and local] governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2), (4). The statute also authorizes the AAG to "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6).

The predecessor to the Byrne JAG Program was created in the same statute that created OJP. Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs." *Id.* § 10152(a)(1). In the same chapter, "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

The Byrne JAG Program provides "formula grants" – that is, grants that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.* § 10156. By statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of local government must submit an application "in such form as the Attorney General may require," *id.* § 10153(a), and the application must include, among other things, "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," *id.* § 10153(a)(5)(D). Applicants must also provide assurances that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(a)(4), (5)(C).

OJP has historically included a variety of conditions in Byrne JAG awards. For example, the Office has imposed, without objection, conditions related to information-sharing and privacy protection, *see* Defs' Request for Judicial Notice ("RJN"), Ex. A (Chicago's FY 2016 Byrne JAG award) ¶ 30, research using human subjects, *see id.* ¶ 29, and training, *see id.* ¶¶ 32-33. Other historical conditions imposed by the Assistant Attorney General have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification. One such condition, which prohibited use of Byrne JAG funds to purchase military style equipment, related in part to an Executive Order issued by President Obama in 2015. *See* RJN, Ex. A ¶ 49; Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015), *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017). Since 2012, other conditions have required that recipients: (a) comply with specific national standards when purchasing body armor and (b) institute a

"mandatory wear" policy for any purchased armor. RJN, Ex. A ¶¶ 38-39. While those conditions have now been codified by Congress, *see* 34 U.S.C. § 10202(c)(1)(B), (C), they originated as exercises of DOJ's authority to impose special conditions. And the AAG has imposed an "American-made" requirement for body armor purchases, something Congress did not choose to codify last year. RJN, Ex. A ¶ 38. In recent years, the number of conditions attached to Byrne JAG Grants has typically numbered in the several dozen. *See* RJN, Ex. A (Chicago's FY 2016 award, containing 52 conditions). The conditions attached to Byrne JAG grants have varied over time, depending on national law enforcement necessities and Department priorities.

For the current Byrne JAG grant cycle, Fiscal Year 2018, OJP notified potential applicants that awards under the Program would include certain conditions requiring modest cooperation with federal law enforcement responsibilities in the immigration setting. As now issued to most of the 2018 applicants, including Chicago, those conditions require Byrne JAG recipients, within the "program or activity" funded by the award:

- Consistent with the objectives of federal law enforcement statutes – including 8 U.S.C. § 1324(a), the smuggling/harboring statute referred to above, and 18 U.S.C. § 1071 – not to publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law, regardless of whether the disclosure would violate 8 U.S.C. § 1324(a) (the "public-disclosure condition"), RJN, Ex. C ¶ 44 (Chicago's FY 2018 Byrne JAG award);

- Consistent with federal law enforcement statutes and regulations – including 8 U.S.C. § 1357(a)(1), the INA interrogation statute referred to above, and 8 C.F.R. § 287.5(a)(1) – not to interfere with the exercise of that authority by impeding the access of immigration officials to any correctional facility to meet with an alien for such an interrogation (the "FY 2018 access condition"), RJN, Ex. C ¶ 45;

- Consistent with federal law enforcement statutes – including 8 U.S.C. §§ 1231(a) and 1226(c)(1), the statutes requiring federal immigration officials to take custody of a criminal alien "when the alien is released" from state or local custody – not to interfere with the removal process by failing to notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials (the "FY 2018 notice condition"), RJN, Ex. C ¶ 46; and

- To comply with 8 U.S.C. §§ 1373 and 1644, and not to obligate or draw down grant funds if the recipient is subject to any prohibition or restriction against providing information regarding immigration status to federal authorities (the "FY 2018 Section 1373/1644 compliance condition"), RJN, Ex. C ¶ 41-43.

Under the "Rules of Construction" within those grant conditions, the FY 2018 award documents make clear that nothing in the FY 2018 notice condition requires a Byrne JAG grantee to detain "any individual in custody beyond the date and time the individual otherwise would have been released." RJN, Ex. C ¶ 46. The documents also make clear that this condition imposes no requirements in relation to any requests from federal immigration authorities to detain non-citizens, and that the condition requires "only as much advance notice as practicable" before the release of an alien. *Id.* Further, the award documents define "impeding" access to a correctional facility, for purposes of the interrogation condition, as taking any action or following any law or policy that "is designed to prevent or to significantly delay or complicate" such access or that "has the effect of preventing or of significantly delaying or complicating" such access. *Id.* ¶ 45.

In order to assess each applicant's ability to fulfill the FY 2018 access and notice conditions, the FY 2018 Byrne JAG solicitation stated that OJP would require each applicant to submit certifications from its chief legal officer and chief executive stating that the jurisdiction had no laws or policies that impede the Federal Government's exercise of its authority under the statutes cited in those conditions (the "FY 2018 certification requirement"). Admin. Record at

AR01193, AR01207, AR01207 (2018 Local Solicitation at 1, 41, 45).[4]  The certifications were part of the application, and were due no later than when the applicant accepted an award.  *Id*. at AR01193 (2018 Local Solicitation at 27).

In light of this Court's ruling in *City of Chicago v. Sessions*, 1:17-cv-05720, and decisions in other courts, OJP has announced that it is not enforcing the FY 2018 access, notice, and Section 1373/1644 compliance conditions, or the FY 2018 certification requirement, in relation to Chicago and several other jurisdictions.  *See* RJN, Ex. D.  OJP issued Chicago's FY 2018 Byrne JAG award on November 20, 2018.  RJN, Ex. C.[5]

## ARGUMENT

Defendant moves for dismissal of plaintiff's new claims under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  A motion under Rule 12(b)(1) challenges the subject matter jurisdiction of the court to reach a claim.  A facial challenge to subject matter jurisdiction requires the court to "look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction."  *Apex Digital, Inc. v. Sears, Roebuck & Co*., 572 F.3d 440, 443 (7th Cir. 2009).  A motion under Rule 12(b)(6) "tests the legal sufficiency of a pleading."  *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001).  Dismissal under this rule is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990), *quoted in Thurman v. Lawrence*, No. 1:15-CV-01085-RLY, 2015 WL 6142819, at *1 (S.D. Ind. Oct. 18, 2015).  Under both 12(b)(1) and 12(b)(6), the court "may take judicial notice

---

[4] The Administrative Record in this action was filed with a Notice of Filing of Administrative Record on February 28, 2019.  Dkt. No. 41.

[5] In addition to the judgment in *City of Chicago v. Sessions*, 1:17-cv-05720, issuance of Chicago's FY 2018 award was required by the preliminary injunction in *City of Evanston v. Sessions*, No: 1:18-cv-04853 (N.D. Ill. Aug. 9, 2018), *stay of injunction lifted sub nom. United States Conference of Mayors v. Sessions*, No. 18-2734 (7th Cir. Aug. 29, 2018).  The issuance of Chicago's FY 2018 award and the non-enforcement of the conditions has mooted the City's request for a writ of mandamus compelling issuance of the award "without" the challenged conditions.  Dkt. No. 34 ¶¶ 113, 122, 128, 135, 144, 158, 167.  Even if plaintiff's request for mandamus relief were not moot, it would be meritless because, among other things, plaintiff does not have a "clear right" to such relief.  *See Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

of matters of public record." *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019). As shown below, plaintiff's challenges to the FY 2018 public-disclosure condition, the FY 2018 certification requirement, and the appointment of the former Acting Attorney General should be dismissed with prejudice under these standards, along with plaintiff's request for a declaration regarding its compliance with Section 1324 of Title 8.

With respect to other FY 2018 Byrne JAG conditions, defendant recognizes that this Court has ruled against conditions used in the FY 2017 Byrne JAG Program that were similar to the FY 2018 access, notice, and Section 1373/1644 compliance conditions, and that the Court has ruled against the constitutionality of 8 U.S.C. § 1373. Defendant respectfully disagrees with those rulings, but does not now repeat in full his arguments in defense of those conditions in the FY 2018 Byrne JAG Program, other than to incorporate herein the arguments made previously and to preserve them for further review. *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167. Defendant retains his right to elaborate upon those arguments based on the outcome of *City of Chicago v. Barr*, 18-2885 (9th Cir.), as well as other cases addressing related issues.

## I. The Public-Disclosure Condition Is Permissible

### A. The Public-Disclosure Condition Is Authorized by Statute and Does Not Violate the Separation of Powers

In Counts One and Two of its Amended Complaint, plaintiff alleges that the FY 2018 Byrne JAG conditions exceed DOJ's statutory authority and intrude upon the powers of Congress. Dkt. No. 34 ¶¶ 106-46. As noted above, defendant reserves his arguments regarding the FY 2018 conditions that are similar to the FY 2017 conditions, pending resolution in the Seventh Circuit. With respect to the public-disclosure condition, an examination of the relevant statutes, with their framework and history, shows that the Assistant Attorney General for OJP possesses ample authority to impose this condition.

As a preliminary matter, it is well-established that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to impose require-ments on recipients of agency spending. *See*, *e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 488

(1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding conditions on spending where statute authorized President to set certain "terms and conditions as he may determine"). Accordingly, plaintiff's assertion that the conditions challenged here "were never approved by Congress," Dkt. No. 34 ¶ 14, 50-51, is beside the point. Rather, the sole relevant question is whether Congress has *delegated* sufficient authority to the Department to impose these requirements.

The content, history, and structure of the relevant statutes demonstrate that Congress has delegated such authority. Congress authorized the Assistant Attorney General for OJP to "maintain liaison with . . . State [and local] governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2), (4), to place "special conditions on all grants," and to determine "priority purposes for formula grants," *id*. § 10102(a)(6). The authority to "maintain liaison" is alone sufficient for the public-disclosure condition. Operational security – the confidentiality of law enforcement operations – is essential to law enforcement operations.[6] Law enforcement officials at different levels of government must able to share information, without a concern that a public official at another level might publicize it.

A liaison is defined as "a close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation." *See* Liaison, Merriam-Webster, https://www.merriam-webster.com/ dictionary/ liaison (last visited Feb. 28, 2019). Thus, the AAG is responsible for maintaining "a close bound or connection" between federal and state criminal justice authorities and for facilitating "mutual understanding and cooperation" among

---

[6] Both the federal Freedom of Information Act and the Illinois Freedom of Information Act protect the confidentiality of operational law enforcement information. *See* 5 U.S.C. § 552(b)(7) (exempting "records or information compiled for law enforcement purposes" to the extent disclosure "could reasonably be expected to interfere with enforcement proceedings" or "disclose techniques and procedures for law enforcement investigations or prosecutions"); 5 Ill. Comp. Stat. Ann. § 140/7(d) (West 2018) (exempting law enforcement records whose disclosure would "interfere with pending or actually and reasonably contemplated law enforcement proceedings" or "disclose unique or specialized investigative techniques other than those generally used and known").

such authorities.  This clearly encompasses, at minimum, protecting the confidentiality of federal law enforcement information provided to state and local agencies.  *Cf. Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011) (stating that plaintiff's contract for "maintaining liaison" between the Principality and foreign intelligence agencies entailed "regularly shar[ing] sensitive intelligence information"), *aff'd*, 533 F. App'x 703 (9th Cir. 2013).  The public-disclosure condition enables federal, state, and local law enforcement officials to work together effectively and safely – that is, to "maintain liaison."

This condition also falls within the AAG's authority to place "special conditions on all grants" and to determine "priority purposes for formula grants," 34 U.S.C. § 10102(a)(6). Congress created the current version of the Byrne JAG Program in 2006, when the Reauthor-ization Act merged two earlier programs.  Pub. L. No. 109-162, 119 Stat. 2960.  Before the 2006 amendments, the relevant statute provided only that the AAG for OJP was authorized to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the [Attorney General]."  *See* 42 U.S.C. § 3712(a)(6) (2005).  In the Reauthorization Act, Congress expressly amended this provision by inserting the words "including placing special conditions on all grants, and determining priority purposes for formula grants."  Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6).  And confirming this amendment's plain text, the House Judiciary Committee report accompanying the Act states unequivocally that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).  The public-disclosure condition is also justified by the statutory requirement for applicants to provide assurance of "appropriate coordination" with affected agencies.  34 U.S.C. § 10153(A)(5)(C).  Protecting sensitive law enforcement information is required for "appropriate coordination" among law enforcement agencies.

Moreover, the AAG's authority to "special conditions on all grants" and to determine "priority purposes for formula grants" clearly applies to the Byrne JAG Program.  Section 10102(a) sets forth the general duties and authorities of the AAG for OJP, and the Bureau of

Justice Assistance, which directly administers the Byrne JAG Program, is part of OJP.  By statute, the Director of the Bureau of Justice Assistance "report[s] to the Attorney General through the Assistant Attorney General [for OJP]."  34 U.S.C. § 10141(b); *see* About Us, OJP, https://ojp.gov/ about/ about.htm (OJP organizational chart) (last visited Feb. 28, 2019).  Thus, the authority conferred on the AAG by Section 10102(a)(6) necessarily reaches all programs under his supervision, including the Byrne JAG Program.

Further, the independent authority to "determin[e] priority purposes for formula grants" plainly reflects an intent to allow the AAG to exercise a degree of discretion over *formula* grants in particular.  Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority to (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) protect the confidentiality of related federal law enforcement information.  In other words, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*.  Additionally, because States and localities would decline to participate in – and thus, effectively annul – the Byrne JAG Program were this authority invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

Finally, plaintiff implies that the challenged conditions constitute prohibited "direction, supervision, and control" under 34 U.S.C. § 10228(a), *see* Dkt. No. 34 ¶ 37, but that is belied by the City's acceptance of numerous other Byrne JAG conditions.  Chicago's Byrne JAG award for FY 2016, which the City accepted without challenge, imposed more than fifty "special conditions."  *See* RJN, Ex. A.  The plaintiff agreed, for example, to refrain from certain specific actions related to human trafficking, including any "[a]cts that directly support or advance trafficking in persons," *see id*., Ex. A ¶ 9; to comply with DOJ regulations on civil rights and non-discrimination, including regulations prohibiting specific forms of discrimination on the basis of religion, *see id*., Ex. A ¶ 16; to refrain from requiring employees to sign any "internal

confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse," *see id.*, Ex. A ¶ 20; and to complete law enforcement training provided by OJP's Bureau of Justice Assistance, *see id.*, Ex. A ¶ 32. If those conditions do not constitute exercising "direction, supervision, and control" over grantees – as shown by plaintiff's own agreement to them – then neither does the public-disclosure condition challenged here.

**B.      The Public-Disclosure Condition Is Consistent with the Spending Clause**

In Count Three of its Amended Complaint, plaintiff alleges that the FY 2018 Byrne JAG conditions violate the Spending Clause. Dkt. No. 34 ¶¶ 147-58. Under its spending authority, Congress "may offer funds to the States, and may condition those offers on compliance with specified conditions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). It is well-established that the Spending Clause confers broad authority, such that conditions imposed pursuant to this authority may permissibly require States to "tak[e] certain actions that Congress could not [otherwise] require them to take." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999). Nevertheless, the spending authority is subject to certain discrete limitations, two of which are purportedly at issue here: (1) "conditions on federal grants may be illegitimate if they are unrelated to the federal interest in particular national projects or programs"; and (2) conditions must be "unambiguous[]." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The public-disclosure condition easily satisfies both of these aspects of *Dole*.

**1.      This Condition Is Related to the Purposes of the Byrne JAG Program**

Initially, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, the Supreme Court has held that only "some relationship" is needed between spending conditions and "the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992); *see Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (stating that this "low-threshold" inquiry "is a far cry from . . . an exacting standard for relatedness"). As the D.C. Circuit has observed, the Supreme Court has never "overturned

14

Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The Byrne JAG Program promotes "criminal justice" by supporting programs such as law enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152(a)(1). The term "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1). Further, immigration enforcement, which the challenged conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide variety of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Indeed, the term "criminal alien" appears multiple times in the INA, and "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378; *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted). Once removed, a criminal alien who has committed a removable offense – for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses – is no longer present in this country with the potential to re-offend.

Thus, the public-disclosure condition ensures that any "program or activity" funded by the Byrne JAG Program does not thwart the federal government's exercise of its ability to remove aliens not lawfully present in the United States or removable due to a criminal conviction. *See Koslow v. Pennsylvania*, 302 F.3d 161, 176 (3d Cir. 2002) (observing that the challenged condition "govern[ed] only a 'program or activity' receiving federal funds," and noting that this limitation aided in satisfying "the 'relatedness' requirement articulated in *Dole*"). Declining to fund jurisdictions that disclose federal law enforcement information in an attempt to hinder federal law enforcement operations is plainly related to the criminal-justice purposes of the Byrne JAG Program. The relationship of the public-disclosure condition to the purposes of

this program are even clearer given that the condition protects not only federal law enforcement information regarding illegal aliens, but also information regarding "fugitive[s] from justice" under the federal criminal laws. RJN, Ex. C ¶ 44.

Recent events further illustrate the need for this condition and its relationship to the purposes of the program. Included in the Administrative Record in this action are public Twitter and Facebook posts by the mayor of a California city informing residents of an impending operation by federal immigration authorities. Admin. Record at AR01038-39. In those communications, the executive of a U.S. jurisdiction specifically made a "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection . . . any alien who [had] come to, entered, or remain[ed] in the United States" in violation of law. Federal law enforcement officials must be able to inform state and local officials of impending operations without fear of compromising those operations. Such basic coordination is essential not only for the success of operations but also for the safety of law enforcement personnel and the public.

In sum, ensuring that jurisdictions receiving federal law enforcement funds do not hinder the enforcement of immigration law supports the purposes the Byrne JAG Program.

### 2.    This Condition Is Unambiguous

Another limitation on the spending power is that when the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). The public-disclosure condition easily satisfies this aspect of *Dole*, especially in light of the accompanying "Rules of Construction."

This condition states very clearly that it prohibits the "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. [§§] 1071 or

1072 or of 8 U.S.C. [§] 1324(a)." The Rules of Construction, moreover, define "alien," "federal law enforcement information," and "public disclosure" in detail. To the extent any uncertainty might possibly remain, the grant award documents specifically direct that "[a]ny questions about the meaning or scope" of the conditions "should be directed to OJP." *See* RJN, Ex. C ¶¶ 42-46.[7]

Any arguable marginal uncertainty regarding the outer boundaries of this condition would not render it unconstitutionally ambiguous. Indeed, as the Court of Appeals has observed, "the exact nature of [grant] conditions may be 'largely indeterminate,' provided that the existence of the conditions is clear, such that [grantees] have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (quoting *Mayweathers*, 314 F.3d at 1067); *see Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach . . . conditions . . . it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)); *see also Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard").

Attempting to establish some ambiguity (and unreasonableness) in the public-disclosure condition, plaintiff asserts that the condition "would appear to prohibit Chicago and its subgrantees from publicly criticizing ICE enforcement strategies that involve targeting City residents at courthouses, schools, and other sensitive locations." Dkt. No. 34 ¶ 86; *see id*. ¶¶ 12, 97. But the condition defines "federal law enforcement information" as "law enforcement sensitive information" communicated through means including databases, law enforcement partnerships or task forces, a request for law enforcement assistance or cooperation, or notice of

---

[7] Many of the operative phrases in the public-disclosure condition also appear in Illinois statutes without explanation. *See* 720 Ill. Comp. Stat. Ann. § 5/31-5(a) (West 2018) ("Every person not standing in the relation of husband, wife, parent, child, brother or sister to the offender, who, with intent to prevent the apprehension of the offender . . . harbors, aids or conceals the offender, commits a Class 4 felony."); 820 Ill. Comp. Stat. Ann. § 305/8.1a(b)(1) (West 2018) (stating that state Department of Insurance "may not publicly disclose" any "confidential, proprietary, or trade secret information" submitted by preferred provider programs); 720 Ill. Comp. Stat. Ann. § 5/17-52.5(b) (West 2018) (criminalizing any attempt to use data encryption "directly or indirectly" to commit a criminal offense).

a federal law enforcement operation. RJN, Ex. C ¶ 44(4)(A)(2). The condition would not apply to general statements regarding immigration "strategies" that become public after the fact. Thus, this condition does not seek "to silence City officials from commenting" on enforcement strategies generally. Dkt. No. 34 ¶ 97.

### C.    Plaintiff's Claims under the Administrative Procedure Act Must Be Dismissed

Count Seven of plaintiff's Amended Complaint alleges that the decision to impose the public-disclosure condition was arbitrary and capricious under the Administrative Procedure Act ("APA") "because the Department failed to rely on reasoned decisionmaking and, to the extent it cited reasons at all, those reasons are contradicted by the evidence before the agency." Dkt. No. 34 ¶ 187. Additionally, plaintiff's *ultra vires*, Separation of Powers, and Spending Clause claims in the First, Second, and Third Counts of the complaint are stated as APA claims. Chicago cannot, however, rely on the APA because it does not challenge final agency action. And, in any event, plaintiff's "arbitrary and capricious" challenge to the public-disclosure condition is without merit.

### 1.    The APA Claims Do Not Challenge Final Agency Action Reviewable under the APA

"[T]he APA allows judicial review of the actions by federal agencies only over final agency action for which there is no other adequate remedy in a court." *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers,* 335 F.3d 607, 614 (7th Cir. 2003) (citing 5 U.S.C. § 704). Such finality, a jurisdictional requirement, is satisfied only when the challenged action (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Notwithstanding this black-letter requirement, Chicago's APA claims fail to identify any qualifying final agency action. The decision to impose the challenged conditions does not constitute "final agency action" under the APA. Rather, the relevant agency action for purposes of APA review in the context of the Byrne JAG Program would be a decision to grant or deny an

18

application.  Although OJP has issued the City's FY 2018 Byrne JAG award pursuant to court injunctions, the Office has not yet determined to grant or deny the application administratively. Thus, the consummation of OJP's decision-making process has not yet occurred, plaintiff's "rights or obligations" have not been determined, and no "legal consequences" have arisen.  *Cf. Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) (affirming dismissal because "a challenge to agency conduct is ripe only if it is filed after the final agency action"; the challenge otherwise "rests upon contingent future events that may not occur as anticipated, or that may not occur at all"); *Abbs v. Sullivan*, 963 F.2d 918, 927 (7th Cir. 1992) ("A challenge to administrative action . . . falls outside the grant of jurisdiction in . . .  the Administrative Procedure Act when the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights.").  This Court should, accordingly, dismiss plaintiff's APA claims on this threshold jurisdictional ground alone.

### 2. The Public-Disclosure Condition Is Reasonable under the Administrative Procedure Act

Further, plaintiff's "arbitrary and capricious" challenge to the public-disclosure condition is without merit.  As an initial matter, if this condition is statutorily authorized and comports with the Spending Clause – which, as shown above, it does – it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion.  In any event, when a court reviews an agency's action under the "arbitrary or capricious" standard, it is required to be "highly deferential" and to "presum[e] that agency actions are valid as long as the decision is supported by a rational basis."  *Sierra Club v. EPA*, 774 F.3d 383, 393 (7th Cir. 2014); *Pozzie v. HUD*, 48 F.3d 1026, 1029 (7th Cir. 1995).  This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Here, Chicago's claim fails because "the agency's reasons for" imposing the public-disclosure condition "were entirely rational."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009).  Even assuming OJP's imposition of this condition were subject to arbitrary-

and-capricious review notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes, it is reasonable for OJP to deny federal law enforcement funding to a jurisdiction that publicly discloses sensitive federal law enforcement information in an attempt to shield an alien or fugitive from detection. That judgment does not depend on a factual determination of the sort that Chicago appears to demand. It simply requires asking whether OJP should blind itself to the disclosure of sensitive federal information by state or local authorities to defeat federal law enforcement efforts regarding illegal aliens or fugitives from criminal justice when distributing federal law enforcement funds, as well as to the public safety threats caused by that disclosure. Indeed, the public-disclosure condition protects some of the same information covered by the law enforcement exemption to the federal Freedom of Information Act, which exempts from disclosure, among other things, information compiled for law enforcement purposes whose disclosure "could reasonably be expected to interfere with enforcement proceedings" or to "endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7); *cf.* 5 Ill. Comp. Stat. Ann. § 140/7(d) (West 2018). Thus, the challenged condition is a "common-sense measure[]," Admin. Record at AR00993, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television Stations, Inc.*, 556 U.S. at 521.

In any event, the Administrative Record submitted by the defendant further supports the rationality of the challenged conditions. Prompted partly by an Inspector General report describing deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States," Admin. Record at AR00366, the Department of Justice under the prior Administration instituted a requirement for FY 2016 Byrne JAG grantees to certify compliance with 8 U.S.C. § 1373 in order to protect the exchange of information among federal, state, and local law enforcement. *Id.* at AR00392-97. For the FY 2017 grant cycle, the Department maintained that condition and added conditions similar to the interview and custody conditions described above, to "increase[e] information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce

20

the law and keep our communities safe." *Id*. at AR00993 (Backgrounder on Grant Requirements). The FY 2018 requirements responded to further developments, including, in relation to the public-disclosure condition, at least one instance in which an elected official in another State publicly disclosed an impending federal law enforcement operation designed to apprehend suspected illegal aliens. *Id*. at AR01038-39.

Finally, as discussed above in relation to the Spending Clause, immigration enforcement undoubtedly relates to criminal justice. Numerous federal statutes expressly connect these two subjects. *See supra* text at 4-5. The public-disclosure condition thus rationally promotes interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), (4), and comports with the intergovernmental cooperation that Congress plainly contemplates in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *see also Arizona v. United States*, 567 U.S. 387, 411-12 (2012) ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

Accordingly, the public-disclosure condition is entirely rational, and this Court should not "substitute its judgment" for that of the Department of Justice. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.

## II.    Plaintiff's Remaining Claims Not Covered by the Court's Prior Ruling Are Non-Justiciable

Under Article III of the Constitution, the jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Matters outside this rubric are "nonjusticiable." *Bd. of Educ. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L.*, 89 F.3d 464, 467 (7th Cir. 1996). Two principles of justiciability are involved here: standing and ripeness. "While standing is concerned with *who* is a proper party to litigate a particular matter, the doctrines of mootness and ripeness determine *when* that litigation may occur." *Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198, 1201 (D. Haw. 1998). Where a plaintiff lacks standing or its claims are non-justiciable, the court lacks jurisdiction. *See Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 477 (7th Cir. 2013). Chicago's remaining claims are non-

21

justiciable for different reasons:  Plaintiff lacks standing to challenge the FY 2018 certification requirement, which has had no effect on the City, and plaintiff's request for a declaration regarding its compliance with 8 U.S.C. § 1324 is unripe because the Federal Government has taken no action to prosecute the City or its leaders thereunder.  (Also, as described in Part III below, plaintiff lacks standing to challenge the President's appointment of the former Acting Attorney General and that challenge is without merit.)

### A. Plaintiff Lacks Standing to Challenge the FY 2018 Certification Requirement

Counts One, Two, and Three of plaintiff's Amended Complaint challenge the FY 2018 certification requirement (among other things).  To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  The injury needed for constitutional standing must be "concrete," "objective," and "palpable," not merely "abstract" or "subjective."  *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975).  Additionally, the injury must be "certainly impending" rather than "speculative."  *Whitmore*, 495 U.S. at 157, 158.  "[S]tanding is perhaps the most important of [the jurisdictional] doctrines."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation marks omitted).

Applying these standards here, the plaintiff cannot show any "injury in fact" from the FY 2018 certification requirement.  As noted earlier, OJP has publicly announced that it is not enforcing this requirement as to Chicago and several other jurisdictions.  RJN, Ex. D.  The Office has stated that if the posture of the applicable litigation were to change "in a manner such that DOJ decides to use or enforce" the certification requirement, the Department would provide "specific, formal, written notice of DOJ's intent" to do so.  *Id.*  Such a development, however, is "specu-lative" rather than "certainly impending."  *Whitmore*, 495 U.S. at 157, 158.[8]

---

[8] In any event, the FY 2018 certification requirement is permissible on its merits for the reasons defendant's predecessor has stated in relation to the access, notice, and Section 1373

**B.     Plaintiff's Request for a Declaration Regarding Its
Compliance with 8 U.S.C. § 1324 Is Unripe**

In Count Six of its Amended Complaint, Chicago seeks a judicial declaration that its

"Welcoming City Ordinance and implementing policies" comply with 8 U.S.C. § 1324, the

federal criminal prohibition against transporting or harboring illegal aliens.  Dkt. No. 34 at 53.

A claim is constitutionally unripe and thus non-justiciable if the challenged action has not been

"formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 148-49 (1967).  In other words, "[a] claim is not ripe for adjudication

[under the Constitution] if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998)

(internal quotation marks omitted); *see Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain*

*Cty., Ind.*, 977 F.2d 287, 288-89 (7th Cir. 1992) (noting that ripeness doctrine "seeks to avoid the

premature adjudication of cases when the issues posed are not fully formed, or when the nature

and extent of the statute's application are not certain").

In assessing constitutional ripeness in the context of a "pre-enforcement challenge" to an

administrative action, the courts consider "both the fitness of the issues for judicial decision and

the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual

development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874

F.2d 624, 627 (9th Cir. 1989).  In other words, a court considers whether the court and the parties

would "benefit from deferring review until the agency's policies have crystallized and the

question arises in some more concrete and final form." *Eagle-Picher Indus., Inc. v. EPA*, 759

F.2d 905, 915 (D.C. Cir. 1985) (internal quotation marks omitted); *see Humana Hosp. Corp. v.*

*Blankenbaker*, 734 F.2d 328, 332 (7th Cir. 1984) (finding that claim was not fit for decision

where administrative proceedings had not concluded and such proceedings may "crystaliz[e] the

issues for judicial review").  Finally, to meet the hardship requirement, plaintiff must show that

---

compliance conditions, which are incorporated herein by reference. *See City of Chicago v.*
*Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167.

withholding review would result in "substantial immediate impact." *See Hinrichs v. Whitburn*, 975 F.2d 1329, 1336 (7th Cir. 1992).

Attempting to establish the ripeness of its request for a declaration regarding compliance with 8 U.S.C. § 1324, plaintiff alleges that "[h]igh-ranking Trump Administration officials have threated [sic] to prosecute local officials and governments for violation of Section 1324." Dkt. No. 34 ¶ 183. The City does not, allege, however, that the Federal Government has taken any action toward prosecuting any Chicago official under Section 1324, or even that any "high-ranking Trump Administration officials" have publicly suggested considering Section 1324 prosecutions against Chicago officials specifically. *See id.* ¶ 65. Accordingly, plaintiff's request for a declaration that its ordinances and policies comply with Section 1324 is constitutionally unripe.

### III. Plaintiff's Challenge to the Appointment of the Former Acting Attorney General Is Irrelevant to the Validity of the Challenged Grant Conditions

In Count Eight of its Amended Complaint, plaintiff seeks a declaration that the President's appointment of Matthew G. Whitaker as the Acting Attorney General on November 7, 2018, was invalid and that he therefore lacked authority to impose the challenged grant conditions, which are allegedly invalid for that reason. Dkt. No. 34 ¶¶ 189-93. But the grant conditions were not imposed by the then-Acting Attorney General.[9] Instead, they were imposed by the Assistant Attorney General for OJP. *See* RJN, Ex. C (Chicago's FY 2018 Byrne JAG award).[10] And the authority of the Assistant Attorney General for OJP to impose these grant

---

[9] On February 14, 2019, the Senate confirmed William P. Barr as Attorney General, and Mr. Barr was sworn into office, thereby terminating Mr. Whitaker's tenure as Acting Attorney General.

[10] The office of the Assistant Attorney General is currently vacant. In absence of a confirmed AAG, the authority of his office is vested in the Principal Deputy Assistant Attorney General, who acts as the head of OJP and performs the functions of the Assistant Attorney General. The Principal Deputy is the Assistant Attorney General's "First Assistant" for purposes of 28 C.F.R. § 0.137(b) and the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345 *et seq.,* and, pursuant to OJP Order No. 1001.1A, ¶ 2(a) (Oct. 31, 2014), he possesses "the authority over and responsibility for the administration and operation of OJP." From February 2017 to November 2017, the Principal Deputy served as the Acting Assistant Attorney General for OJP

conditions does not depend in any way on the validity of the former Acting Attorney General's designation. Thus, this additional challenge to the validity of the conditions is without merit, and plaintiff lacks standing to seek a declaration regarding the former Acting Attorney General's appointment.

By statute, the Assistant Attorney General for OJP is authorized to "plac[e] special conditions on all grants" issued under Chapter 101 of Title 34 (34 U.S.C. §§ 10101-10726), including grants under the Byrne JAG Program (*id.* §§ 10151 *et seq.*). *See* 34 U.S.C. § 10102(a)(6). More generally, Congress assigned responsibility for administering grants under the Byrne JAG Program to the Director of OJP's Bureau of Justice Assistance, and later transferred the functions of the Director to the Assistant Attorney General for OJP. *See id.* 10142(1) (Director responsible for "[p]roviding funds to eligible States, units of local government, and nonprofit organizations pursuant to [34 U.S.C. §§ 10151-10158 (authorizing the Byrne JAG program)]," among other statutes); Pub. L. No. 106-113, div. B, § 1000(a)(1) [title I, § 108(b)], 113 Stat. 1535, 1501A-20 (1999) ("Notwithstanding any other provision of law, effective August 1, 2000, all functions of the Director of the Bureau of Justice Assistance" under what is now codified at 34 U.S.C. § 10142(1) are "transferred to the Assistant Attorney General for the Office of Justice Programs."). Consistent with these statutory authorities, Congress appropriates funding for the Byrne JAG Program to OJP. *See, e.g.*, Pub. L. No. 115-141, 132 Stat. 348, 419 (2018).

In addition to these statutory grants of authority, the Assistant Attorney General for OJP also acts pursuant to a broad delegation of authority from the Attorney General that was made in 1991, decades before Mr. Whitaker became Acting Attorney General, and that has remained in effect continuously since then. *See* Attorney General Order No. 1473-91 (Feb. 19, 1991), RJN, Ex. E; *see also* 28 U.S.C. § 510 (authorizing Attorney General to "make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of

---

pursuant to the FVRA. Since then, he has continued to perform the functions of the Acting Attorney General in his capacity as Principal Deputy.

the Department of Justice of any function of the Attorney General"). The Attorney General delegated authority to the Assistant Attorney General for OJP, among other things, to "establish policies and priorities for the OJP agencies with respect to the award and administration of grants"; to "ensure that those grants . . . entered into by the OJP agencies are designed to accomplish the statutory purposes of the OJP agencies and conform to the policies and priorities of the Department of Justice"; to "make final determinations concerning whether such grants . . . are consistent with the established policies and priorities"; and if they are "not consistent with such policies and priorities," to "direct compliance with the established policies and priorities." Order No. 1473-91 at 1-2.

Such delegations remain valid and binding until revoked or amended by the Attorney General. *See United States v. Nixon*, 418 U.S. 683, 695-96 (1974) (reaffirming the principle that "[s]o long as [a] regulation" delegating certain powers of the Attorney General to subordinate officials "is extant[,] it has the force of law," even if the Attorney General could reassert his authority by "amend[ing] or revok[ing] the regulation" defining the subordinate's authority). Thus, even when there is a new occupant in the office of the Attorney General, such delegations remain in force, providing other officers with standing authority to carry out the delegated functions. Indeed, even if the office of the Attorney General were entirely unoccupied – by either an Acting Attorney General or a Senate-confirmed Attorney General – these delegations would remain valid and permit the Department's work to continue without interruption.

The conditions and requirements at issue in this litigation were imposed by the Assistant Attorney General for OJP pursuant to his independent statutory authority and the authority delegated to him by the Attorney General. None of this authority was derived from, or dependent on, any delegation or other action of then-Acting Attorney General Whitaker. Moreover, OJP placed the challenged conditions on Byrne JAG awards at the express direction of the prior Attorney General, Jeff Sessions. *See* Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://www.justice.gov/ opa/ pr/ attorney-general-sessions-

announces-immigration-compliance-requirements-edward-byrne-memorial (last visited Mar. 1, 2019).  As a result, even if Mr. Whitaker's designation as Acting Attorney General were invalid, it would not affect the authority of the Assistant Attorney General for OJP to impose the challenged conditions, and it therefore could not support any relief relating to those conditions. In any event, for the sake of completeness, defendant adds that plaintiff's objections to the Acting Attorney General's designation are wholly without merit, for reasons recently discussed in detail in *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, ___ F. Supp. 3d ___, No. 18-cv-2988, 2019 WL 922594, *29-30 (D.D.C. Feb. 25, 2019).

## IV.    Any Injunction Should Be Limited to the Plaintiff

Finally, Chicago's prayer for relief seeks a permanent injunction against use of the challenged requirements in the Byrne JAG Program overall, without regard to the identity of the applicant or grantee.  Dkt. No. 34 at 56.  Plaintiff lacks standing to seek such an injunction, however.  As the Supreme Court has observed many times, a plaintiff "must establish standing separately for each form of relief sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and a "plaintiffs' remedy must be limited to the inadequacy that produced [its] injury in fact," *Gill v. Whitford,* 138 S. Ct. 1916 (2018); *see City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating nationwide aspect of injunction); *accord California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (reversing nationwide preliminary injunction as abuse of discretion); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243-45 (9th Cir. 2018) (vacating and remanding nationwide injunction).  Moreover, as an equitable matter, nationwide injunctions "take a toll on the federal court system – preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue").  Indeed, many of the issues presented herein regarding the FY 2018

Byrne JAG Program are, in fact, pending in multiple other cases throughout the country, *e.g*, *Los Angeles v. Barr*, No. 2:18-cv-07347-R-JC (C.D. Cal.); *City of Providence v. Barr*, No. CA-18-437-JJM-LDA (D.R.I.); *San Francisco v. Barr*, No. 3:18-cv-05146-WHO (N.D. Cal.); *California v. Barr*, No. 3:18-cv-05169-WHO (N.D. Cal.); *Oregon v. Trump*, No. 6:18-cv-01959-MC (D. Or.), and a program-wide injunction by this Court would risk conflicting with any orders entered by other district courts.  At minimum, therefore, if the Court were to enter a nationwide injunction, its application beyond the plaintiff should be stayed pending appeal.

## CONCLUSION

Accordingly, the Court should dismiss with prejudice plaintiff's challenges to the FY 2018 public-disclosure condition and the FY 2018 certification requirement, plaintiff's request for a declaration that it complies with 8 U.S.C. § 1324, and plaintiff's challenge to the appointment of former Acting Attorney General Matthew G. Whitaker.

Dated:  March 1, 2019

<div style="margin-left:40%">

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
Assistant Branch Director

/s/ W. Scott Simpson
_____
W. SCOTT SIMPSON
Senior Trial Counsel

Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:     (202) 514-3495
Facsimile:     (217) 492-4888
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANT

</div>