# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

THE CITY OF CHICAGO,

Plaintiff,

     v.

ATTORNEY GENERAL OF THE UNITED STATES,

Defendant.

Civil Action No. 1:18-cv-6859

Hon. Harry D. Leinenweber

# COMBINED OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
# AND MEMORANDUM IN SUPPORT OF CHICAGO'S
# CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    The Department of Justice Imposes Unlawful Conditions On FY2017 JAG Funds And This Court Enjoins Them ...................................................................3

    B.    The Department Imposes Unlawful Conditions On FY2018 JAG Funds...................5

    C.    The FY2018 Conditions Again Place Chicago In An Impossible Bind ........................7

ARGUMENT .........................................................................................................................8

I.    THE FOUR REPEAT CONDITIONS ARE *ULTRA VIRES* AND UNLAWFUL AND SHOULD BE ENJOINED (AGAIN) ......................................................................8

II.    THE HARBORING CONDITION IS *ULTRA VIRES* AND UNLAWFUL AND SHOULD BE ENJOINED.................................................................................................10

    A.    The Harboring Condition Is *Ultra Vires* ........................................................11

    B.    The Harboring Condition Violates The Spending Clause ...............................16

    C.    The Harboring Condition Is Arbitrary And Capricious ..................................18

        1.    Chicago challenges final agency action .................................................18

        2.    The harboring condition violates the APA .............................................18

III.    THE ADDITIONAL CERTIFICATION REQUIREMENT IS *ULTRA VIRES* AND UNLAWFUL AND CHICAGO HAS STANDING TO CHALLENGE IT ......................20

    A.    Chicago Has Standing To Contest The Additional Certification Requirement .........20

    B.    The Additional Certification Requirement Is Unlawful...................................21

IV.    CHICAGO'S REQUEST FOR A DECLARATION IS RIPE .....................................22

V.    MATTHEW WHITAKER'S INSTALLATION AS ACTING ATTORNEY GENERAL WAS ILLEGAL, BUT THE COURT NEED NOT ADDRESS IT ......................................23

VI.    AN ONGOING PROGRAM-WIDE INJUNCTION IS PROPER ...............................24

    A.    Ongoing Injunctive Relief Is Proper ................................................................25

    B.    Program-wide Relief Is Proper .........................................................................26

CONCLUSION...................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Arlington Central School District Board of Education v. Murphy,*
548 U.S. 291 (2006) ................................................................................................16

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..................................................................................................8

*Babbitt v. United Farm Workers National Union,*
442 U.S. 289 (1979) ................................................................................................23

*Board of Regents of University of Wisconsin System v. Southworth,*
529 U.S. 217 (2000) ................................................................................................22

*California ex rel. Bercerra v. Sessions,* No. 3:17-cv-4701,
2018 WL 6069940 (N.D. Cal. Nov. 20, 2018) ........................................................4

*Charles v. Verhagen,*
348 F.3d 601 (7th Cir. 2003) ..................................................................................16

*Citizens United v. FEC,*
558 U.S. 310 (2010) ................................................................................................27

*City & County of San Francisco v. Sessions,* Nos. 18-cv-5146, 18-cv-5169,
2019 WL 1024404 (N.D. Cal. Mar. 4, 2019) ...................................................*passim*

*City & County of San Francisco v. Sessions,*
349 F. Supp. 3d 924 (N.D. Cal. 2018),
*appeal filed* (9th Cir. Dec. 4, 2018) (No. 18-17308) ........................................4, 10, 14

*City & County of San Francisco v. Trump,*
987 F.3d 1225 (9th Cir. 2018) ..................................................................................4

*City of Arlington v. FCC,* 569 U.S. 290 (2013) ............................................................11

*City of Chicago v. Sessions,* No. 17-cv-5720,
2017 WL 4572208 (N.D. Ill. Oct. 13, 2017) ..........................................................26

*City of Chicago v. Sessions,*
264 F. Supp. 3d 933 (N.D. Ill. 2017) ..................................................................*passim*

*City of Chicago v. Sessions,*
321 F. Supp. 3d 855 (N.D. Ill. July 27, 2018) ....................................................*passim*

*City of Chicago v. Sessions,*
888 F.3d 272 (7th Cir. 2018) ..............................................................................*passim*

*City of Philadelphia v. Attorney General*,
    916 F.3d 276 (3d Cir. 2019) ......................................................................*passim*

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ...............................................................14

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ................................................................4

*Decker v. O'Donnell*, 661 F.2d 598 (7th Cir. 1980) ...............................................27

*Eringer v. Principality of Monaco*, No. 10-cv-1803,
    2011 WL 13134271 (C.D. Cal. Aug. 23, 2011)..............................................12

*Federation of Advertising Industry Representatives, Inc. v.*
    *City of Chicago*,
    326 F.3d 924 (7th Cir. 2003)............................................................................21

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..........................................................................................21

*Gattem v. Gonzales*, 412 F.3d 758 (7th Cir. 2005) ...............................................19

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ...............................................26

*Government Suppliers Consol. Servs., Inc. v. Bayh*,
    975 F.2d 1267 (7th Cir. 1992)..........................................................................23

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) .........................................................................26

*Hosty v. Carter*,
    412 F.3d 731 (7th Cir. 2005)............................................................................22

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)..........................................................................................25

*Motor Vehicle Mfrs. Association of U.S., Inc. v. State Farm*,
    463 U.S. 29 (1983)............................................................................................19

*Mudd-Lyman Sales & Serv. Corp. v. UPS*,
    236 F. Supp. 2d 907 (N.D. Ill. 2002) .................................................................8

*National Federation of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)..........................................................................................25

*New York v. Dep't of Justice*,
    343 F. Supp. 3d 213 (S.D.N.Y. 2018)....................................................4, 10, 15

*NLRB v. Express Publ'g Co.*, 312 U.S. 426 (1941) ...................................................................27

*Noel Canning v. NLRB*,
    705 F.3d 490 (D.C. Cir. 2013),
    *aff'd*, 134 S. Ct. 2550 (2014) ............................................................................................24

*Oak Lawn Pavillion, Inc. v. HHS*, No. 98 C 614,
    1999 WL 1023920 (N.D. Ill. Nov. 8, 1999) ......................................................................20

*Owner-Operator Independent Drivers Association, Inc. v.*
    *Federal Motor Carrier Safety Admin.*,
    656 F.3d 580 (7th Cir. 2011) ...................................................................................... 19, 27

*Porter v. Jones*, 319 F.3d 483 (9th Cir. 2003) .......................................................................23

*Printz v. United States*, 521 U.S. 898 (1997) ........................................................................22

*Regents of the University of California v. DHS*,
    908 F.3d 476 (9th Cir. 2018) ............................................................................................26

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995) ........................................................................................................22

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................................................... 16, 17

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ........................................................................................................22

*United States Parole Comm'n v. Geraghty*,
    445 U.S. 388 (1980) ........................................................................................................20

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ................................................................................................... 11, 13

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ....................................................................................................27

*Wisconsin Right to Life, Inc. v. Schober*,
    366 F.3d 485 (7th Cir. 2004) ...................................................................................... 20, 21

*Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082 (7th Cir. 2016) .........................................8

*Zero Zone, Inc. v. United States Dep't of Energy*,
    832 F.3d 654 (7th Cir. 2016) ............................................................................................19

## DOCKETED MATERIALS

*City of Chicago v. Sessions,*
    No. 18-2885 (7th Cir. 2018)............................................................................................ 5, 18, 26

*City of Chicago v. Sessions,*
    No. 17-5720 (N.D. Ill. 2018) ...................................................................................................5, 24

*City of Evanston & U.S. Conference of Mayors v. Sessions,*
    No. 18-2734 (7th Cir. 2018)....................................................................................................... 5

*City of Evanston & U.S. Conference of Mayors v. Sessions,*
    No. 18-cv-4853 (N.D. Ill. 2018).................................................................................................. 5

*City of Los Angeles v. Sessions,*
    No. 18-cv-7347 (C.D. Cal. 2019) ...........................................................................................8, 26

*City of Los Angeles v. Sessions,*
    No. 17-cv-7215 (C.D. Cal. 2018) ............................................................................................... 4

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 1 ...............................................................................................................27

## STATUTES

5 U.S.C. § 706(2) ................................................................................................................. 18, 26

8 U.S.C.
    § 1226 ............................................................................................................... 6, 20, 22
    § 1231 ..................................................................................................................6, 20
    § 1324 .................................................................................................................*passim*
    § 1357 ............................................................................................................... 6, 20, 21
    § 1366 ............................................................................................................... 6, 20, 21
    § 1373 .................................................................................................................*passim*
    § 1644 ................................................................................................................. 2, 5, 9

28 U.S.C.
    § 508 ......................................................................................................................23
    § 2412 ....................................................................................................................10

34 U.S.C.
    § 10102 ...............................................................................................................*passim*
    § 10152 ...................................................................................................................17
    § 10153 ...............................................................................................................*passim*
    § 10156 .................................................................................................................4, 25
    § 10228 ...................................................................................................................16

**OTHER AUTHORITIES**

Kori Rumore, *When Trump Talks About Chicago, we Track it: 'The Crime Spree is a Terrible Blight'*, Chicago Tribune (Feb. 27, 2019) ........................................................................................23

Wright & Miller, *Federal Practice and Procedure* (3d ed. 2002) ................................................................. 20, 25

## INTRODUCTION

The Department of Justice claims to seek "cooperation" with State and local law enforcement agencies in pursuing its chosen civil immigration enforcement strategies. But such cooperation is, by definition, a voluntary endeavor. Here, as before, the Department actually seeks to *coerce* Chicago to submit to the demands of the federal Executive. And here, as before, the Department's efforts violate the constitutional requirements of Federalism and the Separation of Powers.

Last July, after a year of litigation and an interlocutory affirmance by the Seventh Circuit, this Court permanently enjoined the Attorney General from imposing a raft of immigration policy conditions on FY2017 Byrne JAG awards, law enforcement funding that Congress commanded the federal Executive to distribute to State and local governments according to a pre-set formula. The Court enjoined the challenged FY2017 conditions because they were unlawful: The "notice" and "access" conditions were simply *ultra vires*, as nothing at all in the JAG statute or any other statute gave the Department of Justice the authority to promulgate them. A third condition, the "Section 1373 compliance condition," was unlawful because Section 1373 unconstitutionally commandeers local government personnel to serve federal purposes and thus could not be imposed on local governments as a JAG grant condition. The Attorney General, this Court held, had no power to override Chicago's sovereign decisions about how to promote public safety and trust between police and local communities, or to dragoon the City into assisting in federal civil immigration enforcement efforts, or to turn a formula grant into a weapon of coercion. On those points, a dozen federal judges—including five other federal trial and appellate courts beyond this Court and the Seventh Circuit—are now in unanimous accord.

And yet, with the ink on this Court's FY2017 permanent injunction barely dry, the Department of Justice issued its FY2018 Byrne JAG program solicitation *with the same conditions attached*. Despite this Court's warning that, if Chicago were forced to sue again over the same conditions, the City's "lawyers would get paid," the Department sought to re-impose the same notice condition, the same access condition, and the same Section 1373 compliance condition (and a

"Section 1644 compliance condition" that is the same in substance).   Of course, Congress has not provided any new authority for the federal Executive to leverage the JAG program to coerce "cooperation" from local governments, nor has it updated Section 1373 (or the materially identical Section 1644) to remedy their constitutional defects.  All that has changed is that the Department is now on notice that those conditions are illegal.

Nor has the reasoning behind this Court's previous decisions lost any force.  And yet, in addition to conditions that this Court has already expressly rejected, the Department of Justice has also burdened FY2018 Byrne JAG funding with new immigration policy conditions that are foreclosed by that reasoning.  As the Department's motion to dismiss makes clear, its *only* claimed legal authority to impose the vague new "harboring condition" is 34 U.S.C. § 10102, the same generic provision from outside of the JAG statute that this Court, the Seventh Circuit, and others have all held provides no independent authority whatsoever to impose discretionary conditions on JAG funds.

The Justice Department's motion should be denied, and Chicago's cross-motion for partial summary judgment as against all of the FY2018 conditions should be granted.  The four repeated conditions remain unlawful and should be enjoined forthwith.  The new harboring condition is foreclosed by the precise reasoning of the FY2017 decisions by this Court and the Seventh Circuit. The new "certification requirement" is foreclosed by that reasoning too, and, notably, the Department barely tries to defend it on the merits.  And the various non-merits arguments the Department proffers each fail.  The Department cannot claim there is no final agency action here (an argument this Court already rejected in the last round of litigation) where the Department has not only conclusively decided to impose the conditions, but actually issued Chicago an award letter containing them.  It cannot claim that Chicago lacks "standing" on the basis that, after this lawsuit was filed, the Department volunteered to (temporarily) stop enforcing some of its illegal conditions in a strategic play to try to moot the litigation.  It cannot be heard to argue that any of Chicago's claims are unripe when high officials up to and including the President of the United States are publicly threatening Chicago and other so-called "sanctuary cities" with retribution and prosecution.

- 2 -

Chicago remains ready to engage in genuine cooperation with the federal government in areas of mutual agreement. Indeed, on matters like the deconfliction of active law enforcement operations, the Department of Justice does not even hint that Chicago has been anything but cooperative. This case is not about voluntary cooperation between sovereigns at all. It is about a power play to coerce compliance with legally baseless federal dictates, to which the Department clings despite the rulings of seven different federal courts. Summary judgment should be granted.

## BACKGROUND

The Court is familiar with the background of this case, which is recounted at greater length in Chicago's concurrently filed Statement of Undisputed Facts ("SUMF"). Last year, this Court permanently enjoined conditions imposed by the Department of Justice (or, the "Department") on the Byrne JAG ("JAG") program for FY2017. This action involves a largely identical set of unlawful conditions imposed by the Department on the JAG program for FY2018.

### A. The Department of Justice Imposes Unlawful Conditions On FY2017 JAG Funds And This Court Enjoins Them

Under its longstanding "Welcoming City" policy, Chicago prioritizes local crimefighting and public safety over policing federal civil immigration infractions. *See* SUMF ¶¶ 4-8. Chicago's Welcoming City Ordinance ("WCO") was enacted to build trust between the Chicago Police Department ("CPD") and immigrant communities and to ensure that "fear of deportation" would not "chill[]" effective law enforcement by dissuading "witnesses and victims" from cooperating with police. *See* SUMF ¶ 5. In its current form, the WCO prohibits City personnel from spending on-duty time "responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," except under certain limited circumstances such as where the individual has been convicted of a felony. *See* SUMF ¶ 8.

Despite the City's and CPD's considered judgment that cooperation with immigrant communities makes Chicagoans safer—and despite the City's inherent authority to direct its own law enforcement personnel—the Trump Administration has attacked Chicago and other so-called "sanctuary cities," seeking to block federal funds to them, regardless of its legal authority to do so.

- 3 -

*E.g., City & County of San Francisco v. Trump*, 987 F.3d 1225, 1234-1235 (9th Cir. 2018). In July 2017, those efforts led then-Attorney General Jefferson Beauregard Sessions III to impose new conditions on the JAG program, a formula grant program that Congress designed to fund locally determined law enforcement priorities by distributing pre-set funding amounts to State and local governments across the Nation, *see* 34 U.S.C. § 10156(d)(2)(A). *See* SUMF ¶¶ 11, 16.

For FY2017, the Attorney General imposed three immigration-related conditions on JAG recipients: (1) a requirement that, when asked, local governments provide federal agents with "advance notice of the scheduled release date and time for a particular alien" held in local custody (the "notice condition"), SUMF ¶ 18; (2) a requirement that local governments give federal immigration agents "access [to] a local-government … correctional facility" in order to interrogate "individuals who are (or are believed by such agents to be) aliens" (the "access condition"), SUMF ¶ 19; and (3) a requirement that local governments certify compliance with 8 U.S.C. § 1373, a federal law that purportedly prohibits local governments from restricting the sharing of immigration status information by local officers (the "Section 1373 compliance condition"), SUMF ¶ 20.

Every court to consider the legality of the notice, access, and Section 1373 compliance conditions has held them to be unauthorized by Congress, *ultra vires*, and a violation of the constitutional principles of Federalism and the Separation of Powers. *See, e.g., City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019); *see also, e.g., New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 243-246 (S.D.N.Y. 2018); *California ex rel. Bercerra v. Sessions*, 2018 WL 6069940 (N.D. Cal. Nov. 20, 2018); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 944 (N.D. Cal. 2018); Order, *Los Angeles v. Sessions*, No. 17-cv-7215 (C.D. Cal. Sept. 13, 2018), ECF No. 93. This Court was the first to reach that conclusion: In September 2017, the Court granted Chicago a preliminary injunction as to the notice and access conditions, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 951 (N.D. Ill. 2017), which the Seventh Circuit affirmed, *City of Chicago v. Sessions*, 888 F.3d 272, 284 (7th Cir. 2018). And, in August 2018, the Court issued a permanent injunction as to all three conditions. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873-876 (N.D. Ill. 2018), *appeal pending* No. 18-2885

(7th Cir.); Final Judgment & Order, *City of Chicago v. Sessions*, No. 17-5720 (N.D. Ill. Aug. 15, 2018), ECF No. 211; *see also City of Evanston & United States Conference of Mayors v. Sessions*, No. 18-cv-4853 (N.D. Ill. Aug. 9, 2018), ECF No. 23 at *1, *stay of injunction lifted*, No. 18-2734 (7th Cir. Aug. 29, 2018), ECF No. 13. As the Court found in issuing its injunction, "Chicago's compliance with the Conditions would damage local law enforcement's relationship with immigrant communities and decrease the cooperation essential to prevent and solve crimes both within those communities and Chicago at large." *City of Chicago*, 321 F. Supp. 3d at 877.

Responding to Chicago's request that the injunction cover future grant years and not just FY2017, the Court stated that an award of attorney's fees would be appropriate if Chicago were forced to sue again over the same conditions for the FY2018 JAG grant: If the government "impose[d] the exact same conditions without notice and force[d] [Chicago] to affirmatively file a case," the Court explained, "their lawyers would get paid." Aug. 15, 2018 Tr., *City of Chicago v. Sessions*, No. 17-cv-5720 (N.D. Ill.), at 6:4-15; *accord id.* at 3:24-4:11.

B.      **The Department Imposes Unlawful Conditions On FY2018 JAG Funds**

The Department did reimpose virtually identical conditions on the receipt of FY2018 JAG funds. *See* SUMF ¶¶ 32, 36. Specifically, the Department imposed (1) a "notice condition," which, just like the previous notice condition, requires Chicago to provide "advance notice" to federal immigration enforcement agents of the release date and time for a particular alien upon request; (2) an "access condition" which, just like the previous access condition, requires Chicago to allow federal agents to access local correctional facilities for the purpose of interrogating City detainees; (3) a "Section 1373 compliance condition," which, like the previous Section 1373 compliance condition, requires Chicago to certify compliance with 8 U.S.C. § 1373 as a condition for receiving JAG funds; and (4) the "Section 1644 compliance condition," which requires Chicago to certify compliance with 8 U.S.C. § 1644, a federal law whose text is virtually identical to Section 1373(a). *See* SUMF ¶ 36.

The Department also imposed two additional FY2018 conditions: (1) the "harboring condition," which prohibits Chicago from "direct[ly] or indirect[ly]" attempting to "conceal, harbor,

or shield from detection" any undocumented immigrant by publicly disclosing "federal law enforcement information," even when doing so would not violate anti-harboring statutes such as 8 U.S.C. § 1324; and (2) the "additional certification requirement," which requires Chicago to certify that it will not "impede" the federal government's exercise of its duties pursuant to 8 U.S.C. §§ 1357(a), 1226(a) or (c), 1231(a), or 1366(1) or (3). *See* SUMF ¶ 38. The exact content of the harboring condition has shifted over time. The FY2018 JAG solicitation provided that, to receive an award, applicants must commit "[n]ot to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a)," SUMF ¶ 32; now, to receive an award, Chicago must state that it will not disclose any "federal law enforcement information," broadly defined, *regardless* of whether such disclosure would violate Section 1324, SUMF ¶ 38.

After the FY2018 JAG application form was released, Chicago submitted its application. *See* SUMF ¶ 33. The application said that the Department planned to issue awards by the end of September—as it had every year before this immigration-related dispute arose. *See* SUMF ¶¶ 12, 35. But Chicago was not among the cities to receive an award letter when the Department began issuing grants in early October—grants to hundreds of jurisdictions, totaling nearly $59 million as of the first week of that month. *See* SUMF ¶ 34. Chicago was left with no choice but to file this lawsuit. *See* Compl., *City of Chicago v. Attorney General*, No. 1:18-cv-6859 (N.D. Ill. Oct. 12, 2018), ECF No. 1. After Chicago filed suit, the Department announced, on or about November 2, 2018, that it would not "use or enforce" the four repeat conditions and the additional certification requirement. It made no such commitment regarding the harboring condition. And it reserved the unilateral right to enforce them all "[i]f the posture of the pending litigation changes … in a manner such that [the Department] decides to use or enforce any or all of [them.]" *See* SUMF ¶¶ 37-38.

Chicago had still not yet received its award when, on November 7, 2018, Attorney General Sessions resigned at the request of the President. *See* SUMF ¶ 39. President Trump directed Matthew Whitaker, Mr. Sessions's chief of staff, to act as the Attorney General. *See* SUMF ¶ 40. Mr. Whitaker was purportedly serving in that role on November 20, 2018, when Chicago received

notification of its FY2018 JAG award. *See* SUMF ¶ 41. The award notification, however, says it was issued "[o]n behalf of Attorney General Jefferson Sessions III." *See id.*

### C. The FY2018 Conditions Again Place Chicago In An Impossible Bind

The FY2018 conditions again force the City to choose between critical funding for local law enforcement and considered policies designed to bolster public safety and foster trust between police and immigrant communities—the same choice that Chicago faced with respect to the substantively identical FY2017 conditions. *City of Chicago*, 321 F. Supp. 3d at 878; *see* SUMF ¶ 10.

And the new "harboring" condition presents additional dangers. The Trump Administration has pursued a controversial strategy of targeting noncitizens for immigration enforcement actions in "sensitive locations," such as courthouses where noncitizens might come to report crimes, serve as witnesses in criminal cases, or seek protective orders. SUMF ¶¶ 26-28. Indeed, the Administration is targeting so-called "sanctuary" jurisdictions like Chicago in particular for these controversial enforcement actions, arguing that more courthouse arrests are needed because "some law enforcement agencies no longer honor ICE detainers or limit ICE's access to their detention facilities." SUMF ¶ 27. News reports also indicate that there have been arrests at, or in close proximity to, other "sensitive" locations, such as schools and hospitals. SUMF ¶ 28. The harboring condition does far more than ensure appropriate "deconfliction" between law enforcement agencies; it purports to cover any sharing of "federal law enforcement information" that might be construed as even "indirect[ly]" "shield[ing] from detection" non-citizens who are in the U.S. without legal immigration status. SUMF ¶ 38. Chicago could find itself in the Administration's crosshairs for taking *any* action to notify City residents, even in generalized ways that pose no risk to law enforcement, about the prospect of ICE enforcement at courthouses, schools, hospitals, and other such sensitive locations—or even merely from protesting the targeting of those locations. SUMF ¶¶ 29-30, 38.

Meanwhile, although the harboring condition expressly extends far beyond the bounds of the anti-harboring statute, 8 U.S.C. § 1324, senior federal officials are also advancing a radical, new

interpretation of Section 1324. The former Acting Director of ICE, Thomas Homan, proclaimed last year that he had asked the Department of Justice to "look at" whether "sanctuary cities" violate 8 U.S.C. § 1324. SUMF ¶ 31. Kirstjen Nielsen, the Secretary of Homeland Security, confirmed before the Senate that the Department "is reviewing what avenues may be available" to criminally charge elected officials in so-called sanctuary jurisdictions, ostensibly under Section 1324. *See id.*

Chicago intends to use its FY2018 JAG funds to invest in technologies and programs that will assist CPD's Bureau of Detectives in investigating and solving violent crimes, including by permitting forensic analysis of mobile devices, making older hard-copy records computer searchable, and providing advanced interview and investigation training. *See* SUMF ¶ 14. Without JAG funds, Chicago's ability to bring violent criminals to justice will be adversely affected. *See id.*

## ARGUMENT

"To survive a motion to dismiss, the plaintiff must allege 'sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Summary judgment is proper where "'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *E.g., Mudd-Lyman Sales & Serv. Corp. v. UPS*, 236 F. Supp. 2d 907, 909 (N.D. Ill. 2002) (quoting Fed. R. Civ. P. 56(c)). That is the case here with respect to all of the challenged conditions imposed on the JAG program for FY2018.

## I. THE FOUR REPEAT CONDITIONS ARE *ULTRA VIRES* AND UNLAWFUL AND SHOULD BE ENJOINED (AGAIN)

The four repeat conditions imposed on FY2018 JAG funding are materially identical to the conditions already enjoined by this Court. *E.g., City & County of San Francisco v. Sessions*, 2019 WL 1024404, at *1, *4 (N.D. Cal. Mar. 4, 2019) (FY2018 conditions are "essentially the same" as FY2017 conditions and are unlawful); Order, *City of Los Angeles v. Sessions*, 18-cv-7347 (C.D. Cal. Feb. 15, 2019), ECF No. 62 at 5 (holding FY2018 conditions unlawful and explaining that "the substance and effect of those conditions remains the same."). The Department's motion to dismiss (at 2) concedes as much: The four repeat conditions are "very similar to FY2017 conditions that this

Court has already enjoined," and the "arguments regarding the constitutionality of Section 1373, … apply equally to Section 1644." *See also* MTD 10.[1]

Summary judgment should be granted as to all four repeat conditions. The notice and access conditions, which would force Chicago to spend City resources informing the federal government of detainee release dates and opening up City facilities for federal immigration agents, are *ultra vires*: As the Seventh Circuit held, Congress never empowered the Attorney General to use formula funding designated for *local* law enforcement priorities as a way to coerce American cities into participating in *federal* immigration enforcement efforts; rather, the text, structure, and purpose of the JAG statute refute any such authority. *City of Chicago v. Sessions*, 888 F.3d 272, 277, 283-284 (7th Cir. 2018) ("The Attorney General … used the sword of federal funding to conscript state and local authorities to aid in federal civil immigration enforcement. But the power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any immigration enforcement conditions."); *accord City of Chicago v. Sessions,* 321 F. Supp. 3d 855, 874 (N.D. Ill. 2018). And the Section 1373 compliance condition is unlawful because, among other reasons, Section 1373 constitutes unconstitutional commandeering of local government personnel.[2] As this Court held, Section 1373,

---

[1]  For the Court's convenience: The FY2018 notice condition, like the FY2017 notice condition, requires local governments to "provide … advance notice to [federal immigration authorities] of the scheduled release date and time of a particular alien" when federal authorities request it. SUMF ¶¶ 18, 36. The FY2018 access condition, like the FY2017 access condition, requires local governments to permit federal immigration agents "access to any State or local government (or government-contracted) correctional facility … for the purpose [of] interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or remain in the United States." SUMF ¶¶ 19, 36. The FY2018 section 1373 compliance condition, like the FY2017 section 1373 compliance condition, requires that the recipient comply with 8 U.S.C. § 1373(a) and (b), and to execute a certification of "compliance" with those provisions. SUMF ¶¶ 20, 36. And the FY2018 Section 1644 compliance condition is identical in substance to the FY2017 Section 1373 compliance condition, because Section 1644 is identical to subsection (b) of Section 1373. *Compare* 8 U.S.C. § 1644 *with* 8 U.S.C. § 1373(b).

[2]  Even setting aside the commandeering argument, the Section 1373 compliance condition is separately unlawful because it is *ultra vires*. While the Department has argued, and this Court has previously agreed, that the "all other applicable Federal laws" language in 34 U.S.C. § 10153(a)(5)(D) operates as a delegation of authority to impose conditions on the JAG grant, other courts have correctly concluded that "Section 1373 is not an applicable law for the purposes of Byrne JAG." *City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 291 (3d Cir. 2019).

by mandating that local officers assist federal immigration agents in doing their jobs, "impermissibly directs the functioning of local government in contravention of Tenth Amendment principles." *Id.* at 872; *accord City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018); *New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 234-235 (S.D.N.Y. 2018).

Having conceded that the four repeat conditions for FY2018 are essentially the same as the conditions that this Court already declared illegal, the Department opts (at 2) to "not discuss" those conditions in its motion. The Department has no new legal arguments to defend the four repeat conditions, and its previous arguments lacked any merit, and failed as a result. On the notice and access conditions, for example, the Department repeatedly argued that 34 U.S.C. § 10102(a)(6), a provision entirely outside of the JAG statute, provides the authority to impose immigration policy conditions on the JAG formula grant—and court after court, including this Court and the Seventh Circuit, rejected that suggestion as atextual and groundless. *See, e.g., City of Philadelphia v. Attorney General*, 916 F.3d 276, 287-288 (3d Cir. 2019); *City of Chicago*, 888 F.3d at 285; *City & County of San Francisco*, 349 F. Supp. 3d at 947-948; *New York*, 343 F. Supp. 3d at 227-228; *City of Chicago*, 264 F. Supp. 3d at 941-943. The four repeat conditions should be permanently enjoined. And after that ruling, Chicago should then be granted attorney's fees and costs for the resources it has spent contesting these and others grant conditions that lack any legal basis in light of the Court's earlier rulings. *See, e.g.*, 28 U.S.C. § 2412.[3]

## II. THE HARBORING CONDITION IS *ULTRA VIRES* AND UNLAWFUL AND SHOULD BE ENJOINED

The new harboring condition suffers from the same flaws as the repeat conditions. At bottom, it is yet another unmoored immigration policy condition imposed on the JAG formula grant program without any delegation of authority to do so from Congress. The condition prohibits JAG recipients from the "public disclosure … of any federal law enforcement information in a direct or

---

[3]     Chicago intends to file, at the appropriate time, an independent motion for attorney's fees pursuant to the relevant statutes and rules of practice. For the avoidance of any doubt, Chicago reserves the right and indeed intends to seek attorney's fees not only for the four repeat conditions, but for others, like the harboring condition, where this Court and indeed the Seventh Circuit have already rejected the only claimed legal authority for that condition. *See infra* Part II.A.

indirect attempt to conceal, harbor, or shield from detection … any alien" in the U.S. without status, regardless of whether such disclosure would violate existing anti-harboring statutes, like 8 U.S.C. § 1324. *See* Def.'s RJN Ex. C ¶ 44. As with the four repeat conditions and the FY2017 conditions that this Court already declared illegal, the Department grounds the authority to impose the harboring condition in 34 U.S.C. § 10102. The argument fares no better here. And in addition to being *ultra vires* under the prior reasoning of this Court and the Seventh Circuit, the harboring condition also violates the Spending Clause, and the Administrative Procedure Act ("APA"). Summary judgment should be granted as against the harboring condition.

> ### A.    The Harboring Condition Is *Ultra Vires*

With the JAG program, as with all federal statutes, "the Executive Branch's authority [is] circumscribed by statute because the 'power to act ... [is] authoritatively prescribed by Congress.'" *City of Chicago*, 264 F. Supp. 3d at 940 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297-298 (2013) and citing *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). "Accordingly," as this Court explained, "we must look to the statute to determine the authority of the Attorney General to impose conditions on the Byrne JAG grant." *Id.*[4] In fact, this Court and the Seventh Circuit have already performed the basic analysis with respect to the JAG statute: "The Byrne JAG statute itself grants the Attorney General explicit authority to carry out specific actions," but "[n]one of those provisions [in the JAG statute] grant the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions." *City of Chicago*, 888 F.3d at 284. Consistent with that, the Department does not argue that anything in the JAG statute itself authorizes the federal Executive to impose the harboring condition.

Rather, in its motion to dismiss (at 11-14), the Department claims that the authority to impose the harboring condition flows from 34 U.S.C. § 10102, a separate statute that "sets forth the

---

[4] The Department's preferred phrasing, "whether Congress has *delegated* sufficient authority to the Department to impose these requirements," MTD 11, produces the same result: Congress did not delegate authority to the Department to impose the contested conditions on the JAG program.

duties and functions of the Assistant Attorney General for the Office of Justice Programs [(the "AAG")]." *City of Chicago*, 888 F.3d at 284. The Department points to two parts of Section 10102, but neither provides any authority to impose grant conditions at all.

*First*, the Department points to subsections 10102(a)(2) and (a)(4), which instruct the AAG to "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice" and "maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice." Neither of those subsections authorizes imposing any conditions on any grants or grant programs, let alone on a formula grant like the JAG, where "[t]he ability of the Attorney General to depart from the distribution mandated by the formula is strictly circumscribed." *City of Chicago*, 888 F.3d at 286. The Department argues that authority to condition grant funding is somehow implicit in the word "liaison," because the term "liaison" involves "communication for mutual understanding and cooperation," and thus the requirement to "maintain liaison" must include the power to disregard the formula-based constraints of the JAG statute and impose whatever grant conditions might (in the Department's view) "facilitat[e]" effective communications between federal and local government. MTD 11 (citing Merriam-Webster). That reading "puts far more weight on 'maintain liaison' than it can hold." *City & County of San Francisco*, 2019 WL 1024404, at *8 (rejecting Department's argument).[5]

The "'powers'" listed in subsections 10102(a)(1) through (a)(5), including the "maintain liaison" provisions cited by the Department here, "address the communication and coordination duties of the AAG." *City of Chicago*, 888 F.3d at 284, 285. But they are not truly "powers" at all; they are largely "ministerial" responsibilities that belong to the AAG for the Office of Justice Programs, whose office "disseminate[s] criminal justice information and coordinate[s] with various agencies

---

[5]     The Department also cites *Eringer v. Principality of Monaco*, 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011), in which a contract that required a party to "maintain[] liaison" was described as involving "regularly shar[ing] sensitive intelligence information." That case did not involve federal grants, congressional delegations of authority to impose conditions on grants, or anything of relevance here beyond the fact that "maintaining liaison" involves the exchange of information.

and officials." *City of Philadelphia*, 916 F.3d at 288; *accord City & County of San Francisco*, 2019 WL 1024404, at *9.  The power to impose conditions on the JAG program is hardly implicit in such general duties; the AAG is perfectly able to fulfill his responsibility to communicate with and disseminate information regarding criminal justice topics to various institutions and entities without assuming the power to withhold formula grant funding that Congress specifically commanded be disbursed to local governments.  Especially given the otherwise "strictly circumscribed" nature of the JAG program—and the stark contrast with other grant programs where Congress *did* empower the AAG to impose discretionary policy conditions—it would make no sense to think that Congress tucked an incongruous delegation of power to withhold JAG funds into portions of the AAG's job description that do not even mention grants or grantmaking in the first place.  *City of Chicago*, 888 F.3d at 286-287; *City of Chicago*, 264 F. Supp. 3d at 941-942; *see also Whitman*, 531 U.S. at 468 ("Congress ... does not, one might say, hide elephants in mouseholes.").[6]

 *Second*, the Department urges (at 12-13) that the harboring condition is authorized by subsection 10102(a)(6), which provides that the AAG shall "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General . . . , including placing special conditions on all grants, and determining priority purposes for

---

[6] Even reading into the "maintain liaison" duties in subsections 10102(a)(2) and (a)(4) some modicum of power to ensure, for safety and deconfliction purposes, the confidentiality of information about specific, imminent federal law enforcement operations—a tough sell, among other reasons because the AAG for OJP does not handle deconfliction protocols for ongoing operations—the harboring condition sweeps far broader than that.  As one court explained:

> [The harboring condition] focuses not only on preventing disclosures related to harboring "fugitives of justice" but applies to "any alien." Further, it prohibits a "direct or indirect attempt" to harbor those individuals, as determined by the AAG. This language seeks the broadest coverage possible by its use of the term "indirect attempt," which has no boundary. It would be interpreted by the AAG. Given the current tension between federal and local authorities, it does not require much imagination to think that the AAG today might well consider many parts of the "sanctuary" laws as indirect attempts to harbor "aliens," despite rulings of courts around the country that have rejected DOJ's interpretations of its authority and the constitutionality of Section 1373.

*City & County of San Francisco v. Sessions*, 2019 WL 1024404, at *9.  *See also infra* p. 17.

- 13 -

formula grants." If that argument sounds familiar, it is because this Court and the Seventh Circuit have already considered and squarely rejected it as "contrary to the plain meaning of the statutory language." *E.g., City of Chicago*, 888 F.3d at 284.

Unlike subsections 10102(a)(2) and (a)(4), subsection 10102(a)(6) at least mentions the word "grants." But—as this Court, the Seventh Circuit, and other courts have held—subsection 10102(a)(6) does not convey any *independent* authority to do anything, much less to impose conditions on the JAG program. Here, just as the Department urged in the FY2017 litigation for the notice and access conditions, it insists that it may impose the harboring condition by dint of the "AAG's authority to place 'special conditions on all grants' and to determine 'priority purposes for formula grants.'" MTD 12; *see also* MTD 13 (relying on "the independent authority to 'determin[e] priority purposes for formula grants'").[7] But the "special conditions" and "priority purposes" language from subsection 10102(a)(6) are part of an "'including' clause," the "plain meaning" of which "is to set forth a subcategory of the types of powers and functions that the [AAG] may exercise *when vested in [him] either by the terms of this chapter or by delegation of the Attorney General*." *City of Chicago*, 888 F.3d at 285 (emphasis added). The "'including' clause" is emphatically not "a stand-alone grant of authority … to attach any conditions to any grants … even though that authority is not otherwise provided in the chapter and is not possessed by the Attorney General." *Id.* Reading subsection 10102(a)(6) as an independent grant of power—i.e., the very reading the Department proffers now in support of the harboring condition—is "untenable." *Id.*; *City of Chicago*, 264 F. Supp. at 943 ("[A]ny authority of the [AAG] to place special conditions on grants must flow either from the statute itself or from a delegation of power independently possessed by the Attorney General."); *accord City of Philadelphia*, 916 F.3d at 287("[T]he Attorney General's argument runs headlong into … the word 'including.'"); *City & County of San Francisco*, 349 F. Supp. 3d at 947 ("DOJ's interpretation … contradicts the plain

---

[7]      Notably, the phrase "special conditions" is also inapposite because it is a term of art referring to individualized conditions placed on high-risk grantees. *See City of Chicago*, 888 F.3d at 285 n.2; *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 617 (E.D. Pa. 2017).

meaning of the statute."); *New York*, 343 F. Supp. 3d at 228 ("[Subsection] 10102(a)(6) does not provide authority for imposing any of the challenged conditions.").

Moreover, while the statutory text "alone is sufficient to end the inquiry" with respect to subsection 10102(a)(6), every court to consider the issue has further held that the purpose and structure of the relevant statutes support the same conclusion. *E.g., City of Chicago*, 888 F.3d at 285-287. For example, as the Seventh Circuit explained, because the JAG statute "precisely describes the formula through which funds should be distributed …, and imposes precise limits on the extent to which the Attorney General can deviate from that distribution," "it is inconceivable that Congress would have anticipated that the [AAG] could abrogate the entire distribution scheme …, based on the [AAG's] decision to impose his or her own conditions—the putative authority for which is provided in a different statute." *Id.* at 286. That "inconceivable" interpretation of subsection 10102(a)(6) is the exact reading the Department now proposes to support the harboring condition. *See* MTD 13 ("[T]he authority to 'determine priority purposes,'" means "the authority to *prioritize* federal grant monies for … jurisdictions that assist in furthering relevant federal *purposes*."). And, as this Court explained, "[r]eading [subsection] 10102(a)(6) to authorize the Attorney General to impose substantive conditions on all grants under the entire chapter is discordant with the specific and clear grants of authority in other sections of the statute," where Congress *actually did* grant such authority to the Attorney General or the AAG. *City of Chicago*, 264 F. Supp. 3d at 943. The Department does not attempt to grapple with that point, either.

In a single sentence, the Department also asserts that the harboring condition is lawful because the JAG statute contains a "requirement for applicants to provide assurance of 'appropriate coordination' with affected agencies." MTD 12. But the relevant text provides only that, in issuing an award, the Department may require a certification that "there has been appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(5)(C). As a matter of plain text, the use of the past tense—"has been"—indicates that this certification deals with coordination during the grant application and review process. That reading is confirmed by the neighboring provisions of the statute, which explicitly apply to the preparation of the application itself, *see* 34 U.S.C.

- 15 -

§§ 10153(a)(5)(A), (B). *E.g.*, *City of Philadelphia*, 916 F.3d at 288 (applying *noscitur a sociis* canon to JAG statute). Because the Department identifies no statutory basis for its asserted authority to impose the harboring condition, the condition is *ultra vires*. Summary judgment should be granted on that basis alone.[8]

### B. The Harboring Condition Violates The Spending Clause

Beyond the federal Executive's lack of statutory authority to impose the harboring condition on the JAG program, summary judgment is also proper because the harboring condition violates the Spending Clause. Congress may pursue its policy objectives by conditioning receipt of federal funds on compliance with federal directives. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But such conditions must be both unambiguous, and germane to the program for which spending has been authorized. *Id.* at 207. The harboring condition violates those constraints.

*First*, for all the reasons just stated, *supra*, Congress has not unambiguously conditioned receipt of JAG funds on compliance with the Department's policy edicts. In the first instance, "*Congress* [must] make unambiguous the presence of any conditions attached to the receipt of federal funds." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003). The Department (at 17) cites this case law, but never explains how Congress made it unambiguously clear that the JAG grant would come with discretionary policy conditions attached. Moreover, even where Congress clearly authorizes conditions, they must themselves be unambiguous. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006) ("In a Spending Clause case, the key is ... what the States are clearly told regarding the conditions that go along with the acceptance of those funds.). Here, the

---

[8] The harboring condition is also inconsistent with the express provision in the JAG statute disavowing any authority on the part of federal actors to use the JAG program to "exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). The Department argues that "[Chicago's] acceptance of numerous other Byrne JAG conditions" somehow waives this statutory protection. MTD 13-14. But Chicago did not waive its sovereign right to retain control over its own police force simply because, at some earlier point, the City did not elect to spend its resources contesting other, different grant conditions with which it *agrees*.

language of the harboring condition itself is ambiguous, which is an independently fatal defect under the Spending Clause.

The harboring condition prohibits the disclosure of "law enforcement information" in an "direct[] or indirect[]" attempt "to conceal, harbor, or shield from detection" any alien illegally present in the United States. SUMF ¶ 38. The Department defines "law enforcement information" to mean any "records or information compiled for any law enforcement purpose" that is "made available, by the federal government … through any means, including, without limitation" through "any database," "any … partnership," or "any request for … assistance." *Id.* That definition is vast: It apparently includes any information that might ever flow from the federal government under any circumstance. The Department has meanwhile offered no explanation of what constitutes an "indirect" attempt to "conceal" an undocumented person. On its face, the condition is broad enough to cover a situation where, for example, Chicago learns from a federal crime statistics database that ICE raids in schools and courthouses are increasing nationally, and City officials publicly comment to note the change, criticize the policy, and warn City residents of possible ICE enforcement actions at those sensitive locations. It is not enough to say, as the Department does (at 17), that Chicago can ask OJP for clarification (which OJP can choose to provide or not). As the harboring condition comes to the Court, it is impossible for municipalities "to exercise their choice knowingly, cognizant of the consequences" of agreeing to it. *Dole*, 483 U.S. at 207.

Nor is the harboring condition germane to purposes of the JAG program, as is required. *Dole*, 483 U.S. at 207-208. The purpose of the JAG program is "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems" to local law enforcement, for use in meeting local needs and priorities. 34 U.S.C. § 10152(a)(1). That purpose does not encompass assisting in or cooperating with federal civil immigration enforcement. *See, e.g.*, *City & County of San Francisco*, 2019 WL 1024404, at *10 ("The DOJ's interest in immigration enforcement is distinct from the criminal justice focus of the Byrne JAG Program."). The Department's contrary argument (at 15), that immigration and criminal justice "intersect[]" because a

criminal conviction can render an alien removable, would justify imposing any immigration condition under the sun upon recipients of JAG formula funding.

### C.    The Harboring Condition Is Arbitrary And Capricious

In addition to all that, the harboring condition also violates the APA. That is yet another basis for summary judgment in Chicago's favor.

### 1.    Chicago challenges final agency action

The Department opens its argument to dismiss the APA claims with the assertion (at 18-19) that imposing the FY2018 conditions does not constitute final agency action. This is so, the Department says, because it "issued the City's FY 2018 Byrne JAG award pursuant to court injunctions," and thus "the consummation of OJP's decision-making process has not yet occurred." MTD 19. That argument is bizarre, and fails on multiple grounds. First, whether or not Chicago's FY2018 award has been issued does not matter at all because, as this Court held with respect to the FY2017 conditions, the decision to impose conditions on the JAG program itself "constitutes final agency action that is ripe for judicial review." *City of Chicago*, 321 F. Supp. 3d at 866. Notably, the Department did not even challenge that ruling on appeal, No. 18-2885, 7th Cir. Dkt. 5 at 4, yet it cannot explain what is different here. Second, even for an FY2018 award issued "pursuant to" a "court injunction[,]" there would still be legal consequences caused by the presence of the unlawful grant conditions. *City of Chicago*, 321 F. Supp. 3d at 866. And third, Chicago's FY2018 award in fact was not issued "pursuant to" any "court injunctions" at all. Rather, the Department issued the award after this lawsuit was filed, evidently *in anticipation* of yet another federal court order requiring it to administer the JAG program as Congress commanded. The Department's claim that the FY2018 conditions are not final should be rejected.

### 2.    The harboring condition violates the APA

Under the APA, "agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be set aside. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not

intended it to consider [or] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983). The agency also must demonstrate that its decision "was the product of reasoned decisionmaking." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 588 (7th Cir. 2011). The harboring condition fails those requirements.

Here, the Department never articulated any rationale for imposing the harboring condition. A court must look to the reasons given by the agency when it took the challenged action; it "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Zero Zone, Inc. v. United States Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (quoting *State Farm*, 463 U.S. at 43). The administrative record contains no explanation why the Department chose to implement the harboring condition other than the statement in the condition itself that it is "[c]onsistent with the purposes and objectives of federal law enforcement statutes." The Department (at 20-21) references several places in the record that purportedly justify the imposition of *other* conditions, but the only evidence in the record supposedly supporting the harboring condition are two social media posts from the mayor of Oakland, California. *See* AR 1038-1039. There is nothing in the record explaining how these posts influenced agency decisionmaking or justified a program-wide grant condition.[9] And while the Department now attempts (at 19-20) to provide reasons for the harboring condition, that is no substitute for considered agency decisionmaking in the first instance: "The Justice Department's lawyers are not allowed to supply the agency's missing rationale in its brief." *Gattem v. Gonzales*, 412 F.3d 758, 768 (7th Cir. 2005). Concerns about the need for appropriate agency decisionmaking should be at their zenith here considering the "conspicuous lack of a record surrounding why the [harboring] condition was imposed in its current form, where it could be used wittingly or unwittingly as a Trojan horse for acts and interpretations of the law that this court and others across the country have enjoined." *City & County of San Francisco*, 2019 WL

---

[9]     The only further commentary in the record is a Twitter response from someone identified as "General Deplorable" stating "One day the Law will be upheld in California and not just used to abuse & persecute innocent Christian Patriots." AR 1039.

- 19 -

1024404, at *16.  The harboring condition is both final and unlawful, and summary judgment should be granted.

## III. THE ADDITIONAL CERTIFICATION REQUIREMENT IS *ULTRA VIRES* AND UNLAWFUL AND CHICAGO HAS STANDING TO CHALLENGE IT

The other new condition imposed on the FY2018 JAG program is unlawful as well.  To receive FY2018 JAG funds, applicants must certify that they are not subject to or bound by any "law, rule, policy, or practice" that "impede[s] the exercise by federal officers of authority" under 8 U.S.C. §§ 1357(a), 1226(a), 1226(c), 1231(a), 1366(1), or 1366(3).  SUMF ¶ 38.  This certification requirement is *ultra vires*, and summary judgment should be granted against it, too.

### A. Chicago Has Standing To Contest The Additional Certification Requirement

In challenging Chicago's "standing," the Department contends (at 22-23) that it avoided any injury-in-fact from the certification requirement to Chicago by issuing a "Special Notice" announcing it would not enforce that requirement.  SUMF ¶ 38.  But the Special Notice was issued on November 2, 2018, three weeks *after* Chicago filed suit.  *See* SUMF ¶ 37.  As a matter of hornbook law, standing is measured at the commencement of the action, Wright & Miller, *Federal Practice and Procedure* § 3531, and the Special Notice did not even exist when Chicago commenced the FY2018 litigation.  The Attorney General's argument regarding the effects of the Special Notice sounds not in "standing," but in mootness.  *See, e.g.*, *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004) ("The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980))).[10]  The question is thus not whether Chicago had standing to challenge the certification requirement, but whether the voluntary withdrawal of the requirement moots Chicago's challenge.

---

[10]     *See also, e.g.*, *Oak Lawn Pavillion, Inc. v. HHS*, 1999 WL 1023920, at *4 (N.D. Ill. Nov. 8, 1999) ("Mootness traditionally involves a situation in which standing existed at the time litigation commenced, but where some event has made the issue moot before final adjudication.").

It does not. "[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), particularly where the defendant intends to resume the challenged activity once ongoing litigation is resolved, *Wisconsin Right to Life*, 366 F.3d at 491. And here, that is exactly what the Department of Justice has announced it will do: The Special Notice expressly reserves the right to enforce the FY2018 additional certification condition whenever "the posture of the pending litigation changes (or if the pending litigation is resolved)." SUMF ¶ 38. Dismissing Chicago's claims as moot would "leave the defendant free to return to his old ways" and to exploit the mootness doctrine to insulate lawless action from judicial review. *Friends of the Earth*, 528 U.S. at 189. The voluntary-cessation rule exists to protect against precisely that problem.[11]

### B.       The Additional Certification Requirement Is Unlawful

On the merits, the Department offers only a halfhearted defense of the additional certification requirement, incorporating its previous arguments regarding other conditions by reference (at 22 n.8) without pausing to explain which of those arguments it means. To the extent the Department means to rely on 34 U.S.C. § 10153(a)(5)(D), which permits the Attorney General to require JAG applicants to certify compliance with "all other applicable Federal laws," that argument fails. As this Court has explained, the "all other applicable federal laws" language encompasses, at most, those statutes with which a JAG applicant is otherwise "obligated to comply." *City of Chicago*, 264 F. Supp. 3d at 945. But Chicago is not "obligated to comply" with the statutes identified in the certification requirement, which do not apply to the City and instead set forth powers or duties of the *federal government*. For example, 8 U.S.C. § 1366 requires the Attorney General to submit reports to Congress concerning aliens held in state and federal custody. Likewise, 8 U.S.C. § 1357(a) confers

---

[11]       Although courts in this Circuit generally treat voluntary cessation by government officials with some solicitude, such solicitude is appropriate only where it is clear that the conduct will not recur. *Federation of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929-930 (7th Cir. 2003). The Department's stated intent to proceed with the conditions if the litigation is resolved in its favor precludes that treatment here.

powers on federal immigration officials to conduct warrantless interrogations, searches, and arrests of certain aliens. *See also* 8 U.S.C. § 1226(a) and (c) (Attorney General may arrest and detain certain aliens).[12]  There is no legal basis for the imposition of the certification requirement, and summary judgment should be granted as against it.

## IV.    CHICAGO'S REQUEST FOR A DECLARATION IS RIPE

The Department argues (at 23) that Chicago's Count Six, which seeks a declaration that Chicago's Welcoming City Ordinance and implementing policies comply with 8 U.S.C. § 1324, is unripe, in large part because no Executive Branch official has explicitly threatened Chicago with prosecution under that anti-harboring statute.  A plaintiff's claim is ripe "where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  Chicago has met that standard here.

*First*, Chicago's constitutionally protected interests are in play.  It is Chicago's sovereign prerogative to criticize ill-conceived federal policies, and to make its own choices about how to deploy City law-enforcement.  *See, e.g.*, *supra* pp. 7-8, 9-10, 17.  At least two cherished constitutional principles stand behind those prerogatives:  The First Amendment's guarantee of free speech, and the principles of Federalism enshrined in the Tenth Amendment.  Chicago, as a government entity, has the right to "speak for itself," *Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000), and "is entitled to say what it wishes," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995); *see also Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) (similar).  And our Federalist system prohibits the national government from turning Chicago's officials into mere puppets for federal policy choices.  *See Printz v. United States*, 521 U.S. 898, 929-930 (1997).

---

[12]    To the extent the Department means to rely on other arguments made in the FY2017 litigation—for example, that 34 U.S.C. § 10102(a)(6) grants it the power to impose conditions on grants the Department administers—both this Court, *City of Chicago*, 321 F. Supp. 3d at 874; *City of Chicago*, 264 F. Supp. 3d at 941-943, and the Seventh Circuit, *City of Chicago*, 888 F.3d at 284-287, have rejected those arguments.  *See supra* Parts I and II.A.

*Second*, the Administration has made a "credible threat of prosecution" for "harboring" under Section 1324 for Chicago's exercise of those rights.  Specifically, high-ranking Administration officials have made clear that they are considering prosecuting so-called "sanctuary jurisdictions" under Section 1324.  SUMF ¶ 31.  And officials, including the former Attorney General and others, have repeatedly identified Chicago as one such jurisdiction, based on policies such as the WCO.  *See id.*[13]  The Department now argues that none of the high-ranking officials discussing Section 1324 specifically named Chicago in their statements.  But that is not required.  Rather, where the federal government "has not disavowed any intention of invoking" the statute, the plaintiff is "not without some reason in fearing prosecution for violation" of that statute.  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979).  That is especially true where the Department is pursuing cities with similar policies:  Chicago's "present harms … flow from the threat of future actions," *Government Suppliers Consol. Servs., Inc. v. Bayh*, 975 F.2d 1267, 1275 (7th Cir. 1992).  *See also, e.g. Porter v. Jones*, 319 F.3d 483, 489-491 (9th Cir. 2003) (pre-enforcement challenge ripe where defendant had prosecuted a similarly situated entity under the challenged legal theory).  The motion to dismiss Count Six should be denied.

## V.    MATTHEW WHITAKER'S INSTALLATION AS ACTING ATTORNEY GENERAL WAS ILLEGAL, BUT THE COURT NEED NOT ADDRESS IT

Matthew Whitaker's appointment to the role of Acting Attorney General was unlawful.  He was not confirmed to that position by the United States Senate, was not serving in a Senate-confirmed role at the time of his purported appointment, and was not in the line of succession provided by the specific, applicable vacancies statute for the Office of the Attorney General, 28 U.S.C. § 508.  Mr. Whitaker thus had no authority to invoke the powers of the Office of the Attorney General and impose conditions on Chicago's FY2018 JAG award, and the conditions he

---

[13]    President Trump has also repeatedly invoked Chicago in this context, suggesting, for example, that Chicago's violent crime problems could be solved if "Democrats in Congress … cease their obstruction and do the right thing – end sanctuary cities."  *See* Rumore, *When Trump talks about Chicago, we Track it: 'The Crime Spree is a Terrible Blight'*, Chicago Tribune (Feb. 27, 2019).

imposed are therefore invalid. *E.g.*, *Noel Canning v. NLRB*, 705 F.3d 490, 499 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014).

The Department's primary counter to this point is not to defend the legality of Mr. Whitaker's appointment, but to claim that the issue is nonjusticiable because (the Department argues) the AAG, and not the Attorney General, imposed the challenged conditions. MTD 24-27. That claim cannot be squared with Chicago's FY2018 JAG grant award letter itself, which expressly states that it was issued "on behalf of [the] Attorney General" on November 20, 2018, during Mr. Whitaker's purported tenure. SUMF ¶ 41. Doubly so because the JAG conditions at issue here were not the brainchild of some lower-level appointee or technocrat, but were imposed, as the Department volunteers, at the "express direction of the prior Attorney General, Jeff Sessions." MTD 26; *see also* SUMF ¶ 16. A properly appointed Attorney General, subject to the accountability (and Senate scrutiny) that the Appointments Clause demands, might not have doubled down on Mr. Sessions's illegal directives.

Regardless, the Court need not take up this weighty constitutional issue now. In the face of challenges to Mr. Whitaker's appointment by Chicago and others, the President ultimately nominated a new Attorney General, who has since been confirmed by the Senate. Thus, while the letter issued pursuant to Mr. Whitaker's purported authority is defective, correcting the defect would be a merely ministerial task now that a properly nominated and confirmed Attorney General holds office. The Court should enjoin the challenged conditions on other grounds.

## VI.    AN ONGOING PROGRAM-WIDE INJUNCTION IS PROPER

At the remedies stage in the FY2017 litigation, Chicago requested an injunction covering future program years, but the Court limited its injunction to the FY2017 JAG program in the hope that the Department would not repeat its unlawful action. *See* Aug. 15, 2018 Tr., *City of Chicago*, No. 17-cv-5720, at 6:4-13. Sadly, the Department did. With the FY2019 JAG solicitation only a few months over the horizon, the Court should now order full relief, in the form of a blanket injunction

for all future years. And it should enjoin the conditions on a program-wide basis, which is the result required by the APA, and which is entirely consistent with Article III and equity principles.

### A.       Ongoing Injunctive Relief Is Proper

As an initial matter, Chicago has met the requirements for injunctive relief here, as it did in the FY2017 litigation. *See City of Chicago*, 321 F. Supp. 3d at 876-882; *City of Chicago*, 264 F. Supp. 3d at 949-951. As before, Chicago faces an untenable choice. It can either forgo critical JAG funds— funds that once forfeited cannot be later reclaimed, *see* 34 U.S.C. § 10156—or the City can capitulate to the unlawful conditions, sacrificing important constitutional rights and jeopardizing the invaluable trust built up over decades between law enforcement and the City's immigrant communities. SUMF ¶ 10. Addressing the same scenario last year, this Court explained that "whether to suffer this injury or else decline much-needed grant funds . . . is not a choice at all and is itself sufficient to establish irreparable harm." *City of Chicago*, 321 F. Supp. 3d at 878 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)).

As before, only an injunction can prevent this irreparable injury. The loss of trust the City would suffer from its own immigrant communities cannot be adequately remedied by money damages. *City of Chicago*, 321 F. Supp. 3d at 877-878; *City of Chicago*, 264 F. Supp. 3d at 950. Additionally, the conditions pose an incursion on Chicago's sovereignty—a structural constitutional injury that cannot be fixed with a cash payment. *See, e.g.*, *National Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 587 (2012); *accord City of Chicago*, 321 F. Supp. 3d at 878 ("[A] constitutional injury alone can constitute irreparable harm." (citing Wright & Miller, *Federal Practice & Procedure* § 2948.1)). Chicago further suffers the threat of annual litigation costs and chaos-inducing, months-long budget holes because the Department has proven that it will keep reimposing the same unlawful conditions year after year in the absence of an ongoing injunction. *See* SUMF ¶ 12.

And as before, the balance of equities and the public interest support injunctive relief. Without an injunction, the unlawful conditions here threaten permanent damages to the relationship between the City and its immigrant communities, with a concomitant degradation of public safety;

however, with an injunction, the Department would (as before) "experience[] little hardship." *City of Chicago*, 321 F. Supp. 3d at 878-879. Indeed, the "enforcement of an unconstitutional law is always contrary to the public interest." *E.g.*, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

### B. Program-wide Relief Is Proper

The Department argues that, if the Court does issue an injunction, it should be limited to Chicago only, and that this result is required as a matter of law because so-called "nationwide" injunctions are impermissible. MTD 27-28. That argument lacks merit.

To start, this Court has already resolved this question, holding that a program-wide injunction may be proper in cases like this one. *See City of Chicago v. Sessions*, 2017 WL 4572208, at *4 (N.D. Ill. Oct. 13, 2017) (denying stay of program-wide preliminary injunction "based on the need for federal uniformity and the unfairness resulting from disparate applications"); *see also City of Chicago*, 321 F. Supp. 3d 779-881 (ordering program-wide permanent injunction but staying effect in deference to pending Seventh Circuit proceedings). The issue is also currently before the Seventh Circuit, *see* Chicago Br. at 41-63, City of *Chicago v. Sessions*, No. 18-2885 (7th Cir. Nov. 8, 2018), ECF No. 19, a reason not to revisit the issue where nothing about the underlying facts supporting program-wide relief have changed. But if this Court were to revisit the merits of the issue, the result would be the same: There is no categorical bar to a program-wide injunction, which is proper under the APA, under Article III, and under equity principles.

*First*, the APA instructs that courts "shall hold unlawful and set aside agency action" found to be, *inter alia*, "not in accordance with law," "contrary to constitutional … power," or "in excess of statutory … authority." 5 U.S.C. § 706(2). Here, Chicago has sought relief under the APA, and challenged the program-wide imposition of the FY2018 conditions as the relevant "agency action." The "ordinary result" in this posture would be to match the scope of the relief to the scope of the action challenged—to "set aside" program-wide agency action on a program-wide basis. *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also*, *e.g.*, *Regents of Univ. of California v. DHS*,

908 F.3d 476, 512 (9th Cir. 2018) (this is the "normal rule in APA cases"); *Owner-Operator Indep. Drivers Ass'n*, 656 F.3d at 589 (vacating entire rule under APA).

*Second*, even leaving the APA aside, the Department's "standing" argument fails. Federal courts possess the "judicial Power of the United States," U.S. Const. art. III, § 1, which includes the "broad power to restrain acts" by injunction, *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435-437 (1941). The Department cites cases (at 27) that show that a plaintiff must establish standing for each *claim* asserted, but it never argues (nor can it) that Chicago lacks standing here and it never supports (nor can it) the implicit suggestion that a plaintiff must establish some additional "standing" to obtain its desired *remedy*. The Department's theory in this respect is not just inconsistent with the nature of Article III; it contravenes a long line of cases that recognize that where government action is "unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (affirming state-wide injunction against state-wide law) (citing *Citizens United v. FEC*, 558 U.S. 310, 333 (2010)); *see also, e.g.*, *Decker v. O'Donnell*, 661 F.2d 598 (7th Cir. 1980) (affirming program-wide injunction of agency action).

*Third*, the Department's suggestion that equity principles pose some bar to program-wide injunctions is a non-starter. For one, it is dispelled by controlling authority like *Whole Women's Health* and *Decker*. For another, it is simply wrong that program-wide or nationwide injunctions stymie the percolation of legal issues, and this case proves the point. Just last month, a federal court in Los Angeles issued a "nationwide" injunction against the FY2018 JAG conditions challenged here. Order, *City of Los Angeles v. Sessions*, 18-cv-7347 (C.D. Cal. Feb. 15, 2019), ECF No. 62. The Department still filed its motion to dismiss in this case, and Chicago still seeks summary judgment. The same thing happened in the FY2017 litigation: This Court's program-wide preliminary injunction did not prevent other jurisdictions from prosecuting additional lawsuits, which proceeded through judgment and appeal, as the *Philadelphia* litigation illustrates. Indeed, given that all those parallel suits have produced an unbroken string of rulings *against* the Department's lawless attempts to weaponize the JAG formula grant, the suggestion (at 28) that "a program-wide injunction by this

Court would risk conflicting with any orders entered by other district courts" is least compelling of all.

## CONCLUSION

The Department's motion to dismiss should be denied in its entirety, and Chicago's cross-motion for partial summary judgment should be granted.

Respectfully submitted,

April 3, 2019

JAMIE S. GORELICK (*pro hac vice*)
DAVID W. OGDEN (*pro hac vice*)
ARI HOLTZBLATT (*pro hac vice*)
ARI SAVITZKY (*pro hac vice*)
JUSTIN BAXENBERG (*pro hac vice*)
MOLLY JENNINGS (*pro hac vice*)
ARI EVANS (*pro hac vice*)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (*pro hac vice*)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

By  /s/ Edward N. Siskel
EDWARD N. SISKEL
Corporation Counsel of the City of Chicago
ANDREW W. WORSECK
Chief Assistant Corporation Counsel
JUSTIN A. HOUPPERT
SCOTT D. SPEARS
Assistant Corporation Counsel
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7129

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
LAURA KLEINMAN
TAL CHAIKEN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*