**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

THE CITY OF CHICAGO,

                         Plaintiff,

        *v.*

WILLIAM P. BARR,
Attorney General of the United States,

                      Defendant.

Civil Action No. 1:18-cv-6859

Hon. Harry Leinenweber

**DEFENDANT'S RESPONSE TO
CHICAGO'S LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Defendant William P. Barr, in his official capacity as Attorney General of the United States, responds to the Plaintiff's LR 56.1 statement of facts as follows:

**I.      Parties and Claims for Relief**

1.      Plaintiff Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois. *See* Ill. Const. art. 7, § 6(a).

**RESPONSE:**    Undisputed.

2.      Defendant William P. Barr is the Attorney General of the United States.

**RESPONSE:**    Undisputed.

3.      Chicago seeks relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706; the All Writs Act, 28 U.S.C. § 1651; the mandamus statute, 28 U.S.C. § 1361; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. Am. Compl. ¶ 21. Chicago

asserts that the Attorney General violated the U.S. Constitution, the Administrative Procedure Act, and other federal statutes. *Id.* ¶¶ 106-193.

**RESPONSE:**     Undisputed as to the nature of Plaintiff's claims.

II.     **Chicago's Welcoming City Ordinance ("WCO")**

4.     In 1985, Mayor Harold Washington promulgated Executive Order 85-1, for the stated purpose of "assur[ing] that all residents of the City of Chicago, regardless of nationality or citizenship, shall have fair and equal access to municipal benefits, opportunities and services." Request for Judicial Notice ("RJN") Ex. A (preamble). The Executive Order declared that City agents would not "request information about or otherwise investigate or assist in the investigation of the citzenship (sic) or residency status of any person" unless "required by statute, ordinance, federal regulation or court decision." *Id.* § 3. In 1989, Mayor Richard M. Daley promulgated Executive Order 89-6, which also prohibited agents of Chicago from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or residency status of any person" unless required by other law. RJN Ex. B § 3.

**RESPONSE:**     Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

5.     In 2006, the Chicago City Council unanimously enacted a predecessor of the current Welcoming City Ordinance. RJN Ex. C at 74325-74326. This ordinance (the "2006 Ordinance") incorporated much of the language and policy of the previous Executive Orders. *Id.* at 74326- 74330. The 2006 Ordinance stated that the federal government had "signal[ed] pressure to expend limited local resources on traditionally federal functions," and declared that "[r]equiring, or even promoting, local enforcement of immigration laws" would "give[] rise to an increased threat of immigrant and minority profiling and harassment."  *Id.* at 74326-74327.  The 2006 Ordinance further stated that "[s]uch an environment would cause a chilling effect on crime

prevention and solving if both witnesses and victims are called upon to weigh a need to
cooperate with local authorities against a fear of deportation, thereby undermining long-standing
efforts to engender trust and cooperation between law enforcement officials and immigrant
communities." *Id.* at 74327.

**RESPONSE:**     Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

6.     The 2006 Ordinance, like the previous Executive Orders, mandated that "[n]o
agent or agency shall request information about or otherwise investigate or assist in the
investigation of the citizenship or residency status of any person unless such inquiry or
investigation is required by Illinois State Statute, federal regulation, or court decision." *Id.* at
74328. It barred disclosure of "information regarding the citizenship or residency status of any
person unless required to do so by legal process or such disclosure has been authorized in
writing by the individual to whom such information pertains" or unless "otherwise provided
under applicable federal law." *Id.* at 74329.

**RESPONSE:**     Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

7.     In 2012, the City Council unanimously amended the 2006 Ordinance, and
renamed that section of the Municipal Code of Chicago the "Welcoming City Ordinance"
("WCO"). RJN Ex. D at 33041-43. The "Purpose and Intent" section of the WCO set forth
several findings of the City Council, including: (1) "the cooperation of all persons, both
documented citizens and those without documentation status, is essential to achieve the City's
goals of protecting life and property, preventing crime and resolving problems," (2) "assistance
from a person, whether documented or not, who is a victim of, or a witness to, a crime is
important to promoting the safety of all [Chicago] residents," and (3) "[t]he cooperation of the
City's immigrant communities is essential to prevent and solve crimes and maintain public

---
DEFENDANT'S RESPONSE TO PLAINTIFF'S L.R. 56.1 STATEMENT

order, safety and security in the entire City." *Id.* at 33043.

**RESPONSE:** Undisputed as to the existence of the Welcoming City Ordinance. The Court is

respectfully referred to that Ordinance for a complete and accurate statement of its contents.

The remainder of this paragraph is not material. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

8.      As amended in 2012, the WCO prohibits any "agency or agent" of Chicago

from spending on-duty time "responding to ICE inquiries or communicating with ICE

regarding a person's custody status or release date," unless that person is "acting pursuant to a

legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration

law." RJN Ex. E

§ 2-173-042(b). That prohibition, however, does not apply when the target of an investigation:

(1) "has an outstanding criminal warrant," (2) "has been convicted of a felony in any court of

competent jurisdiction," (3) "is a defendant in a criminal case in any court of competent

jurisdiction where a judgment has not been entered and a felony charge is pending," or (4) "has

been identified as a known gang member either in a law enforcement agency's database or by

his own admission." *Id.* § 2-173-042(c).

**RESPONSE:** Undisputed as to the existence of the Welcoming City Ordinance. The Court is

respectfully referred to that Ordinance for a complete and accurate statement of its contents.

9.      The Chicago Police Department ("CPD") has implemented the Welcoming City

Ordinance in CPD Special Order S06-14-03, "Responding to Incidents Involving Citizenship

Status." That Special Order provides that, "[u]nless acting pursuant to a legitimate law

enforcement purpose that is unrelated to the enforcement of a civil immigration law," CPD

members may not "while on duty, expend time responding to ICE inquiries or communicating with

ICE regarding a person's custody status or release date." RJN Ex. F § IV.C. That prohibition does

not apply when the subject of the inquiry either (1) "has an outstanding criminal warrant," (2) "has been convicted of a felony in any court of competent jurisdiction," (3) "is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony charge is pending," or (4) "has been identified as a known gang member either in a law enforcement agency database or by their own admission." *Id.* § IV.D.

**RESPONSE:** Undisputed as to the existence of CPD Special Order S06-14-03. The Court is respectfully referred to that Special Order for a complete and accurate statement of its contents.

10.     Lieutenant Kevin Hannigan, a CPD veteran of thirty years, has submitted a declaration that discusses his understanding of CPD's interactions with immigrant communities. Hannigan Decl. ¶¶ 1-2.  He states that "the Chicago Police Department has never instructed me or other officers to ask for or investigate a person's immigration status" and that "[i]t is our engrained practice not to do that." *Id.* ¶ 4. He avers that "[i]nteracting with residents without inquiring as to their immigration status information allows us to focus our energies on serious or violent crime and threats to public safety," *id.*, and that, "[i]n [his] view, requiring Chicago's police officers to request immigration status would drive a wedge between us and the local communities," *id.* ¶ 5. According to him, such a requirement "would run the risk of alienating portions of the Chicago population; could increase hostility toward law enforcement in vulnerable areas of the City; and could deprive officers of valuable sources of information." *Id.* ¶ 5. He states that he is "confident that the type of cooperation we are able to achieve with immigrant communities would be materially damaged if the Chicago Police Department were to begin investigating peoples' immigration status." *Id.* ¶5.  Lieutenant Hannigan also highlights the importance of the City's ability to speak freely in opposition to ICE policies targeting its immigrant communities.  *Id.* ¶ 6.  He states that "[w]hen the City publicly supports its immigrant

communities by speaking out against perceived threats to immigrant communities—for example, by declaring itself a 'sanctuary city,' or decrying and warning residents against the general possibility of ICE raids on courthouses and schools, it further builds trust between immigrant communities and local government, including law enforcement." *Id*. Lieutenant Hannigan explains that immigrant communities will be less likely to share information and "cooperate in the effort to solve violent crime" if they do not believe that local authorities take seriously threats to their security. *Id*. He further states that "gagging City or Chicago Police Department officials from speaking out in support of immigrant communities means taking away an important trust-building tool," would "undermine[] cooperation" between CPD and immigrant communities, and "damage[] public safety." *Id*.

**RESPONSE:**     Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

### III.    The Byrne JAG Program

11.    The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") "is the primary provider of federal criminal justice funding to states and units of local government."

Admin. Record at AR01171. The Byrne JAG program is overseen by the Office of Justice Programs ("OJP") within the Department of Justice ("the Department").  *Id.* at 01167.  A recent Congressional Research Service report shows that, for Fiscal Year ("FY") 2017, Congress appropriated $403 million for the Byrne JAG program. Holtzblatt Decl. Ex. A at 4. Appropriated funds are distributed to state and local governments pursuant to a statutorily-defined formula that is based on population and crime statistics. *See* 34 U.S.C. §§ 10152(a)(1), 10156.

**RESPONSE:**     The first two full sentences are undisputed.  The third full sentence is not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.  The last full sentence is a characterization

of law that requires no response.

12.  Chicago received Byrne JAG funds in 2005, the year the program began, and every year since. Sachs Decl. ¶ 3. Since 2005, Chicago has received more than $76 million in Byrne JAG funds, of which approximately $54 million has been used by the Chicago Police Department and more than $20 million has been sub-granted to Cook County and municipalities within Cook County. *Id; see also id.* ¶ 10. The Chicago Police Department's Director of Grants Management stated that "[f]rom FY2005 to FY2016, the Department of Justice had always issued Chicago's Byrne JAG grant award by the end of September of the grant year." *Id*. ¶ 10. Chicago did not receive its FY 2017 Byrne JAG funding until December 2018—approximately a year later than anticipated—and has yet to receive its FY 2018 funding. *Id*. ¶ 10. The delay in FY2017 funding forced Chicago to push back implementation of critical initiatives depending on Byrne JAG grants. *Id*. ¶ 10. The Director of Grants Management expressed his concern that "if this trend continues, and Chicago's Byrne JAG funds are tied up every year while the legal issues are sorted out in court, our ability to plan effectively and bring needed resources and best practices into the City will be adversely impacted." *Id* ¶ 22. He explained that uncertainty surrounding the status of the Byrne JAG funds presents budgetary challenges and puts at risk critical initiatives that rely on the funding. *Id* ¶¶ 14, 21-22.

**RESPONSE:**  Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

13.  Chicago has used Byrne JAG funds to support various projects ranging from acquiring critical law enforcement equipment to promoting community policing outreach and engagement.  Sachs Decl. ¶ 4-7.  Since FY 2005, for instance, Chicago has spent $33 million in Byrne JAG funds to buy nearly 1,000 police vehicles. *Id*. ¶ 4. As another example, the Byrne JAG program has been the exclusive source of funding for the Chicago Police Department's "A

Force for Good" program. *Id.* ¶ 6. The Chicago Police Department's Director of Grants Management has described "A Force for Good" as a program designed to "strengthen the capacities of community and faith-based not-for profit organizations (NFPs) to meet pressing needs in Chicago communities impacted by high rates of violent crime." *Id.*

**RESPONSE:**    Not material. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

      14.    In FY 2018, Chicago intends to use its Byrne JAG funds to increase its Bureau of Detectives' capacity to clear violent cases and bring shooters to justice. Those capacity-building efforts include a planned investment in technology that will permit forensic analysis of mobile devices; an initiative to digitize hard-copy records and make them searchable; prioritized case and evidence review of homicides, nonfatal shootings, and cold cases to generate new investigative leads; and advanced interview and investigation training for detectives. Sachs Decl. ¶ 11; Holtzblatt Decl. Ex. B at 1-4.

**RESPONSE:**    Not material. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

      15.    Twelve other localities depend on Chicago's Byrne JAG application for the funds they receive through the program each year. Sachs Decl. ¶ 23. Because Chicago's costs of preventing and investigating violent crimes far outstrip those of surrounding jurisdictions, Chicago is required to file a Byrne JAG application on behalf of these neighboring, smaller communities. *Id.*; *see* 34 U.S.C. § 10156(d)(4). Those communities receive their allocation of Byrne JAG funds only if Chicago's application is granted. *See* 34 U.S.C. § 10156(d)(4).

**RESPONSE:**    Not material. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

**IV.    The Department Imposes Three Additional Conditions On Byrne JAG Applicants**

      16.    On July 25, 2017, the Department issued a press release claiming that "[s]o-called 'sanctuary' policies make all of us less safe because they intentionally undermine our

laws and protect illegal aliens" and announcing that three immigration-related conditions would apply to FY 2017 Byrne JAG funding. Admin. Record at AR00992.

**RESPONSE:** The Court is respectfully referred to the cited press release for a complete and accurate statement of their contents.

17. Those three conditions appeared in Chicago's FY 2017 Byrne JAG award. Defendant's Request for Judicial Notice ("Def.'s RJN") Ex. B. The three challenged conditions are conditions 52, 53 and 56. Def.'s RJN Ex. B ¶¶ 52, 53, 56.

**RESPONSE:** The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

18. The first condition (the "notice" condition) required that, "when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request

… that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable … — provide the required notice to DHS." Def.'s RJN Ex. B ¶ 56.

**RESPONSE:** The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

19. The second condition (the "access" condition) required that "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local- government contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States." Def.'s RJN Ex. B ¶ 56.

**RESPONSE:** The Court is respectfully referred to the cited documents for a complete and

accurate statement of their contents.

20.     The third condition (the "Section 1373 compliance" condition) required Chicago to certify its compliance with Section 1373. Def.'s RJN Ex. B ¶¶ 52-53.

**RESPONSE:**     The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

21.     In August 2017, Chicago sought a preliminary injunction to prevent Attorney General Sessions from imposing those conditions on FY 2017 Byrne JAG funds, on grounds that the conditions were unconstitutional, *ultra vires*, and arbitrary and capricious. *City of Chicago v. Sessions*, No. 1:17-cv-5720 (N.D. Ill. Aug. 10, 2017), ECF No. 21.

**RESPONSE:**     The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

22.     This Court preliminarily enjoined the notice and access conditions. *City of Chicago v.* *Sessions*, 264 F. Supp. 3d 933, 941 (N.D. Ill. 2017). The Court did not preliminarily enjoin the Section 1373 compliance condition. *Id.* Attorney General Sessions took an interlocutory appeal from the preliminary injunction order, and the Seventh Circuit affirmed, unanimously holding that the notice and access conditions were *ultra vires* and unlawful. *City of Chicago v. Sessions*, 888 F.3d 272, 284 (7th Cir. 2018).

**RESPONSE:**     The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

23.     This Court ultimately granted summary judgment in Chicago's favor as to all three conditions, concluding in July 2018 that each of the notice, access, and Section 1373 compliance conditions were *ultra vires* and unconstitutional. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873- 876 (N.D. Ill. 2018).

**RESPONSE:**     The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

24.     The Court's final judgment declared each of the notice, access, and Section 1373 compliance conditions *ultra vires* and a violation of the constitutional principle of separation of powers, and set them aside under the Administrative Procedure Act as unlawful. Final Judgment and Order, *City of Chicago v. Sessions*, No. 1:17-cv-5720 (N.D. Ill. Aug. 15, 2018), ECF No. 211, at 2. It also permanently enjoined the Attorney General from "denying or delaying issuance of any FY 2017 Byrne JAG award insofar as that denial or delay" was based on the notice, access, or compliance condition, and prohibited the Attorney General from "using the Conditions in any FY 2017 Byrne JAG award document, delaying the processing or approval of a recipient's requests to draw upon the FY 2017 Byrne JAG funds based on the Conditions, and enforcing the Conditions against FY 2017 Byrne JAG recipients, regardless of whether those Conditions appeared in FY 2017 Byrne JAG award documents." *Id.* at 3.

**RESPONSE:**     The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

## V.     The Trump Administration Adopts Controversial Immigration Enforcement Strategies And A Broad Interpretation Of Section 1324

25.     Beyond the addition of conditions to the Byrne JAG program, the Trump Administration has adopted immigration enforcement tactics that target noncitizens in so-called "sanctuary" jurisdictions.

**RESPONSE:**     Because this statement is a characterization, not a "material fact" as contemplated by Fed. R. Civ. P. 56(c), no response is necessary.

26.     One such strategy involves targeting noncitizens inside courthouses, including

noncitizens appearing on official business at the courthouse (e.g., to seek a protective order or testify as a witness). *E.g.*, Holtzblatt Decl. Exs. C, D, E. The prior Administration had limited immigration enforcement at courthouses to targeting noncitizens fitting within certain "enforcement priorities," such as threats to national security, public safety, and border security. RJN Exs. G, H. The Trump Administration has formally expanded the scope of permissible immigration enforcement at courthouses to include "aliens who have been ordered removed from the United States but have failed to depart … and aliens who have re-entered the country illegally after being removed," RJN Ex. I, and the frequency of immigration arrests at courthouses has greatly increased. *See* RJN Ex.J.

**RESPONSE:** Because this statement is a characterization of cited documents, not "material facts" as contemplated by Fed. R. Civ. P.56(c), no response is necessary. The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

27. The Trump Administration has expressly linked its strategy of targeting people in courthouse to its disagreement with the policies of so-called "sanctuary" jurisdictions. According to a Frequently Asked Questions document jointly issued by U.S. Customs and Immigration Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), "courthouse arrests seem to be occurring more frequently" because "some law enforcement agencies no longer honor ICE detainers or limit ICE's access to their detention facilities." RJN Ex. J.

**RESPONSE:** Because this statement is a characterization of cited documents, not "material facts" as contemplated by Fed. R. Civ. P.56(c), no response is necessary. The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

28. Although the Trump Administration's formal policy is purportedly to "generally

_____

… avoid[]" taking enforcement action at schools, medical facilities, places of worship, religious ceremonies, or public demonstrations, the policy permits enforcement activity at such locations if "other law enforcement actions have led officers to a sensitive location" or "prior approval is obtained from a designated supervisory official." RJN Ex. J. News reports thus reflect immigration arrests at schools and hospitals. Holtzblatt Decl. Exs. F, G, H.

**RESPONSE:** Regarding the first sentence, the Court is respectfully referred to the cited documents for a complete and accurate statement of their contents. The last sentence contains inadmissible hearsay that is not material to this case. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

29. Chicago Mayor Rahm Emanuel has stated that it is City policy not to permit ICE to enforce federal immigration law in Chicago schools. *See* Press Conference, Chicago Mayor Rahm Emanuel (September 6, 2017),

https://livestream.com/chicagosmayor/press/videos/162377651.

**RESPONSE:** Not material. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

30. The Board President of Cook County (which is a Byrne JAG sub-grantee of Chicago) has also issued a formal proclamation opposing ICE's courthouse arrests after a resident who had previously received protection from immigration enforcement activity under the Deferred Action for Childhood Arrivals ("DACA") program was wrongfully detained in a Cook County courthouse after appearing for a minor traffic violation. Holtzblatt Decl. Ex. I.

**RESPONSE:** Not material. *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

31. The Trump Administration has also advanced a new interpretation of 8 U.S.C. § 1324. During a January 2, 2018 interview on Fox News, then-Acting Director of ICE Thomas Homan said that he had asked the Department of Justice to "look at" whether "sanctuary cities" violate 8 U.S.C. § 1324 when they "knowingly shield and harbor an illegal alien in their jail."

Holtzblatt Decl. Ex. J. Kirstjen Nielsen, the Secretary of Homeland Security, confirmed during testimony before the Senate Judiciary Committee on January 16, 2018, that "the Department of Justice is reviewing what avenues may be available" to charge elected officials in so-called sanctuary jurisdictions. Holtzblatt Decl. Ex. K. From the early days of the Trump Administration, high- ranking Department officials have identified Chicago as a so-called sanctuary jurisdiction. *See e.g.* RJN Exs. K, L.

**RESPONSE:**     Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.  Moreover, the cited statements are not final agency actions that can be challenged under the APA or otherwise in this lawsuit.

### VI.     The Department Imposes Immigration-Related Conditions On FY 2018 Byrne JAG Funding

32.     The Department of Justice's FY 2018 Byrne JAG Local Solicitation (Admin. Record at AR01167-01205) and required certifications (AR01206-01211) announced immigration-related conditions for FY 2018 Byrne JAG funding. Among the immigration-related conditions was a requirement that applicants commit "[n]ot to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a)." AR01202. And among the required certifications was a requirement that the Chief Legal Officer of the applying government entity certify that neither the "jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the 'program or activity' to be funded … that would or does … violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) …." AR01211.

**RESPONSE:**    The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

33.     Chicago submitted an application for FY 2018 Byrne JAG funding, but refused to certify that

it would comply with the immigration-related conditions. Holtzblatt Decl. Exs. L, M.

**RESPONSE:**    The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

34.    Chicago was not among the recipients of the grant awards that the Department began issuing in early October 2018. When Chicago filed this lawsuit on October 12, the Department had already issued 752 FY 2018 local awards, totaling almost $59 million. Holtzblatt Decl. ¶ 2.

**RESPONSE:**    Not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

35.    On November 20, 2018, Chicago received notification of its FY 2018 Byrne JAG award. Def.'s RJN Ex. C. The November 20 notification date was more than seven weeks later than the September 30, 2018 date the Department had projected in the FY 2018 Byrne JAG Local Solicitation. Admin. Record at AR01201.

**RESPONSE:**    The first sentence is undisputed.  The second sentence is not material.  *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

36.    Four of the conditions are nearly identical to the FY 2017 conditions this Court has already held unlawful and set aside.

    a.    The "FY 2018 notice" condition requires Chicago to "provide—as early as practicable…—advance notice to [federal immigration officials] of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from [a federal immigration authority] a formal written request pursuant to the INA that seeks such advance notice." Def.'s RJN Ex. C ¶ 46.

    b.    The "FY 2018 access" condition requires Chicago to permit "access to any State or local government (or government-contracted) correctional

DEFENDANT'S RESPONSE TO PLAINTIFF'S L.R. 56.1 STATEMENT

facility by such agents for the purpose [of] 'interrogat[ing] any alien or

person believed to be an alien as to his [or her] right to be or remain in the

United States.'" Def.'s RJN Ex. C ¶ 45.

c.   The "FY 2018 Section 1373 compliance" condition requires that the

"program or activity" funded under Chicago's Byrne JAG award comply

with 8 U.S.C. §§ 1373 (a) and (b) and that the Chief Legal Officer of the

recipient execute a certification (Admin. Record at AR01209) asserting

that the "program or activity" complies with those provisions. Def.'s RJN

¶¶41-43.

d.   The "FY 2018 Section 1644 compliance" condition requires that the

"program or activity" funded under Chicago's Byrne JAG award comply

with 8 U.S.C. § 1644 and that the Chief Legal Officer of the recipient

execute a certification (Admin. Record at AR01209) asserting that the

"program or activity" complies with that provisions. Def.'s RJN Ex. C ¶¶

41-43.

**RESPONSE:**   This statement merely characterizes a number of documents instead of setting

forth material facts.  The Court is respectfully referred to the cited documents for a complete

and accurate statement of their contents.

37.   On or about November 2, 2018, the Department of Justice announced that it would not "use or

enforce" these repeat conditions, but reserved the right to do so "[i]f the posture of the pending

litigation changes (or if the pending litigation is resolved) in a manner such that DOJ decides to

use or enforce any or all of [the repeat conditions.]" Def.'s RJN Ex. D; Holtzblatt Decl. Ex. N.

**RESPONSE:**   The Court is respectfully referred to the cited Department of Justice

_____

announcement for a complete and accurate statement of its contents.

38.    In addition to the repeat conditions, Chicago's FY 2018 Byrne JAG award contains a new

condition and an additional mandatory certification.

a.    The "harboring" condition prohibits Chicago from "direct[ly] or

indirect[ly]" attempting to "conceal, harbor, or shield from detection" any

undocumented immigrant by publicly disclosing federal law enforcement

information, even where doing so would not violate any statute, such as 8

U.S.C. § 1324(a). Def.'s RJN Ex. C ¶ 44. "[L]aw enforcement

information" is defined as any "records or information compiled for any

law enforcement purpose" that is "made available, by the federal

government … through any means, including, without limitation" through

"any database," "any law enforcement partnership or -task-force," "any

request for … assistance," or "any deconfliction (or courtesy) notice of

planned, imminent, commencing, continuing, or impending federal law

enforcement activity." *Id*.

b.    The "additional certification" condition requires Chicago to submit an

executed "Certifications and Assurances by the Chief Executive of the

Applicant Government" (Admin. Record at AR01207), which

incorporates a Chief Legal Officer "Certification Relating to 8 U.S.C. §§

1226(a) & c, 1231(a), 1324(a), 1357(a), & 1366(1) & (3)" (RJN Ex. M).

Def.'s RJN Ex. C 61. The Chief Legal Officer certification represents that

"neither the jurisdiction nor any entity, agency, or official of the

jurisdiction has in effect, purports to have in effect, or is subject to or

DEFENDANT'S RESPONSE TO PLAINTIFF'S L.R. 56.1 STATEMENT

bound by, any law, rule, policy, or practice that would apply to the 'program or activity' to be funded … that would or does— (a) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); or (b) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) or (c), 8 U.S.C. § 1231(a), or 8 U.S.C. § 1366(1) or (3)." RJN Ex. M. This updated version of the certification, which the Department revised months after releasing the FY 2018 Local Solicitation, does not include language requiring Chicago to certify compliance with 8 U.S.C. § 1324(a). *Compare* AR01211 *with* RJN Ex. M. As with the repeat conditions, the Attorney General has temporarily withdrawn this condition, but reserved the right to reimpose it "[i]f the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner such that DOJ decides to use or enforce any or all of [the repeat conditions]." Def.'s RJN Ex. D.

**RESPONSE:**   This statement merely characterizes a number of documents instead of setting forth material facts.  The Court is respectfully referred to the cited documents for a complete and accurate statement of their contents.

### VII.   Attorney General Sessions Resigns And The President Directs Matthew Whitaker To Act As Attorney General

39.   On November 7, 2018, Attorney General Sessions resigned at the request of the President.

Holtzblatt Decl. Ex. O.

**RESPONSE:**   This statement is not material because Plaintiff waived its challenge to the appointment of Mr. Whitaker as Assistant Attorney General.  *See* Plaintiff's Combined Opposition to Defendant's Motion to Dismiss and Memorandum in Support of Chicago's

_____

Cross-Motion for Partial Summary Judgment, at 23-24 (ECF No. 50). *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

40.    The President directed Matthew Whitaker, former Attorney General Sessions's chief of staff, to act as the Attorney General. Holtzblatt Decl. Ex. P. The President did so without seeking the advice and consent of the Senate. *Id.*

    **RESPONSE:**    This statement is not material because Plaintiff waived its challenge to the appointment of Mr. Whitaker as Assistant Attorney General. *See* Plaintiff's Combined Opposition to Defendant's Motion to Dismiss and Memorandum in Support of Chicago's Cross-Motion for Partial Summary Judgment, at 23-24 (ECF No. 50). *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

41.    Whitaker was serving as Acting Attorney General on November 20, 2018, when Chicago received notification of its FY 2018 Byrne JAG award. Notwithstanding Mr. Whitaker's assumption of the Acting Attorney General Role, Chicago's Byrne JAG award notification states that it was issued "[o]n behalf of Attorney General Jefferson Sessions III." Def's RJN Ex. C.

    **RESPONSE:**    This statement is not material because Plaintiff waived its challenge to the appointment of Mr. Whitaker as Assistant Attorney General. *See* Plaintiff's Combined Opposition to Defendant's Motion to Dismiss and Memorandum in Support of Chicago's Cross-Motion for Partial Summary Judgment, at 23-24 (ECF No. 50). *See* Fed. R. Civ. P. 56(a); Local Rule 56.1.

DEFENDANT'S RESPONSE TO PLAINTIFF'S L.R. 56.1 STATEMENT

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN TYLER
Assistant Director

/s/ Daniel D. Mauler
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20001
Tel: (202) 514-8095
Fax: (202) 616-8470
E-mail: dan.mauler@usdoj.gov
*Counsel for Defendant*

DEFENDANT'S RESPONSE TO PLAINTIFF'S L.R. 56.1 STATEMENT